# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

STARLINK LOGISTICS, INC.,          )
          )
    **Plaintiff,**          )
          )    **Case No. 1:12-cv-0011**
          )    **Judge Trauger**
**v.**          )
          )
ACC, LLC,          )
          )
    **Defendant.**          )

## MEMORANDUM

Pending before the court is the defendant's Motion to Dismiss (Docket No. 15), to which the plaintiff has responded (Docket No. 26), and the defendant has filed a reply (Docket No. 31). For the reasons discussed herein, the defendant's motion will be denied.

## BACKGROUND

This case arises out of the alleged discharge of toxic pollutants from a landfill site in Mount Pleasant, Tennessee.  The plaintiff, Starlink Logistics, Inc., is the owner of an approximately 1,485-acre tract of land that is located at 786 Arrow Lake Road in Mount Pleasant, Tennessee.[1]  The defendant, ACC, LLC ("ACC"), owns property situated immediately east of and adjoining Arrow Lake Road that contains an approximately 14-acre industrial landfill where wastes ("the aluminum smelting wastes")[2] from a secondary aluminum smelting plant operated by Smelter Services Corporation were previously disposed of.  During the course of its

---

[1] Unless otherwise noted, the allegations are drawn from the plaintiff's Complaint. (Docket No. 1.)

[2] These wastes allegedly consisted of aluminum salt cake, slag, and bag house dusts.

approximately 22-year operation of this landfill, ACC accepted thousands of tons of aluminum smelting wastes for disposal.

A few years after operations began, the landfill started to discharge elevated levels of pollutants offsite to an unnamed tributary that flows into Sugar Creek, which, in turn, is impounded to form Arrow Lake. Each of these water bodies is located on the plaintiff's property. The discharged pollutants include sodium and potassium chlorides, ammonia, dissolved solids, metals, and sediments. These pollutants are discharged at concentrations that allegedly exceed applicable water quality criteria by orders of magnitude. As a result, all aquatic life has been allegedly extinguished in the unnamed tributary and downstream in Sugar Creek. Surrounding trees and surface vegetation have also been destroyed as a result of the discharge. In addition, the discharge contains a high volume of sediments that have filled Arrow Lake with deep deposits of toxic "muck" that has reduced dissolved oxygen levels to a point at which no aquatic life survives in the upper portion of the lake.

Although ACC received several notices of violation from the Tennessee Department of Health and Environment (the predecessor agency to the Tennessee Department of Environment and Conservation) ("the TDEC"), the discharge of pollutants continued unabated. In 1989, the TDEC ordered ACC to close its landfill and comply with the department's rules for proper closure and post-closure care and monitoring. Despite this order, ACC nonetheless continued to dispose of the aluminum smelting wastes at its landfill until September 1993. According to the Complaint, ACC did not achieve complete closure of the landfill until July 1995.

Although ACC's landfill closed in 1995, the Complaint alleges that the discharge of contaminants from the landfill continues to enter the water bodies located on the plaintiff's

property. This discharge results from the contact between surface and groundwaters entering the landfill and buried wastes. During this contact, the entering waters pick up contaminants from the buried wastes and then discharge from the landfill as surface and subsurface leachate containing the elevated levels of pollutants.

Surface leachate exits the landfill and enters the plaintiff's property through an approximately 36-inch diameter corrugated steel culvert pipe running underneath Arrow Lake Road. Once it reaches the plaintiff's property, the surface leachate discharges into the unnamed tributary of Sugar Creek, which is between approximately 100 and 200 yards long. The tributary then empties into Sugar Creek a few hundred yards before the creek is impounded to form Arrow Lake. The Complaint alleges that, on information and belief, subsurface leachate exits the landfill and enters the plaintiff's property as perched groundwaters that seep and discharge to the unnamed tributary to Sugar Creek and also migrate into surrounding soils.

According to the Complaint, large quantities of contaminated sediment also discharge from the landfill during storm events and enter the plaintiff's property through the aforementioned culvert pipe running underneath Arrow Lake Road. This sediment then scours the unnamed tributary and Sugar Creek and ultimately deposits at the bottom of Arrow Lake. It is alleged that approximately 5-10 acres of the upper portion of Arrow Lake is filled with toxic "muck."

As a result of this continuous discharge of pollutants, the plaintiff alleges that it has investigated the soil, surface water, and groundwater on its property to determine the extent of contamination, identified individual pollutants that have entered its property, evaluated the impacts the pollutants have had on aquatic life and surrounding vegetation, and studied

alternative removal and/or remedial actions. These removal and remedial actions are aimed at stopping and/or treating the discharge, removing and/or remedying the contamination, restoring the aquatic life, and removing and replacing the distressed vegetation.

As alluded to in the Complaint, the TDEC has engaged in past enforcement actions against ACC in connection with the contaminated discharges exiting its landfill. In June 2011, both ACC and the TDEC entered into an administrative Consent Order, which was filed by ACC in the Chancery Court for Davidson County on June 9, 2011, pursuant to a petition brought under Tennessee Code Annotated §§ 68-212-114(e), 68-212-215(f), and 69-3-115(e), requesting that the court enter a judgment by consent. (Docket No. 16, Ex. 3.) The petition asserts that the TDEC neither opposed the petition's filing nor the relief requested therein. (*Id.*) In November 2011, a joint agreed order was filed in the Chancery Court, in which both the plaintiff and the TDEC were added as parties to the proceeding initiated by ACC. (Docket No. 16, Exs. 4-5.) The plaintiff contends that it has intervened in that proceeding because, among other things, the administrative Consent Order does not address all of ACC's violations resulting from the continuing discharge of pollutants from its landfill. (Docket No. 26, at 6.)

The plaintiff later commenced this action against ACC on January 19, 2012, asserting claims under the Federal Water Pollution Control Act (the "Clean Water Act"), 33 U.S.C. § 1251 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act, 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.*, and state law. (Docket No. 1, at 9-17.) The plaintiff's state law claims assert causes of action for private nuisance, negligence, and trespass. (Docket No. 1, at 15-17.) On February 15, 2012, ACC filed the pending Motion to Dismiss. (Docket No. 15.)

## <u>ANALYSIS</u>

ACC has moved to dismiss the plaintiff's Complaint on two grounds. First, it contends that the court lacks subject-matter jurisdiction over the plaintiff's claims on account of the TDEC's enforcement actions, which produced the administrative Consent Order filed by ACC in the Chancery Court on June 9, 2011. It thus contends that the Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). Alternatively, it contends that the plaintiff's Complaint fails to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Before turning to the merits of ACC's motion, the court will briefly describe the three environmental statutes under which the plaintiff has asserted its federal claims.

## I.     Federal Statutory Framework

### A.      The Clean Water Act

The purpose of the Clean Water Act ("CWA") "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, it is "illegal to discharge a pollutant into the navigable waters of the United States except as authorized by the EPA or the Army Corps of Engineers." *United States v. Holden*, 557 F.3d 698, 701 (6th Cir. 2009) (*citing* 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12)(A)). Through its National Pollutant Discharge Elimination System, 33 U.S.C. § 1342, the United States Environmental Protection Agency ("EPA") has authorized the TDEC to issue discharge permits under the CWA. *See id.*

In its Complaint, the plaintiff alleges that ACC is in violation of two permitting requirements of the CWA. First, it alleges that ACC, without ever obtaining the required

discharge permit, has continued to discharge surface leachate, subsurface leachate, and sediment-laden stormwater from its landfill into the water bodies on the plaintiff's property in violation of 33 U.S.C. § 1311.  (Docket No. 1, at 9-10.)  The plaintiff similarly alleges that ACC, without first obtaining a dredging or filling permit from the Army Corps of Engineers, 33 U.S.C. § 1344, has continued to discharge "fill material" that ultimately settles at the bottom of Arrow Lake in violation of 33 U.S.C. § 1311.  (*Id.* at 10-11.)  The plaintiff has asserted these claims pursuant to the CWA's citizen suit provision, 33 U.S.C. § 1365, which allows any individual having an interest that is or may be adversely affected to bring suit against any person who is alleged to be in violation of an effluent standard or limitation.[3]  33 U.S.C. § 1365(a) and (g); *See also Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 590 (6th Cir. 2004).

## B.      The Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act ("RCRA") "is a comprehensive environmental statute governing the treatment, storage, and disposal of solid and hazardous waste."  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996).  Its primary purpose is to reduce the generation of hazardous waste and to ensure that the waste that is generated is

_____

[3] The CWA defines an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."  33 U.S.C. § 1362(11).

The term "point source" is defined by the Act as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  The definition does not encompass "agricultural stormwater discharges and return flows from irrigated agriculture."  *Id.*

properly "treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b); *see also Meghrig*, 516 U.S. at 483.

The plaintiff has asserted three RCRA claims against ACC. The first alleges that ACC is engaging in open dumping in violation of 42 U.S.C. § 6945, because it has, and continues to discharge pollutants: (1) without obtaining the necessary permits under the CWA; (2) in violation of the TDEC's EPA-approved solid waste management plan and its specific rules concerning post-closure care of landfills; and (3) that contaminate underground drinking water sources. (Docket No. 1, at 11-13.) The second RCRA claim alleges that ACC is violating the TDEC's EPA-approved solid waste management plan and its specific post-closure landfill rules, because solid waste, its constituents, leachate, contaminated rainfall, and waste decomposition products have and continue to escape into ground and surface water offsite in quantities and concentrations that are toxic to all aquatic life and surrounding surface vegetation. (*Id.* at 13- 14.) The final RCRA claim alleges that ACC, by virtue of the continuing contaminated discharge escaping its landfill, has contributed, or is contributing "to the past or present disposal of solid waste which may present an imminent and substantial endangerment to health or the environment." (*Id.* at 14.)

Like the CWA, the RCRA contains its own citizen suit provision. The first provides that any citizen may commence a civil action against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to" the Act. 42 U.S.C. § 6972(a)(1)(A). The plaintiff's open dumping and solid waste management plan violation claims proceed under Section 6972(a)(1)(A). The RCRA also authorizes a citizen to bring suit against any person "who has contributed or who is

contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). As is made evident by the discussion in the preceding paragraph, the plaintiff's final RCRA claim proceeds under Section 6972(a)(1)(B).

## C. The Comprehensive Environmental Response, Compensation, and Liability Act

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") was enacted by Congress in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. and Sante Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). Its purpose is to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Id.* (internal quotation marks omitted). CERCLA grants private citizens the opportunity to recover the "necessary costs of response" they have incurred from a potentially responsible party that is subject to liability under the statute. 42 U.S.C. § 9607(a)(4)(B). In its Complaint, the plaintiff has asserted a claim against ACC to recover its "necessary costs of response" caused by the discharge of hazardous substances from ACC's landfill. (Docket No. 1, at 15.)

## II. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of lawsuits for lack of subject-matter jurisdiction. "Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Both parties agree that ACC's Rule 12(b)(1) motion

represents a factual attack against the subject-matter jurisdiction alleged in the Complaint. When a party makes a factual attack, "no presumptive truthfulness applies to the allegations" made in the Complaint. *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330. If such an attack "raises a factual controversy, the district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Id.* "In its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Id.*

**B.      Section 113(h) of CERCLA**

ACC first contends that Section 113(h) of CERCLA prevents the court from exercising subject-matter jurisdiction over the plaintiff's CWA and RCRA claims for injunctive relief. (Docket No. 16, at 8.) That section specifically states that, subject to certain statutory exceptions, a federal court shall not "have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) . . . to review any challenges to removal or remedial action selected under section 9604 of this title [Section 104], or to review any order issued under section 9606(a) of this title [Section 106(a)]." 42 U.S.C. § 9613(h). ACC specifically argues that the plaintiff's CWA and RCRA claims must be dismissed under this statute because they represent a "challenge" to remedial action ordered by the TDEC pursuant to the administrative Consent Order. (Docket No. 16, at 8-9.)

ACC's contention is without merit. Section 113(h) plainly bars a federal court from exercising jurisdiction to review any challenges to removal or remedial action selected *under* Section 104 or any order issued *under* Section 106(a) of CERCLA. 42 U.S.C. § 9613(h). However, the administrative Consent Order outlining the required remedial action to be

undertaken by ACC was issued pursuant to the Tennessee Hazardous Waste Management Act of 1983 ("THWMA"), Tenn. Code Ann. § 68-212-201 *et seq.* (2011), the Tennessee Water Quality Control Act of 1977 ("TWQCA"), Tenn. Code Ann. § 69-3-101 *et seq.* (2004), and the Tennessee Solid Waste Disposal Act ("TSWDA"), Tenn. Code Ann. § 68-211-101, *et seq.* (2011), not CERCLA.  Indeed, as the plaintiff points out in its opposition brief, the administrative Consent Order fails to cite any CERCLA section.  (Docket No. 26, at 8.)

Moreover, to the extent that ACC argues that the TDEC Commissioner was granted remedial authority to carry out actions pursuant to Section 104 of CERCLA, that contention is equally unavailing.  (*See* Docket No. 16, at 9.)  CERCLA specifically provides that a state may apply to carry out actions authorized in Section 104 and, if approved, it may enter into a contract or cooperative agreement with the EPA to carry out such actions.  *See* 42 U.S.C. § 9604(d)(1)(A).  Here, ACC has failed to provide any evidence of a contract or cooperative agreement between the State of Tennessee and the EPA allowing the state to carry out actions pursuant to Section 104.  Instead, it cites a September 28, 2005 letter from the EPA to the TDEC, stating that certain state response programs related to the THWMA and the Tennessee Inactive Hazardous Substance Site Remedial Action Program are eligible to receive federal funding pursuant to Section 128(a) of CERCLA.  (Docket No. 16, at 9 n. 5; Docket No. 16, Ex. 6.)  This letter neither references Section 104(d)(1)(A), which again authorizes a state to apply to the EPA to carry out actions authorized in Section 104, nor otherwise indicates that it constitutes an agreement to allow the State of Tennessee to order remedial action under that section.  (Docket No. 16, Ex. 6.)

While ACC cites two cases, *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236 (9th Cir. 1995) and *Long v. Tenn. Valley Auth.*, No. 3:09-cv-114, 2010 WL 1223917 (E.D. Tenn. Mar. 24, 2010), for the proposition that courts have applied Section 113(h) broadly to bar lawsuits attacking remedial actions that were already underway, those cases are inapposite. (Docket No. 16, at 9.) In contrast to this case, the consent orders at issue in both *Razore* and *Long* were issued by the EPA pursuant to authority granted by CERCLA. *Razore*, 66 F.3d at 239; *Long*, 2010 WL 1223917, at *8. Moreover, neither of these cases stands for the proposition that Section 113(h) precludes a federal court from exercising jurisdiction over any challenges, including those brought under the CWA and the RCRA, to remedial actions ordered, as here, by a state agency pursuant to state statutory authority.[4]

**C.      CWA Citizen Suit Bar**

ACC next argues that two provisions of the CWA, 33 U.S.C. § 1365(b)(1)(B) and 33 U.S.C. § 1319(g)(6)(A), preclude the court from exercising subject-matter jurisdiction over the plaintiff's claims under the Act. (Docket No. 16, at 10.) Both of these provisions are exceptions to the citizen suit provision found in Section 1365(a) of the CWA. In analyzing ACC's argument, the court will address each statutory provision in turn.

Section 1365(b)(1)(B), provides, in pertinent part, that:

> No action may be commenced . . . if the Administrator or *State has commenced* and is diligently prosecuting *a civil or criminal* action *in a court of* the United States, or *a State* to require compliance with the standard, limitation, or order . . . .

---

[4] Having concluded that, by virtue of its plain language, the jurisdictional bar contained in Section 113(h) is not applicable, the court need not address the plaintiff's remaining contentions concerning the statute.

33 U.S.C. § 1365(b)(1)(B) (emphasis added).  ACC contends that this section bars the plaintiff's CWA claims because it voluntarily filed a petition in the Chancery Court seeking entry of a consent judgment pursuant to the terms contained in the administrative Consent Order it entered into with the TDEC.  (Docket No. 16, at 14.)  Yet, as the plaintiff notes, ACC's voluntary filing of the aforementioned petition does not constitute a civil or criminal enforcement action commenced by the TDEC in a state court.  Indeed, as the petition itself makes clear, the agreement reached between ACC and the TDEC constitutes an administrative Consent Order, as opposed to a consent agreement reached between the parties as a result of a judicial enforcement action that had been previously commenced by the State.  (Docket No. 16, Ex. 3.)  ACC has not otherwise pointed to any proof in the record demonstrating that the TDEC commenced any civil or criminal enforcement action against it in state court.  For these reasons, ACC's contention must fail.[5]

The second statutory provision cited by ACC, Section 1319(g)(6)(A), provides, in pertinent part, that:

> [A]ny violation - -
>
> . . . .
>
> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . .
>
> . . . .
>
> shall not be the subject of a civil penalty action under . . .  section 1365 of this title.

[5] Having concluded that the TDEC did not commence a civil or criminal enforcement action against ACC in state court, the court need not reach the separate issue of whether the TDEC is diligently prosecuting such an enforcement action.

33 U.S.C. § 1319(g)(6)(A).  In support of its argument that Section 1319(g)(6)(A) bars the plaintiff's CWA claims, ACC asserts that the CWA and the TWQCA are comparable laws. (Docket No. 16, at 11.)  In particular, it contends that both statutes share comparable goals, penalty provisions, enforcement schemes, and mechanisms to provide citizens with a meaningful opportunity to participate at significant stages of the decision-making process.  (*Id.* at 11-12.) However, despite its best efforts to demonstrate comparability, ACC's contention must be rejected, because the Sixth Circuit squarely held, in *Jones v. City of Lakeland, Tenn.*, 224 F.3d 518, 524 (6th Cir. 2000), that the CWA and the TWQCA are not comparable statutes.

In reaching this determination, the Court of Appeals found that the TWQCA and the Tennessee Open Meetings Act, Tenn. Code Ann. § 8-44-101 *et seq*. (2011), failed to provide citizens with a meaningful opportunity to participate in administrative enforcement proceedings or to initiate an original action.  *Lakeland*, 224 F.3d at 523-24.  It also noted that citizens' ability to access the judicial process is not unconditional, but is instead subject to the discretion of the TDEC.  (*Id.* at 524.)  Despite its holding, ACC unsuccessfully attempts to distinguish *Lakeland*, arguing that, unlike the plaintiffs in that case, the plaintiff here has actively participated in judicial proceedings in the Chancery Court.  (Docket No. 16, at 15.)  In making this argument, ACC relies on the following language in the *Lakeland* decision:

> The only window for redress available to the plaintiffs in the instant case, and others similarly situated, occurs in an ongoing administrative action by the TDEC before the Water Quality Control Board when Tennessee law requires that, if a consent judgment is entered between the TDEC and an offending party and filed with the chancery court, the court shall withhold final judgment for forty-five days during which adversely affected parties shall be permitted to intervene.  Tenn. Code Ann. § 69-3-115(e)(2).  *See Jones*, 175 F.3d at 416 . . . Needless to say, the language of Tennessee Code § 69-3-

115(e)(2) presupposes that a final order of the TDEC has been filed with the chancery court as a condition precedent to invoking its jurisdiction. It is apparent from Tennessee public records attached to the complaint and the Affidavit of David A. McLaughlin, an attorney for the plaintiffs, [that] *not one of the four orders* issued by the TDEC and/or Water Quality Control Board, relied upon by the district court in arriving at its decision, *were filed with the chancery court by the State or any of its agencies during the ten or more years of this ongoing enforcement proceeding*. Consequently, the plaintiffs and other similarly affected citizens are, at the discretion of the TDEC, denied access to both the courts and to a meaningful opportunity to participate at significant stages of the administrative decision-making process, to adequately safeguard their legitimate interests as mandated by the Clean Water Act. Accordingly, the TWQCA and related Tennessee statutes are not comparable to 33 U.S.C. § 1365(a)(1)(b) and/or 33 U.S.C. § 1319(g)(6).

224 F.3d at 524. ACC thus argues that *Lakeland* is inapplicable here because the administrative Consent Order entered into between itself and the TDEC was filed in the Chancery Court, and the plaintiff has timely intervened in the proceedings there. (Docket No. 16, at 15.)

The flaw in ACC's argument is that it assumes that the Court of Appeals' decision in *Lakeland* concerning comparability solely turned on the issue of whether the plaintiffs had the opportunity to participate in proceedings before the Chancery Court. However, as the penultimate sentence of the quoted language above demonstrates, the Court of Appeals held that the TWQCA was not comparable to the Clean Water Act because the TWQCA and related state statutes "denied access to *both* the courts *and* to a meaningful opportunity to participate at significant stages of the administrative decision-making process." *Lakeland*, 224 F.3d at 524 (emphasis added). Moreover, it is immaterial that the plaintiff in this case has actively participated in proceedings before the Chancery Court. As the quoted language makes clear, the reason the TWQCA was found to deny citizens access to a judicial forum was because such access was not unconditional, but was instead subject to the discretion of the TDEC. *See id.* at

524.  Indeed, ACC's argument only serves to highlight the discretionary nature of judicial access under the TWQCA, as the plaintiff was only able to participate in the Chancery Court proceedings because ACC happened to file a petition (with the consent of the TDEC) attaching the administrative Consent Order.  Thus, ACC's contention is without merit.[6]

### D.    RCRA Citizen Suit Bar

ACC lastly contends that all three of the plaintiff's RCRA claims are barred by Section 6972(b)(2)(B)(iv) of the Act because the Commissioner of the TDEC has issued an administrative Consent Order concerning the landfill.  (Docket No. 16, at 12-13.)  Section 6972(b)(2)(B)(iv) of RCRA provides that:

> (B) No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment - -
>
> . . . .
>
> (iv) has obtained a court order (including a consent decree) or issued an administrative order under section 106 of . . . [CERCLA] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

42 U.S.C. § 6972(b)(2)(B)(iv).  While ACC contends that this provision bars all of the plaintiff's RCRA claims, the statutory text plainly demonstrates that its scope is limited to only those claims brought under Section 6972(a)(1)(B) of the RCRA.  Thus, ACC cannot rely on this particular bar, to the extent it seeks to dismiss the plaintiff's open dumping and solid waste management plan violation claims, since those claims are brought under Section 6972(a)(1)(A).

---

[6]  Having concluded that the TWQCA is not comparable to the Clean Water Act so as to trigger the Section 1319(g)(6) bar, the court need not consider the separate issue of whether the TDEC is diligently prosecuting its enforcement action against ACC.

As for the plaintiff's imminent and substantial endangerment claim, which is brought under Section 6972(a)(1)(B), ACC's reliance on Section 6972(b)(2)(B)(iv) to argue for dismissal is unavailing. In its opposition brief, the plaintiff asserts that this bar is inapplicable, because the administrative Consent Order was not issued by the Administrator of the EPA. (Docket No. 26, at 17-18.) The court agrees.

Again, Section 6972(b)(2)(B)(iv) expressly states that a citizen's imminent and substantial endangerment claim is barred if "the *Administrator* . . . has . . . issued an administrative order under section 106 of . . . CERCLA or section 6973" of RCRA. 42 U.S.C. § 6972(b)(2)(B)(iv) (emphasis added). The term "Administrator" is defined under the RCRA to mean "the Administrator of the Environmental Protection Agency." 42 U.S.C. § 6903(1). The administrative Consent Order here was issued by the Commissioner of the TDEC. Therefore, Section 6972(b)(2)(b)(iv) is inapplicable.[7] Accordingly, the plaintiff is not barred from proceeding on its imminent and substantial endangerment claim.[8] *See Natural Res. Def. Council*

---

[7] ACC also asserts in passing that the Commissioner of the TDEC operated as the Administrator's designee (Docket No. 16, at 13), yet it has offered no evidentiary support for this assertion. Moreover, one court in this district has explained that, "[a]lthough Congress has delegated certain RCRA hazardous and solid waste authority to the States, Congress did not delegate RCRA's endangerment provisions to the States." *Orsted v. City of Dickson*, Nos. 3:07-0727, 3:07-732 (Memorandum, at 59) (Docket No. 314) (M.D. Tenn. Mar. 25, 2009) (Haynes, J.)

In any event, even if the court assumed that the Commissioner of the TDEC acted as the Administrator's designee, Section 6972(b)(2)(b)(iv) would still be inapplicable because the administrative Consent Order was issued under state law, not Section 106 of CERCLA or Section 6973 of the RCRA. Indeed, the administrative Consent Order fails to cite to any provisions of either of these federal statutes.

[8] In its reply brief, ACC, for the first time, contends that the plaintiff's imminent and substantial endangerment claim should be dismissed for lack of subject-matter jurisdiction because it did not comply with the statute's notice provisions. (Docket No. 31, at 9.) Specifically, ACC contends that the plaintiff did not allege in the Complaint that it provided the

*v. Cnty. of Dickson, Tenn.*, No. 3:08-0229, 2010 WL 1408797, at *3 (M.D. Tenn. Apr. 1, 2010) (concluding that Section 6972(b)(2)(b)(iv) did not bar a citizen suit because "the TDEC Commissioner's Order is not an administrative order issued by the EPA Administrator regarding an imminent hazard.")

Thus, for all of the foregoing reasons, ACC's Rule 12(b)(1) Motion to Dismiss will be denied.

## III.     Motion to Dismiss for Failure to State a Claim

### A.     Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The

---

statutorily required 90-day notice of the alleged endangerment to ACC, the Administrator of the EPA, and the State of Tennessee prior to commencing this action. *See* 42 U.S.C. § 6972(b)(2)(A).

Contrary to ACC's contention otherwise, the Complaint does allege that written notice of the plaintiff's "intention to commence this action was given to ACC as required by . . . 42 U.S.C. § 6972(b)." (Docket No. 1, at 2.) Nonetheless, it is also true that the Complaint only alleges that 60, not 90 days notice was given to ACC, and it does not otherwise allege that notice was given to the Administrator of the EPA and the State of Tennessee. (*See id.*) However, as mentioned above, ACC raised this argument for the first time in its reply brief. Such arguments "are generally not considered because such a practice deprives the non-moving party of its opportunity to address the new arguments." *G.C. ex rel. Johnson v. Wyndham Hotels and Resorts, LLC*, 829 F.Supp.2d 609, 614 (M.D. Tenn. 2011) (internal quotation marks omitted). Given that ACC raises this argument in the context of a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction that attacks the factual allegations contained in the Complaint, the court believes that the plaintiff should be given an opportunity to present evidence regarding the issue of notice that may rebut ACC's lately-asserted charge. Accordingly, the court will not consider this argument in resolving the pending motion. ACC may again raise this issue in a properly supported motion at a later time.

Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009).

**B        CERCLA Section 107(a) Cost Recovery Claim**

Again, CERCLA's purpose is to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Burlington N. and Sante Fe Ry. Co.*, 556 U.S. at 602 (internal quotation marks omitted). Section 107(a) of CERCLA identifies four categories of potentially responsible parties ("PRPs") subject to liability:

> (1) the current owner or operator of a waste facility; (2) any previous owner or operator during any time in which hazardous substances were disposed at a waste facility; (3) any person who arranged for disposal or treatment of hazardous substances at the waste facility;

and (4) any person who transported hazardous substances to a waste facility.

*Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347 n.8 (6th Cir. 1998)

(*citing* 42 U.S.C. § 9607(a)(1)-(4)). Under Section 107(a)(4), PRPs are specifically liable for

"all costs of removal or remedial action incurred by the United States Government or a State or

an Indian tribe" and for "any other necessary costs of response incurred by any other person."

42 U.S.C. § 9607(a)(4)(A)-(B). Thus, while CERCLA allows the government to recover its

costs from a PRP, the statute also grants private parties the opportunity to recover their

"necessary costs of response." *Id.*; *see also United States v. Atl. Research Corp.*, 551 U.S. 128,

131 (2007).

As a result of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"),

Pub.L. No. 99-499, 100 Stat. 1613, CERCLA also grants an express right of contribution in

certain circumstances. 42 U.S.C. § 9613(f). Specifically, Section 113(f)(1) allows any person to

seek contribution from a PRP during or following any civil action brought under Section 106 or

Section 107(a). 42 U.S.C. § 9613(f)(1). Section 113(f)(3)(B) allows a person to seek

contribution after resolving its liability with the federal or state government in an administrative

or judicially approved settlement. 42 U.S.C. § 9613(f)(3)(B).

In *United States v. Atlantic Research Corp.*, the Supreme Court held that PRPs could

maintain a private right of action under Section 107(a) to recover necessary response costs from

other PRPs. 551 U.S. at 131. After reaching this holding, the court nonetheless interpreted

Section 107(a) to allow a PRP to recover only those response costs that it voluntarily incurred.

*Id.* at 139 n.6. By contrast, the court observed that Section 107(a) would not permit a liable PRP

to recover the sums it paid to reimburse other parties for the response costs they incurred. *Id.* at

139.  In such situations, the PRP would only be eligible to seek contribution under Section

113(f).  *Id.*  The court left open the issue of what statutory avenue of recovery was available to a

PRP who sustained expenses pursuant to a consent decree following a suit brought under Section

106 or 107(a).  *Id.* at 139 n.6  It noted that, "[i]n such a case, the PRP does not incur costs

voluntarily but does not reimburse the costs of another party."  *Id.*  Nevertheless, the court stated

that it would "not decide whether these compelled costs of response are recoverable under §

113(f), § 107(a), or both."  *Id.*

    In the instant case, the plaintiff seeks to recover its costs of response caused by the

release of hazardous substances from ACC's landfill under Section 107(a) of CERCLA.  (Docket

No. 1, at 15.)  ACC moves to dismiss this claim on the sole ground that all of the alleged

response costs were incurred by the plaintiff pursuant to an administrative Consent Order that it

entered into with the TDEC.  (Docket No. 16, at 16.)  ACC adds that such compelled response

costs are not available under Section 107(a), in light of opinions issued by various courts of

appeals in the wake of the *Atlantic Research* decision.  (*Id.* at 17.); *See Solutia, Inc. v. McWane,*

*Inc.*, 672 F.3d 1230, 1237 (11th Cir. 2012) (concluding that a party incurring direct cleanup costs

pursuant to a consent decree following a lawsuit brought under Section 106 or 107 may not seek

those costs under Section 107(a)); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 603

(8th Cir. 2011) (holding that "section 113(f) provides the exclusive remedy for a liable party

compelled to incur response costs pursuant to an administrative or judicially approved settlement

under" Sections 106 or 107); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229

(3d Cir. 2010) (holding that plaintiffs cannot maintain Section 107(a) claims for recovery of

costs "incurred pursuant to consent decrees in a CERCLA suit"); *Niagara Mohawk Power Corp.*

*v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127-28 (2d Cir 2010) (concluding that a PRP that settles its CERCLA liability with a governmental agency can only seek contribution under Section 113(f)).

As explained above, ACC relies on an administrative Consent Order ("the SLLI Consent Order") that the plaintiff entered into with the TDEC to support its argument. ACC attached this document as an exhibit to the memorandum of law in support of its motion to dismiss. (*See* Docket No. 16, Ex. 1.) In opposing ACC's motion, the plaintiff objects to ACC's use of this exhibit because ACC: (1) makes arguments in support of its Rule 12(b)(6) motion based on its own interpretation of the factual statements contained in the exhibit; (2) has not authenticated the exhibit; and (3) has not otherwise presented a valid basis for the court to take judicial notice of the SLLI Consent Order. (Docket No. 26, at 5, 23.) ACC failed to respond to any of these arguments in its reply brief.

The court finds that the plaintiff's argument is well-taken and will disregard the SLLI Consent Order in analyzing the pending motion. The court also notes that, even if it were to assume that the SLLI Consent Order was an authenticated public record that it could consider in analyzing the present motion, it could nonetheless only take judicial notice of the document's existence, and not the truth of the facts recited therein. *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008); *Passa v. City of Columbus*, 123 Fed.Appx. 694, 697 (6th Cir. 2005). Indeed, as a general matter, "a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa*, 123 Fed.Appx. at 697. Here, ACC argues that the SLLI Consent Order governs all remedial action undertaken by the plaintiff on its own brownfield site, including its

efforts to remediate contamination originating from ACC's adjoining landfill. (Docket No. 16, at 15.) However, the plaintiff disputes this interpretation and cites to a specific provision in the SLLI Consent Order that arguably supports its contention that the order does not cover the plaintiff's activities in response to ACC's alleged discharge of hazardous substances. (Docket No. 26, at 19.) This dispute plainly demonstrates that the scope of remedial activities covered by the SLLI Consent Order is a fact the accuracy of which can reasonably be questioned and thus is not a proper subject for judicial notice. *See Passa*, 123 Fed.Appx. at 697.

Accordingly, limiting its review to the factual allegations contained in the plaintiff's Complaint, the court finds that the plaintiff has stated a claim for cost recovery under Section 107(a) of CERCLA. The Complaint alleges that the plaintiff has incurred, and continues to incur response costs caused by the discharge of hazardous substances from ACC's adjoining landfill into the water bodies located on its property. (Docket No. 1, at 15.) These hazardous substances allegedly include ammonia and metals. (*Id.*) Moreover, the Complaint does not allege that the plaintiff incurred these costs pursuant to an administrative Consent Order it entered into with the TDEC. (*See id.*)

In its opposition brief, the plaintiff contends that the cases cited by ACC that have held that a PRP is precluded from recovering compelled response costs under Section 107(a) are inapposite. The court agrees. The cited cases involved PRPs who, unlike the plaintiff here, sought to recover compelled response costs incurred pursuant to administrative or judicially-approved settlements. Indeed, none of the cases cited by ACC precludes a PRP from recovering response costs that it voluntarily incurred as a result of an adjoining property owner's alleged

discharges of hazardous substances.  Accordingly, the court will deny ACC's motion to dismiss the plaintiff's Section 107(a) cost recovery claim.

### C.    CWA and RCRA Claims

ACC next moves to dismiss all of the plaintiff's CWA and RCRA claims on the sole ground that they allege violations that are wholly past and are thus barred under applicable precedent.  (Docket No. 16, at 18.)  In its view, the plaintiff's claims fail because they do not allege that ACC is currently adding any material into its landfill, but instead are merely based on the residual effects of ACC's prior landfill operations, namely, the continuing discharges of pollutants into water bodies located on the plaintiff's property.  (*Id.* at 18, 21.)  ACC thus contends that these allegations fail to state a claim for relief under both the CWA and the RCRA.

In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found, Inc.*, 484 U.S. 49 (1987), the Supreme Court held that the "to be in violation" language that appears in the text of the CWA's citizen suit provision requires "that citizen plaintiffs allege a state of either continuous or intermittent violation - that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  484 U.S. at 57.  This holding applies with equal force to the RCRA citizen suit provision using the same "to be in violation" language.  *See id.*  (noting that Congress used the "identical ["to be in violation"] language in the citizen suit provisions of several other environmental statutes that authorize only prospective relief," including the RCRA citizen suit provision found in 42 U.S.C. § 6972(a)(1)(A)).  The Sixth Circuit, in an unpublished decision, subsequently adopted the standard applied by the Fourth Circuit in the *Gwaltney* case for determining a continuous or intermittent violation after that case was remanded to it following the Supreme Court's decision.  *Allen Cnty. Citizens for the Env't, Inc. v. BP Oil Co.*, No. 91-

3698, 1992 WL 138410, at *2 (6th Cir. June 18, 1992). To state a claim for a continuous or intermittent violation under this standard, a citizen plaintiff must allege "violations that continue on or after the date the complaint is filed" or facts "from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *See id.* (*quoting Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1988)); *see also Tamaska v. City of Bluff City, Tenn.*, 26 Fed.Appx. 482, 485 (6th Cir. 2002). Having examined the factual allegations underlying each of the plaintiff's claims brought under the citizen suit provisions of the CWA and the RCRA, the court finds that it has sufficiently alleged a state of continuous violation. Each of the plaintiff's five claims brought under these statutes is premised on ACC's alleged unlawful and continuous discharge of contaminants from its landfill into an unnamed tributary that flows into Sugar Creek, which, in turn, is impounded to form Arrow Lake. All three of these water bodies are located on the plaintiff's property. The Complaint plainly alleges that this ongoing and unauthorized discharge has and continues to violate the CWA and the RCRA. Thus, the Complaint alleges a state of continuing violation as of the date this action was commenced. *See Gwaltney*, 484 U.S. at 57; *Allen Cnty*, 1992 WL 138410, at *2. These allegations are sufficient to defeat a motion to dismiss brought under Rule 12(b)(6).

To support its argument for dismissal, ACC cites this court's previous decision in *Crigler v. Richardson*, No. 3:08-cv-0681, 2010 WL 2265675, at *7 (M.D. Tenn. June 3, 2010), where it dismissed the plaintiff's CWA claim against two defendants as alleging a wholly past violation. These two defendants, from a roster of seventeen, were alleged to have arranged on one occasion in 2006 for another defendant to transport and dispose of previously generated waste. 2010 WL

24

2265675, at *1.  That waste was then disposed of over a period of months down a hillside at a dump site owned and operated by other defendants, where it, among other things, flowed into a stream that ran through the plaintiffs' property.  *Id.*; *see also Crigler v. Richardson*, No. 3:08-cv-0681, (Docket No. 166, at 5-8) (M.D. Tenn. Mar. 24, 2010).  Because the complaint only alleged a single violation by these two defendants that occurred approximately four years prior to the commencement of the action and did not otherwise allege that the defendants were engaging in continuous or intermittent violations of the CWA at the time they were sued, the court dismissed the CWA claim brought against them.  *Id.* at 7.  This case, however, is factually distinguishable from *Crigler*.  Indeed, unlike the complaint in *Crigler*, the Complaint here alleges that ACC, the owner and operator of the site in question, has failed to abate the ongoing discharge of pollutants from its landfill and thus continues to violate various provisions of the CWA and the RCRA.

    In support of its contention that the residual effects of historic acts do not constitute ongoing violations, ACC also cites language in the court's subsequent decision in *Crigler* denying the plaintiff's motion to reconsider the dismissal of its CWA claim.  *Crigler v. Richardson*, No. 3:08-cv-0681, 2010 WL 2696506, at *5 (M.D. Tenn. July 7, 2010) ("*Crigler II*").  In particular, it cites the following statement from *Crigler II*, which the court made after it remarked that all indications from the Sixth Circuit cases it cited in its previous memorandum dismissing the plaintiff's CWA claim led it to believe that the Court of Appeals would find that the plaintiff alleged a wholly past violation:

> That is, again, in both *Allen County* and *Ailor v. City of Maynardville*, 368 F.3d 587, 598 (6th Cir. 2004), the Sixth Circuit focused on the defendants' conduct and whether the defendants were actively polluting at the time that the Complaint was filed, and the court did not focus on any possibility that the defendant[s] would be liable

under the CWA for the consequences of active pollution that had
ceased by the time that the Complaint had been filed.

*Id.* ACC submits that, because the Complaint here merely seeks recovery for the residual effects

of ACC's historic conduct, the plaintiff's CWA and RCRA claims should be dismissed.

However, the court believes that the aforementioned statement appearing in *Crigler II*

must be read in the context of the factual allegations presented by the plaintiffs in that case.

Moreover, the CWA claim against the two defendants in *Crigler* was based on a different theory

of liability than the claims advanced by the plaintiff here. Indeed, the *Crigler* plaintiffs argued

that the two defendants were liable because they contributed to a previously completed discharge

of pollutants into navigable waters where those pollutants then remained and continued to

release harmful substances. *Crigler II*, 2010 WL 2696506, at *2, 4. In contrast, the plaintiff

here alleges that ACC is liable because it has, as of the filing of this Complaint, failed to abate

the *ongoing* discharge of pollutants exiting its landfill into the water bodies located on the

plaintiff's property.

In addition, the two Sixth Circuit decisions cited in the quoted statement from *Crigler II*

do not compel dismissal of the plaintiff's claims. As the court has already found, the allegations

contained in the plaintiff's Complaint satisfy the test adopted by the Sixth Circuit in *Allen

County*. Moreover, *Ailor* is factually and procedurally distinguishable, as it involved an appeal

from a grant of summary judgment, where it was shown that the defendant's last recorded CWA

violation occurred several weeks prior to the date the plaintiffs filed their complaint and that the

defendant had already completed remedial measures to bring it into compliance with the CWA's

permitting requirements before the commencement of the plaintiff's suit. *Ailor*, 368 F.3d at 590,

598 Moreover, in that case, the Sixth Circuit simply restated the Supreme Court's holding in

*Gwaltney* that, to bring a violations claim under the CWA and RCRA citizen suit provisions, a plaintiff must "allege a state of either continuous or intermittent violation." *Id.* at 597 (*quoting Gwaltney*, 484 U.S. at 57). Again, the plaintiff has sufficiently made that showing here. That is, it has alleged that ACC, by virtue of its failure to abate the ongoing discharge of contaminants from its landfill, is in a state of noncompliance with various provisions of the CWA and the RCRA. *See Gwaltney*, 484 U.S. at 69 ("The phrase in § 505(a) [1365(a)], 'to be in violation,' . . . suggests a *state rather than an act* - the opposite of a state of compliance.") (Scalia, J., concurring in part) (emphasis added).[9]

Finally, the court notes that ACC's argument concerning wholly past actions has no applicability to the plaintiff's imminent and substantial endangerment claim brought under Section 6972(a)(1)(B) of the RCRA   Again, Section 6972(a)(1)(B), which lacks the "to be in violation" language contained in Section 6972(a)(1)(A), RCRA's other citizen suit provision, allows a citizen to commence a civil action against any person "who has contributed or who is

---

[9] ACC also submits that two decisions from courts in the Second Circuit, *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305 (2d Cir. 1993) and *Aiello v. Town of Brookhaven*, 136 F.Supp.2d 81 (E.D.N.Y. 2001) also support its contention that the CWA and the RCRA do not authorize a citizen to commence an action for the residual effects of historic conduct. As an initial matter, both of these cases are not controlling authority. Indeed, in its decision in *Crigler II*, this court noted the defendants' citation to both of these cases, yet nonetheless relied on the Sixth Circuit's decisions in *Allen County* and *Ailor* in concluding that the plaintiff had alleged a wholly past violation under the CWA. *See Crigler II*, 2010 WL 2696506, at *4-5. Second, both *Remington Arms* and *Aiello* presented different procedural postures than the one facing the court in the case at bar. *See Remington Arms*, 989 F.2d at 1310 (on appeal from the district court's decision concerning cross-motions for summary judgment); *Aiello*, 136 F.Supp.2d at 84-85 (involving a memorandum decision following the conclusion of a bench-trial). Unlike those cases, the court here is presented with a motion to dismiss the plaintiff's CWA and RCRA claims pursuant to Federal Rule of Civil Procedure 12(b)(6), and it must accordingly limit its review to the factual allegations pled in the Complaint. Indeed, at this stage of the proceedings, the plaintiff only needs to allege "a state of either continuous or intermittent violation." *Gwaltney*, 484 U.S. at 57; *Allen County*, 1992 WL 138410, at *2. As the court has already concluded, the plaintiff has sufficiently made this showing.

contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  As the plaintiff correctly notes, even if its imminent and substantial endangerment claim was based on ACC's wholly past actions, it would still be able to bring suit under Section 6972(a)(1)(B), because the statute's plain terms allow suits for wholly past actions which may now imminently and substantially endanger health or the environment.

Accordingly, ACC's motion to dismiss the plaintiff's CWA and RCRA claims for failure to state a claim upon which relief can be granted will be denied.

### D.    State Law Claims

Lastly, ACC moves to dismiss all of the plaintiff's state law claims on the ground that they are barred under the four-year statute of repose attaching to actions for damages arising from deficiencies in the design or construction of an improvement to real property.  (Docket No. 16, at 21-22.)  This statute of repose specifically provides that:

> All actions to recover damages for any deficiency in the design, planning, supervision, observation of construction, or construction of an improvement to real property, for injury to property, real or personal, arising out of any such deficiency . . . shall be brought . . . within four (4) years after substantial completion of such an improvement.

Tenn. Code Ann. § 28-3-202 (2000).  In its Complaint, the plaintiff has asserted state law claims for private nuisance, negligence, and trespass arising out of ACC's alleged acts and omissions in connection with its closed landfill.  (Docket No. 1, at 15-17.)  ACC specifically contends that, because the plaintiff's state law claims are, in essence, claims that its landfill was improperly

designed, built and closed, they are barred under the statute of repose, since the landfill was closed in 1995. (Docket No. 16, at 22.)

In its opposition brief, the plaintiff contends that ACC's argument must be rejected, because it overlooks an important exception to the four-year statute of repose that is applicable to those persons who are in actual possession or control of an improvement. (Docket No. 26, at 22.) Section 28-3-205(a) of the Tennessee Code Annotated sets forth this exception:

> The limitation provided by [Tenn. Code Ann. § 28-3-202] shall not be asserted as a defense by any person in actual possession or the control, as owner, tenant, or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or death for which it is proposed to bring an action.

Tenn. Code Ann. § 28-3-205(a) (2000). The plaintiff contends that, because ACC did not design its landfill, but has and continues to own it, its reliance on the four-year statute of repose is without merit. The court agrees.

By its express terms, Section 28-3-205(a) states that any person in actual possession or control of an improvement containing a deficiency that is alleged to proximately cause an injury cannot assert the four-year statute of repose as a defense. In its Complaint, the plaintiff has alleged ACC to be the owner of the landfill at issue in this case. (Docket No. 1, at 3.) It has also alleged an injury proximately caused by ACC's acts and omissions in connection with the landfill, namely, that such acts and omissions have led to the ongoing destruction of the water bodies and surface vegetation located on the plaintiff's property and have also reduced the property's value. (Docket No. 1, at 15-17.) Accordingly, the statute of repose is inapplicable and the court will deny ACC's motion to dismiss the plaintiff's state law claims. *See Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 WL 22794479, at *5 (Tenn. Ct. App., Nov. 25,

2003) (noting that it is clear that the four-year statute of repose located in Tenn. Code Ann. § 28-3-202 was intended to be applicable to the designer, not owner of the improvement to real property).

## **CONCLUSION**

For all of the reasons discussed herein, the defendant's Motion to Dismiss (Docket No. 15) will be **DENIED**.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge