# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| STARLINK LOGISTICS, INC., | ) |
| Plaintiff, | ) |
| | ) Case No. 1:12-cv-0011 |
| | ) Judge Trauger |
| v. | ) |
| ACC, LLC and | ) |
| SMELTER SERVICE CORP., | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the court is the Defendant's Motion to Stay (Docket No. 40), to which the plaintiff has responded (Docket No. 44), and the defendant has filed a reply (Docket No. 47). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

This case arises out of the alleged discharge of toxic pollutants from a landfill site in Mount Pleasant, Tennessee owned by ACC, LLC ("ACC"). An adjoining property owner, plaintiff Starlink Logistics, Inc., alleges that these continuous discharges violate the Federal Water Pollution Control Act (the "Clean Water Act"), 33 U.S.C. § 1251 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act, 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.*, and state law. (Docket No. 61 ¶¶ 25-51.) The plaintiff's state law claims assert causes of action for private nuisance, negligence, and trespass. (*Id.* ¶¶ 52-61.)

1

I.  **Factual Background**[1]

The plaintiff is the owner of an approximately 1,485-acre tract of land that is located at 786 Arrow Lake Road in Mount Pleasant, Tennessee. ACC owns property situated immediately east of and adjoining Arrow Lake Road that contains an approximately 14-acre industrial landfill, where wastes ("the aluminum smelting wastes")[2] from a secondary aluminum smelting plant operated by the defendant Smelter Service Corp. were previously disposed of.[3] During the course of its approximately 22-year operation of this landfill, ACC is alleged to have accepted thousands of tons of aluminum smelting wastes for disposal.

A few years after operations began, the landfill allegedly began to discharge elevated levels of pollutants offsite to an unnamed tributary that flows into Sugar Creek, which, in turn, is impounded to form Arrow Lake. Each of these water bodies is located on the plaintiff's property. The discharged pollutants include sodium and potassium chlorides, ammonia, dissolved solids, metals, and sediments. These pollutants are discharged, in the form of leachate and sediment, at concentrations that allegedly exceed applicable water quality criteria by orders of magnitude. The leachate discharge results from the contact between surface and groundwaters entering the landfill and buried wastes, while the sediment discharge occurs during storm events. As a result

---

[1] A substantial portion of this section is reproduced from the court's prior Memorandum Opinion (Docket No. 34), entered on June 25, 2012, denying the Defendant's Motion to Dismiss (Docket No. 15). To the extent that this section recites new facts, they are drawn from the plaintiff's Amended Complaint (Docket No. 61.)

[2] These wastes allegedly consisted of aluminum salt cake, slag, and bag house dusts.

[3] Smelter Service Corp. ("SSC") is alleged to be the sole member of ACC. (Docket No. 61 ¶ 5.) It was added as a party to this case after the pending motion was fully briefed, when the court granted the plaintiff's Motion for Leave to Amend Complaint (Docket No. 42) on January 3, 2013. (Docket No. 49.) The Amended Complaint seeks to hold SSC jointly and severally liable for ACC's alleged violations of federal and state law. (Docket No. 61, prayer for relief.)

of these discharges, it is alleged that all aquatic life has been extinguished in the unnamed tributary and downstream in Sugar Creek, surrounding trees and surface vegetation have been destroyed, and portions of Arrow Lake have been filled with deep deposits of toxic "muck" that has reduced oxygen levels to a point at which no aquatic life survives in the upper portion of the lake.

Although ACC's landfill closed in 1995, it is alleged that the discharge of contaminants from the landfill continues to enter the water bodies located on the plaintiff's property. As a result, the plaintiff alleges that it has investigated the soil, surface water, and groundwater on its property to determine the extent of contamination, identified individual pollutants that have entered its property, evaluated the impacts the pollutants have had on aquatic life and surrounding vegetation, and studied alternative removal and/or remedial actions. These removal and remedial actions are aimed at stopping and/or treating the discharge, removing and/or remedying the contamination, restoring the aquatic life, and removing and replacing the distressed vegetation.

## II. Federal Statutory Framework[4]

### A. The Clean Water Act

The purpose of the Clean Water Act ("CWA") "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the CWA, it is "illegal to discharge a pollutant into the navigable waters of the United States except

---

[4] While a substantial portion of this section is reproduced from the court's prior Memorandum Opinion (Docket No. 34) denying the Defendant's Motion to Dismiss (Docket No. 15), it nonetheless provides a more detailed discussion of the relevant aspects of the applicable federal and state regulatory schemes.

as authorized by the EPA or the Army Corps of Engineers." *United States v. Holden*, 557 F.3d 698, 701 (6th Cir. 2009) (*citing* 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12)(A)). Through its National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, the United States Environmental Protection Agency ("EPA") has authorized the Tennessee Department of Environmental Conservation ("TDEC") to issue discharge permits under the CWA. *See id.* Tennessee has thus promulgated laws to manage the issuance of permits. *See* Tenn. Code Ann. § 69-3-108; Tenn. Comp. R. & Regs. 1200-4-10-.03. Specifically, the Tennessee Water Quality Control Act of 1977, Tenn. Code Ann. § 69-3-101 *et seq.*, prohibits unauthorized discharges into waters of the state. Tenn. Code Ann. §§ 69-3-108(a)-(b), -3-114(a)-(b).

In its Amended Complaint, the plaintiff alleges that ACC is in violation of two permitting requirements of the CWA. First, it alleges that ACC, without ever obtaining the required discharge permit pursuant to the procedures outlined in Tennessee's implementing statutes and regulations, has continued to discharge leachate and sediment-laden stormwater from its landfill into the water bodies on the plaintiff's property, in violation of 33 U.S.C. § 1311 (the "discharge permit claim"). (Docket No. 61 ¶¶ 26-29.) The plaintiff similarly alleges that ACC, without first obtaining a dredging or filling permit from the Army Corps of Engineers, 33 U.S.C. § 1344, has continued to discharge "fill material" that ultimately settles at the bottom of Arrow Lake, in violation of 33 U.S.C. § 1311 (the "fill permit claim").[5] (*Id.* ¶¶ 31-33.) The plaintiff has asserted these claims pursuant to the CWA's citizen suit provision, 33 U.S.C. § 1365, and seeks

---

[5] The term "fill material" is generally defined as "material placed in waters of the United States where the material has the effect of . . . [r]eplacing any portion of a water of the United States with dry land; or . . . [c]hanging the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1); 40 C.F.R. § 232.2. The term "waters of the United States" is defined at 33 C.F.R. § 328.3 and 40 C.F.R. § 232.2.

injunctive relief and the assessment of civil penalties of $32,500 per day per violation. (*Id.* ¶¶ 29, 13, and prayer for relief.)

B.   **The Resource Conservation and Recovery Act**

The Resource Conservation and Recovery Act ("RCRA") "is a comprehensive environmental statute governing the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). Its primary purpose is to reduce the generation of hazardous waste and to ensure that the waste that is generated is properly "treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b); *see also Meghrig*, 516 U.S. at 483.

Pursuant to these statutory objectives, the RCRA contemplates that states will develop solid waste management plans pursuant to regulatory guidelines promulgated by the EPA. *See* 42 U.S.C. §§ 6941-6949. RCRA requires that such plans must, among other things, prohibit the establishment of open dumps or operation of existing open dumps. *See* 42 U.S.C. §§ 6943-6945.[6] On February 16, 1982, Tennessee's proposed solid waste management plan was

---

[6] The RCRA defines an open dump as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under [42 U.S.C. § 6944] and which is not a facility for disposal of hazardous waste." 42 U.S.C. § 6903(14). Section 6944, in turn, requires the EPA Administrator to:

> [p]romulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps . . . At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility.

42 U.S.C. § 6944(a). The aforementioned criteria are located at 40 C.F.R. §§ 257.1 - 257.4

approved by the EPA.[7]  Approval of the Tennessee Solid Waste Management Plan, 47 Fed. Reg. 6643-01 (Feb. 16, 1982).  Tennessee also maintains a comprehensive regulatory scheme concerning solid waste disposal.  *See* Tenn. Code Ann. § 68-211-101 *et seq.* ("Solid Waste Disposal Act"); Tenn. Comp. R. & Regs. 400-11-01-.01 *et seq.* (regulations concerning solid waste management).  Among other things, the Solid Waste Disposal Act prohibits unlawful methods of solid waste disposal.  Tenn. Code Ann. § 68-211-104.  Such activities include: (1) making unauthorized disposals of solid waste into the waters of the state; (2) constructing, altering, or operating a solid waste disposal site in violation of TDEC rules, regulations, or orders; or (3) processing or disposing of solid waste in violation of the Act or TDEC rules, regulations, or orders.  *See* Tenn. Code Ann. § 68-211-104(1), (3), and (4).

The plaintiff has asserted three RCRA claims against ACC.  The first alleges that ACC is engaging in open dumping in violation of 42 U.S.C. § 6945, because it has and continues to discharge pollutants: (1) without obtaining the necessary permits under the CWA; (2) in violation of the TDEC's EPA-approved solid waste management plan and its specific rules concerning post-closure care of landfills; and (3) that contaminate underground drinking water sources.  (Docket No. 61 ¶¶ 35-38.)  The second RCRA claim alleges that ACC is violating the TDEC's EPA-approved solid waste management plan and its specific post-closure landfill rules, because solid waste, its constituents, leachate, contaminated rainfall, and waste decomposition

---

[7] Tennessee has also received authorization from the EPA to administer and enforce its own hazardous waste program under the RCRA, effective February 5, 1985.  Tennessee; Decision on Final Authorization of State Hazardous Waste Management Program, 50 Fed Reg. 2820-02 (Jan. 22, 1985); *See also* 42 U.S.C. § 6926 (authorizing states to seek EPA-approval to administer and enforce their own hazardous waste program under the RCRA).

products have and continue to escape into ground and surface water offsite in quantities and concentrations that are toxic to all aquatic life and surrounding surface vegetation. (*Id.* ¶¶ 41-43.) The final RCRA claim alleges that ACC, by virtue of the continuing contaminated discharge escaping its landfill, has contributed or is contributing "to the past or present disposal of solid waste which may present an imminent and substantial endangerment to health or the environment." (*Id.*, ¶¶ 45-47.) The plaintiff brings these claims pursuant to RCRA's citizen suit provisions. 42 U.S.C. § 6972(a)(1)(A) - (a)(1)(B). Like the CWA claims, the RCRA claims seek injunctive relief and the assessment of civil penalties of $32,500 per day per violation. (*Id.* ¶¶ 38, 43, 47, and prayer for relief.)

### C. The Comprehensive Environmental Response, Compensation, and Liability Act

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") was enacted by Congress in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. and Sante Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). Its purpose is to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Id.* (internal quotation marks omitted). CERCLA grants private citizens the opportunity to recover the "necessary costs of response" they have incurred from a potentially responsible party that is subject to liability under the statute. 42 U.S.C. § 9607(a)(4)(B). In its Amended Complaint, the plaintiff has asserted a claim against ACC to recover its "necessary costs of response" caused by the discharge of hazardous substances from ACC's landfill. (Docket No. 61 ¶¶ 49-51.) The plaintiff also requests declaratory relief as to ACC's liability for future costs incurred as a result of the contaminated discharge. (*Id.* ¶ 51.)

7

**III. Procedural History**

Although the TDEC engaged in past enforcement actions against ACC in connection with the contaminated discharges exiting its landfill, for the purposes of this motion, the relevant procedural history traces back to June 2011, when ACC and TDEC entered into an administrative Consent Order ("consent order"). (Docket No. 41, Ex. 1.) This consent order was filed by ACC in the Chancery Court of Davidson County on June 9, 2011, pursuant to a petition brought under Tennessee Code Annotated §§ 68-212-114(e), 68-212-215(f), and 69-3-115(e), requesting that the court enter a judgment by consent.[8] (Docket No. 16, Ex. 3.) The petition asserted that the TDEC neither opposed the petition's filing nor the relief requested therein. (*Id.*)

On July 21, 2011, the plaintiff filed a motion to intervene in the Chancery Court proceeding pursuant to the aforementioned statutory authority.[9] (Docket No. 41, Ex.2) In support of its motion to intervene, the plaintiff contended, among other things, that the consent order was inadequate because it did not obligate ACC to cease the contaminated discharges

---

[8] These statutes provide that, when an order issued by the Commissioner of the TDEC has become final, a notarized copy of the order may be filed with the clerk of the Chancery Court of Davidson County. Tenn. Code Ann. §§ 68-212-114(e)(1); 68-212-215(f)(1); 69-3-115(e)(1). Upon such filing, a final order shall be considered as a consent judgment on the same terms and conditions recited therein. Tenn. Code Ann. §§ 68-212-114(e)(2); 68-212-215(f)(2); 69-3-115(e)(1). Since ACC waived its right to appeal the consent order, it was final when filed in the Chancery Court. (*See* Docket No. 41, Ex. 1 at 25.)

[9] Specifically, the relevant statutes provide that, once a final order issued by the Commissioner of the TDEC is filed in the Chancery Court of Davidson County resulting in the entry of a consent judgment, a citizen shall have 45 days after entry of this judgment to intervene on the ground that the penalties or remedies contained in the final order are inadequate or are based on an erroneous finding of facts. *See* Tenn. Code Ann. §§ 68-212-114(e)(3)(B); 68-212-215(f)(3)(B); 69-3-115(e)(3). If no motion for intervention is filed within the aforementioned time period, the judgment shall become final. *Id.*

exiting its landfill and obtain and comply with an NPDES permit pursuant to the CWA and the Tennessee Water Quality Control Act. (*Id.* at 11, 16-20.) The plaintiff also challenged the penalties assessed under the consent order as being inadequate to ensure compliance with agreed-upon remedial measures. (*Id.* at 20-24.)

In November 2011, ACC, the plaintiff, and the TDEC filed a joint agreed order in the Chancery Court. (Docket No. 41, Ex. 8.) Pursuant to that order, both the plaintiff and the TDEC were added as parties to the proceeding. (*Id.* at 3.) The parties also agreed to file a notice with the court by December 20, 2011 concerning their attempts to negotiate a modified consent order addressing the concerns raised by the plaintiff in its motion to intervene. (*Id.* at 2-3.) In the event that such an agreement could not be reached by the December 20, 2011 deadline, the parties agreed to file a proposed order remanding the case to the Tennessee Solid Waste Disposal Control Board ("the Board")[10] for further proceedings as a contested case pursuant to the Tennessee Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-101 *et seq.* (*Id.* at 3.) The joint agreed order stayed further proceedings in the Chancery Court until further notice. (*Id.*) Ultimately, the three-party negotiations failed to yield agreement concerning a modified consent order. (*See* Docket No. 41, Ex. 16.) Accordingly, pursuant to the joint agreed order, the action was dismissed from the Chancery Court and remanded to the Board for a contested case on March 21, 2012. (*Id.*)

Before the Chancery Court proceedings were remanded to the Board, the plaintiff commenced the instant action on January 19, 2012. (Docket No. 1.) Shortly thereafter, ACC

---

[10] The Board was created by statute to "adopt, modify, repeal, promulgate after due notice, and enforce rules and regulations which [it] deems necessary for the proper administration of" the Solid Waste Disposal Act. Tenn. Code Ann. § 68-211-111(d)(1).

filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docket No. 15.) Specifically, ACC contended that: (1) this court lacked subject-matter jurisdiction over the plaintiff's federal claims asserted under the CWA, RCRA, and CERCLA on account of the TDEC's enforcement actions, which produced the consent order filed by ACC in the Chancery Court on June 9, 2011; and (2) the plaintiff's Complaint otherwise failed to state claims upon which relief could be granted. (*Id.*) On June 25, 2012, the court issued a Memorandum Opinion denying the defendant's motion. (Docket No. 34.)

On August 7, 2012, an Administrative Law Judge presided over a contested case hearing before the Board. (Docket No. 47 Exs. 1-2.) At issue was an Amended and Restated Consent Order ("ACO") negotiated by ACC and the TDEC following the breakdown of the aforementioned three-party negotiations. (Docket No. 41, Ex. 17, at 4.) In the ACO, ACC agreed that it is causing or allowing unauthorized discharges to waters of the state, contributing to a condition of pollution in Sugar Creek, and releasing solid waste or its constituents to the waters of the state, in violation of Tenn. Code Ann. §§ 68-211-104(1), (3), and (4); 69-3-108(a)-(b); 69-3-114(a)-(b). (*Id.* at 46-47.) Among other things, ACC also agreed to undertake the following remedial actions under the ACO: (1) construct a berm upgradient of its landfill to divert uncontaminated storm water away from the landfill; and (2) remove all solid waste from the landfill that has the potential to contact ground or surface water, to the extent practicable, and relocate it to a new landfill cell on site or offsite to a permitted landfill. (*Id.* at 48-49.) ACC was also required to submit to the TDEC a corrective action plan containing a discharge reduction plan and details concerning the methods and time-frames by which it would remove and relocate the solid waste at its landfill. (*Id.* at 48-51.) Unless extended by written consent of the TDEC Commissioner, the ACO provided that the removal and relocation activities were to be completed

within 4 years of the order's effective date. (*Id.* at 51, 56.) Finally, ACC agreed to an assessed penalty of $400,000, which was payable to the state in $100,000 increments that corresponded to four annual milestone deadlines contained in the corrective action plan. (*Id.* at 57.) However, ACC was only required to make a penalty payment if it failed to meet the corresponding annual milestone deadline. (*Id.*)

The plaintiff was a party to the contested case hearing before the Board, wherein it called its own witnesses to testify about the impacts on its property from landfill discharges and the shortcomings of the ACO, submitted evidence, cross-examined rebuttal witnesses called by ACC, and presented opening and closing arguments. (Docket No 47 Exs. 1-2.) The plaintiff objected to the ACO because, among other things, it did not contain concrete goals or firm deadlines regarding the contemplated remedial activities, allowed ACC to continue making contaminated discharges without a permit in violation of the Clean Water Act, and assessed penalties that were insufficient to ensure compliance with the agreed-upon remedial measures. (Docket No. 47, Ex. 1 at 21; Docket No. 47 Ex. 2, at 9-16.) At the close of the hearing, the Board voted to approve the ACO. (Docket No. 47, Ex. 2 at 90-91.) In a document entitled Board Approval of Amended and Restated Consent Order, the Board noted that its factual findings, legal conclusions, and order adopting the ACO "were made in an effort to provide a coordinated system of control and management of solid waste, hazardous waste and hazardous waste substances in Tennessee." (Docket No. 41, Ex. 17 at 6.) On October 5, 2012, the plaintiff appealed the Board's order to the Chancery Court of Davidson County, which is vested with exclusive original jurisdiction over all review proceedings instituted under the authority and provisions of the Solid Waste Disposal Act. (Docket No. 44 at 2; Docket No. 44, Ex. 1.); Tenn. Code Ann. § 68-211-113(g).

11

ACC filed the present motion on November 30, 2012. (Docket No. 40.) In support of its motion, ACC has submitted affidavits attesting to the fact that remedial activities pursuant to the ACO are currently underway at the landfill site. Specifically, Nancy Sullivan, a professional engineer and principal at an environmental consulting firm retained by ACC to assist in its remedial activities, testified that ACC has completed construction of a new phase-1 landfill cell to hold the landfill waste. (Docket No. 41, Ex. 18, at 1-2.) She added that ACC has incurred over $1 million in costs for conducting remedial activities in 2012. (*Id.* at 2.) Thomas Grosko, ACC's Manager, also testified to the completion of the phase-1 landfill cell and added that, pursuant to the ACO, ACC constructed an upgradient berm to divert uncontaminated storm water away from the landfill. (Docket No. 41, Ex. 17 at 1-3.) The plaintiff does not appear to dispute that ACC has commenced remedial activities at its landfill pursuant to the ACO, although it does appear to challenge the effectiveness of the actions taken thus far. (*See* Docket No. 44 at 2, n.1.)

## **ANALYSIS**

In the pending motion, ACC requests the court to enter an order staying this case pending the final adjudication of the review proceedings underway in the Chancery Court of Davidson County. (Docket No. 41 at 6.) To support its motion, ACC relies on the *Burford* abstention doctrine, which is named after the Supreme Court's decision in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). (*Id.* at 6-12.) The plaintiff contends that the court should decline ACC's invitation to further delay this case by virtue of ordering a stay.[11] (Docket No. 44.) It adds that only this

---

[11] In its reply, ACC argues that the court should not consider the plaintiff's opposition brief, which was filed on December 20, 2012, because it was filed after the December 17, 2012 response deadline. (Docket No. 47 at 1.) While the plaintiff has made no attempt to explain why it failed to timely file its opposition brief, or otherwise seek a filing extension from the court, in the interest of deciding the pending motion on the merits, the court will nonetheless consider this late filing. However, the plaintiff is advised of its obligation under the Local Rules of this court

12

court can afford the plaintiff the complete menu of relief that it seeks in its federal and state law claims. (*Id.* at 7-10.)

As a general matter, "the courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends, . . . [and] [t]hey cannot abdicate their authority or duty in any case in favor of another jurisdiction." *New Orleans Pub. Serv., Inc., v. Council of New Orleans*, 491 U.S. 350, 358 (1989) ("*NOPSI*") (internal quotation marks and citation omitted). Nonetheless, "there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is the normal thing to do." *Id.* (internal quotation marks and citation omitted). Under the abstention doctrine, a "District Court may decline to exercise or postpone the exercise of its jurisdiction." *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976). While abstention is permissible, it remains the exception and not the rule. *Id.*

Again, in the instant case, ACC argues that the court should stay all matters pursuant to the *Burford* abstention doctrine. This doctrine provides that:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

---

to timely file responses to pending motions. Failure to comply with this obligation with respect to a future motion may result in the court's finding that the plaintiff does not oppose the requested relief. *See* M.D. Tenn. R. 7.01(b) ("Failure to file a timely response shall indicate that there is no opposition to the motion.")

*NOPSI*, 491 U.S. at 361 (internal quotation marks and citation omitted). ACC appears to contend that *Burford* abstention is warranted under the second prong. (*See* Docket No. 41 at 8-10, 12.) In support of its argument, it relies on the Sixth Circuit's decisions in *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir. 1995) and *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004). (*Id.* at 8-10.)

In *Coalition for Health Concern*, the plaintiffs brought a federal suit that asserted, among other things, RCRA claims against LWD, Inc. ("LWD"), the owner and operator of a hazardous waste incinerator facility, and the Secretary of Kentucky's Cabinet for Natural Resources and Environmental Protection (the "Secretary"). 60 F.3d at 1189. The plaintiffs alleged that LWD was in violation of RCRA because its facility was operating without the appropriate permit. *Id.* at 1189-90. The plaintiffs also alleged that the Secretary failed to perform his statutory duty to either issue or deny the applicable permit within a deadline contained in RCRA. *Id.* at 1190. The federal suit was filed after the plaintiffs abandoned ongoing state administrative proceedings concerning the permitting issue. *Id.* at 1192.

In concluding that the district court should have abstained under *Burford* from hearing the aforementioned RCRA claims, the Sixth Circuit found that "Kentucky has an overriding interest in the protection of its environment from the effects of unregulated hazardous waste as indicated by its enactment of a broad statutory scheme and review process governing the issuance and approval of permits for hazardous waste facilities." *Coal. for Health Concern*, 60 F.3d at 1194. It added that, based on the circumstances, the exercise of federal review at that time would have disrupted "Kentucky's efforts to establish a coherent policy with respect to the licensing of hazardous waste facilities." *Id.* In light of Kentucky's EPA-approved hazardous waste program incorporating RCRA's provisions and based on a review of the plaintiffs' relevant RCRA claims,

14

the Court of Appeals determined that those claims could not "arise in isolation from state law issues nor [were] they premised solely on alleged violations of federal law." *Id.* The court also found that abstention was warranted because the plaintiff's claims were "based on assertions that the Secretary [had] failed to apply or misapplied his lawful authority under Kentucky law and under RCRA concerning the issuance of LWD's" permit. *Id.* at 1195.

In *Ellis*, the plaintiffs' federal suit included Clean Air Act claims against the operators of a steel manufacturing facility and a slag processing plant, alleging that those defendants failed to obtain the required permits for their air emissions. 390 F.3d at 466. As in *Coalition for Health Concern*, the Sixth Circuit determined that *Burford* abstention was warranted with respect to these claims. *Id.* at 480. Reciting factors found to be dispositive of the *Burford* abstention issue in *Coalition for Health Concern*, the Court of Appeals highlighted the fact that Kentucky: (1) had enacted its own authorized program under the Clean Air Act; (2) was attempting to establish a coherent policy concerning the licensing of emitting facilities; (3) had enacted its own EPA-approved state implementation plan that included comprehensive regulations concerning the permits at issue; and (4) provided a scheme for reviewing administrative permitting decisions, which included the availability of judicial review. *Id.* Moreover, it found that federal review would be disruptive of Kentucky's attempts to establish a coherent policy with respect to its permitting requirements, since the state agency and the courts were reviewing the same issue raised by the plaintiffs' Clean Air Act claims at the time the district court dismissed those claims. *Id.* The court also characterized the plaintiffs' claims as boiling down to allegations that the state agency, through its permitting decisions, "'failed to apply or misapplied [its] lawful authority under Kentucky law and under' the Clean Air Act," which offered "a classic explanation for applying *Burford* abstention." *Id.* at 481 (quoting *Coal. for Health Concern*, 60 F.3d at 1195);

15

*see also NOPSI*, 491 U.S. at 362 (noting that "claim[s] that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state law factors" warrant *Burford* abstention).

Applying the relevant considerations from these two cases here, the court finds that Tennessee has an overriding interest in protecting its environment from the effects of contaminated discharges flowing from solid waste disposal sites into state waters, as evidenced by its enactment of a broad regulatory scheme concerning water quality and solid waste disposal. The TDEC has obtained EPA approval to issue NPDES discharge permits and implement its own solid waste management plan. *Holden*, 557 F.3d at 698 (authorization to issue NPDES permits); 47 Fed. Reg. 6643-01 (EPA approval of solid waste management plan). Tennessee also provides for judicial review of the decisions of the Solid Waste Disposal Control Board. *See* Tenn. Code Ann. 68-211-113(g). Given these circumstances, the exercise of federal review at this juncture would be disruptive of Tennessee's efforts to establish a coherent policy with respect to its management of water quality and solid waste disposal, especially given that the issues underlying the plaintiff's CWA and RCRA claims were reviewed during the contested case hearing before the Board, to which the plaintiff was a party, and are now before the Chancery Court on appeal. *See Ellis*, 390 F.3d at 480. Moreover, the plaintiff's CWA and RCRA claims do not arise in isolation from state law issues, as they seek to hold ACC liable under federal statutes for failures

to comply with both federal and state law requirements.[12] *See Coal. for Health Concern*, 60 F.3d at 1194; (Docket No. 61, counts 1-5.)

Finally, the court notes that, while the plaintiff's CWA discharge permit claim is not expressly directed against the TDEC, in seeking injunctive relief requiring ACC to obtain an NPDES permit and civil penalties stiffer than those provided in the ACO, it essentially invites this court to second-guess the policy decisions reached by the TDEC in negotiating the consent order and ACO with ACC. The same can also be said for the plaintiff's RCRA claims, which seek injunctive relief against ACC to eliminate its statutory violations, as well as more severe civil penalties. In this respect, these claims are similar to those that boil down to allegations that the state agency "failed to apply or misapplied its lawful authority under" applicable state and federal law. *See Ellis*, 390 F.3d at 481 (quoting *Coal. for Health Concern*, 60 F.3d at 1195). As the Sixth Circuit recognized in *Ellis*, such claims "offer a classic explanation for applying *Burford* abstention." *Id.*

Accordingly, the court will abstain from exercising jurisdiction over the CWA and RCRA claims pending the final adjudication of the Chancery Court proceeding.[13] However, the court is

---

[12] While the court acknowledges that Tennessee does not possess authority to issue permits for the discharge of fill material, *see* Tenn. Comp. R. & Regs. 1200-04-08-.01 (noting that issuance of fill permits are governed by the Clean Water Act and its associated regulations), it nonetheless believes that it should abstain from exercising jurisdiction over the fill permit claim in light of the aforementioned considerations, as well as the claim's close nexus to the corresponding CWA discharge permit and RCRA claims.

[13] In a footnote in its opposition brief, the plaintiff argues that, in two related cases from this district, *Natural Res. Def. Council v. Cnty. of Dickson, Tenn.*, No. 3:08-0229, 2010 WL 1408797, at *7 (M.D. Tenn. Apr. 1, 2010) (Campbell, J.) and *Orsted v. City of Dickson*, Nos. 3:07-0727, 3:07-732 (Memorandum at 55-56) (Docket No. 314) (M.D. Tenn. Mar. 25, 2009) (Haynes, J.), the court considered and rejected the application of *Burford* abstention to a RCRA claim involving the discharge of contaminants from a landfill in Dickson, Tennessee. (Docket No. 44 at 3, n.3.) This court, however, finds both of those cases distinguishable, since, unlike

not persuaded by ACC's argument that *Burford* abstention is also applicable to the plaintiff's remaining claims brought under CERCLA and Tennessee state law, since neither of those claims was addressed in the administrative proceeding that is now under review in the Chancery Court. ACC nevertheless contends that this court should stay this action pursuant to its inherent power to control matters on its docket. (Docket No. 41 at 13.)

It is true that "'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants,' . . . and that the entry of such an order ordinarily rests with[in] the sound discretion of the District Court." *Ohio Envtl. Council v. United States Dist. Court*, 565 F.2d 393, 396 (6th Cir. 1977) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). However, "it is also clear that a court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay." *Id.* Accordingly, the burden is on the movant to "show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *Id.*

ACC has failed to carry its burden on this point. Many of ACC's arguments concerning the propriety of a stay are premised upon its assertion that the scope of this federal suit and the Chancery Court proceeding are identical. (*See* Docket No. 41 at 14-16.) Based on this assertion, ACC submits that the plaintiff will not be harmed by a stay. (*Id.* at 14.) ACC further asserts that, should the federal action proceed, it would suffer financial hardship, because it would be forced

---

the circumstances here, where the plaintiff was given an opportunity to appeal the Board's order, the plaintiffs in those actions did not possess a state court venue to review the administrative orders at issue. *See Cnty. of Dickson, Tenn.*, 2010 WL 1408797, at *7; *Orsted*, Nos. 3:07-0727, 3:07-732 (Memorandum at 55-56) (Docket No. 314).

18

to defend two identical lawsuits, while also expending financial resources in connection with its ongoing remedial actions at the landfill site. (*Id.* at 14.)

ACC's argument would have merit if, in fact, the scope of the two current proceedings were indeed identical. However, a review of the record demonstrates that the federal suit involves claims that are not at issue in the Chancery Court proceeding - namely those brought under CERCLA and Tennessee state law. Given these circumstances, the court fails to see how there is a pressing need to delay this action as it pertains to the CERCLA and state law claims.[14] It also finds that ordering a stay of this action pursuant to its inherent power would unduly delay the plaintiff from pursuing its legal rights for alleged violations of these remaining claims. For all of these reasons, ACC's motion will be denied to the extent it seeks a stay of this action in its entirety.[15]

---

[14] ACC also asserts, without explanation, that the public would be harmed if this federal action proceeded because the remedial activities at the landfill site would cease. (Docket No. 41 at 14.) However, given its abstention rulings, the court fails to see how the plaintiff's remaining claims, which were not addressed during the state administrative proceedings, would cause ACC to cease its remedial activities at the site.

[15] ACC also argues that this court lacks jurisdiction over any challenges to the removal action currently underway at the landfill site pursuant to Section 113(h) of CERCLA. (Docket No. 41 at 17-18.) The court considered and rejected a similar argument involving Section 113(h) in its June 25, 2012 Memorandum Opinion denying ACC's Motion to Dismiss. (Docket No. 34 at 9-11.) ACC nonetheless renews this contention in the current motion, arguing that, pursuant to the Board's adoption of the ACO, a removal action is currently underway in compliance with Section 104 of CERCLA. (*Id.*)

Section 113(h) of CERCLA specifically states that, subject to certain statutory exceptions, a federal court shall not "have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) . . . to review any challenges to removal or remedial action selected under section 9604 of this title [Section 104], or to review any order issued under section 9606(a) of this title [Section 106(a)]." 42 U.S.C. § 9613(h). Given this express statutory text, the court finds ACC's argument unavailing, since the ACO outlining the required remedial action to be undertaken at the landfill site was not issued under CERCLA and does not otherwise cite to any CERCLA section. (Docket No. 41, Ex. 17.)

## CONCLUSION

For all of the reasons discussed herein, the Defendant's Motion to Stay (Docket No. 40) will be **GRANTED** in part and **DENIED** in part. The motion will be granted to the extent that it requests this court to temporarily abstain from exercising jurisdiction over the plaintiff's CWA and RCRA claims pending the final adjudication of the Chancery Court proceeding. However, the motion will be denied to the extent that it seeks a stay of this action in its entirety.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge