UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| STARLINK LOGISTICS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:12-cv-0011 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| ACC, LLC and ) | |
| SMELTER SERVICE CORP., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM**

Pending before the court is the Plaintiff's Motion for Partial Reconsideration (Docket No. 73), to which the defendant ACC, LLC ("ACC") has responded (Docket No. 76), the plaintiff has filed a reply (Docket No. 80), and ACC has filed a sur-reply (Docket No. 83). For the reasons discussed herein, the plaintiff's motion will be denied.

**BACKGROUND**

This case arises out of the alleged discharge of toxic pollutants from a closed landfill site in Mount Pleasant, Tennessee owned by ACC.[1] It is alleged that the landfill discharges pollutants, in the form of leachate and sediment, to an unnamed tributary that flows into Sugar Creek, which, in turn, is impounded to form Arrow Lake. Each of these water bodies is located on the property of the plaintiff, Starlink Logistics, Inc.. The plaintiff alleges that these continuous discharges violate the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, the

---

[1] A more thorough recitation of the factual and procedural background of this case is contained in the court's prior memorandum opinions in this case, located at Docket Nos. 34 and 64.

1

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.*, and state law. (Docket No. 61 ¶¶ 25-51.) The plaintiff's state law claims assert causes of action for private nuisance, negligence, and trespass.[2] (*Id.* ¶¶ 52-61.)

On November 30, 2012, ACC filed a Motion to Stay, relying on the *Burford* abstention doctrine. (Docket No. 40; Docket No. 41 at 6.) This doctrine provides that:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies . . . where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989). In its motion, ACC argued that the court should enter an order staying the case pending the final adjudication of proceedings currently underway in the Chancery Court of Davidson County. (Docket No. 41 at 6.) Pending before the Chancery Court is the plaintiff's appeal of an order entered by the Tennessee Solid Waste Control Board approving an Amended and Restated Consent Order ("ACO") negotiated by ACC and the Tennessee Department of Environment and Conservation ("TDEC"). (*See* Docket No. 64 at 8-12.) Under the terms of the ACO, ACC agreed that its activities were violating various state statutory provisions pertaining to water quality and solid waste disposal. (*Id.* at 10.) It also agreed to undertake certain remedial actions

---

[2] The defendant, Smelter Service Corp. ("SSC"), is alleged to be the sole member of ACC. (Docket No. 61 ¶ 5.) The Amended Complaint seeks to hold SSC jointly and severally liable for ACC's alleged violations of federal and state law. (*Id.*, Prayer for Relief.)

2

at its landfill site to bring itself into compliance with state law. (*Id.*) The plaintiff opposed a stay on the ground that it would unnecessarily delay an adjudication of the merits of this case. (Docket No. 44 at 1.) In addition, it argued that only this court could afford the total relief sought in its federal and state law claims. (*Id.* at 7-10.)

On January 17, 2013, the court issued a memorandum opinion granting ACC's Motion to Stay in part and denying it in part. (Docket No. 64.) The court ruled that it would abstain from exercising jurisdiction over the plaintiff's CWA and RCRA claims pending the final adjudication of the Chancery Court proceeding. (*Id.* at 17.) In the process of reaching its decision, the court outlined the relevant federal statutory framework underlying the plaintiff's claims. (*Id.* at 3-7.)

The court described the CWA's prohibition against discharging a pollutant into the navigable waters of the United States unless authorized by the United States Environmental Protection Agency ("EPA") or the Army Corps of Engineers ("Corps"). (Docket No. 64 at 3-4.) It noted that, through its National Pollution Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, the EPA authorized the TDEC to issue discharge permits under the CWA. (*Id.* at 4.) After explaining that Tennessee had promulgated laws to manage the issuance of such permits, the court described each of the plaintiff's two CWA claims alleging that ACC had failed to obtain the required NPDES permit ("discharge permit claim") from the state and a filling permit ("fill permit claim") from the Corps for its discharge. (*Id.* at 4-5.)

The court also explained that, pursuant to its statutory objectives, "the RCRA contemplates that states will develop solid waste management plans pursuant to regulatory guidelines promulgated by the EPA." (Docket No. 64 at 5.) The court outlined some of the required contents of such plans and noted that Tennessee's proposed solid waste management

plan received EPA approval. (*Id.* at 5-6.) In a footnote, the court also highlighted the fact that the state had received EPA approval to administer and enforce its own hazardous waste program under the RCRA. (*Id.* at 6, n.7.) After discussing Tennessee's comprehensive regulatory scheme concerning solid waste disposal, the court described each of the plaintiff's three RCRA claims. (*Id.* at 6-7.)

Turning to the merits of ACC's motion, the court relied on two Sixth Circuit decisions applying the *Burford* abstention doctrine - *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir. 1995) and *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004) - and concluded that the factors found to be dispositive of the abstention question in both of those cases were similarly present here. (Docket No. 64 at 14-17.) In doing so, the court pointed out that Tennessee had: (1) an overriding interest in regulating water quality and solid waste disposal, as evidenced by its enactment of a broad statutory scheme; (2) obtained approval from the EPA to issue NPDES permits under the CWA and implement its own solid waste management plan under the RCRA; and (3) provided for judicial review of the decisions of the Solid Waste Control Board. (*Id.* at 16.) In light of these considerations, the court determined that:

> [T]he exercise of federal review at this juncture would be disruptive of Tennessee's efforts to establish a coherent policy with respect to its management of water quality and solid waste disposal, especially given that the issues underlying the plaintiff's CWA and RCRA claims were reviewed during the contested case hearing before the Board, to which the plaintiff was a party, and are now before the Chancery Court on appeal. *See Ellis*, 390 F.3d at 480.

(*Id.*) The court also noted that abstention over the CWA and RCRA claims was warranted because they "do not arise in isolation from state law issues, as they seek to hold ACC liable under federal statutes for failures to comply with both federal and state law requirements." (*Id. at*

4

16-17.) Finally, the court noted that the plaintiff's CWA discharge permit claim and RCRA claims essentially invited the court "to second-guess the policy decisions reached by the TDEC in negotiating the consent order and ACO with ACC" and that the Sixth Circuit had previously held that such claims "'offer a classic explanation for applying *Burford* abstention.'" (*Id.* at 17) (quoting *Ellis*, 390 F.3d at 481). However, the court declined to abstain from hearing the plaintiff's CERCLA and Tennessee state law claims, "since neither of those claims was addressed in the administrative proceeding that is now under review in the Chancery Court." (*Id.* at 17-18.)

The plaintiff filed the present motion on February 12, 2013. (Docket No. 73.) In its motion, the plaintiff requests the court to reconsider its previous ruling staying the following two claims: (1) the plaintiff's CWA fill permit claim alleging that ACC, without first obtaining a dredging or filling permit from the Corps, has continued to discharge fill material that ultimately settles at the bottom of Arrow Lake, in violation of 33 U.S.C. §§ 1311 and 1344 (Docket No. 61 ¶¶ 31-33.); and (2) the plaintiff's RCRA claim alleging that ACC, by virtue of the contaminated discharge escaping its landfill, has presented an imminent and substantial endangerment to the environment in violation of 42 U.S.C. § 6972(a)(1)(b) ("RCRA endangerment claim") (*Id.* ¶¶ 45-47.). (*Id.*)

## ANALYSIS

**I.      Standard of Review**

While the Federal Rules of Civil Procedure fail to explicitly address motions to reconsider interlocutory orders, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959

5

(6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)); *see also In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.") (citing *Rodriguez*, 89 F. App'x at 959 and *Mallory*, 922 F.2d at 1282).

Thus, district courts may "afford such relief from interlocutory orders as justice requires." *Rodriguez*, 89 F. App'x at 959 (internal quotation marks and brackets omitted). Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct clear error or prevent manifest injustice. *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, 89 F. App'x at 959). This standard "vests significant discretion in district courts." *Rodriguez*, 89 F. App'x at 959 n.7.

In its motion, the plaintiff fails to identify which of the aforementioned bases it is invoking to seek reconsideration. Indeed, it does not identify any intervening change of controlling law. Nor does it present any new evidence or complain of manifest injustice. Presumably, the plaintiff is contending that reconsideration is warranted due to clear error, although, again, the plaintiff fails to expressly say as much in its motion papers.

## II.     The Plaintiff's Motion

Again, the plaintiff urges the court to reconsider its prior ruling staying the CWA fill permit and RCRA endangerment claims. The plaintiff primarily supports its motion by advancing two arguments. (Docket No. 74 at 3-5.) First, it asserts that the ACO negotiated between ACC and the TDEC does not address the aforementioned claims. Second, the plaintiff

6

contends that the TDEC lacks the authority to order the relief contemplated by each of those claims.

### A. CWA Fill Permit Claim

In its Amended Complaint, the plaintiff alleges that ACC has continued to discharge fill material, in the form of sediment, without first obtaining a dredging or filling permit from the Corps. (Docket No. 61 ¶¶ 31-33; Docket No. 74 at 1-2.) The Amended Complaint provides the following details concerning the sediment discharge:

> Throughout the operating life of ACC's Landfill, and continuing today, during storm events large quantities of sediment discharge from the Landfill operating surface and surrounding areas into [a] 36-inch diameter corrugated steel culvert pipe running under Arrow Lake Road, causing scouring of the unnamed tributary to Sugar Creek and Sugar Creek, and depositing the sediment, along with contaminants from the buried wastes, at the bottom of Arrow Lake, effectively filling 5-10 acres of the upper end of the Lake with toxic "muck" or "crud.

(Docket No. 61 ¶ 13.) It also alleges that this discharge has raised "the bottom elevation of the upper portion of [Arrow] Lake substantially." (*Id.* ¶ 31.) The fill permit claim accompanies the separate CWA discharge permit claim alleging that ACC has continued to discharge polluted leachate and sediment-laden stormwater from its landfill without ever obtaining the required NPDES permit from the State in violation of 33 U.S.C. § 1311. (*Id.* ¶¶ 26-29.)

The plaintiff argues that its fill permit claim should not have been stayed because the ACO does not address it, in that it does not require ACC to obtain a permit for its discharge of fill material. (Docket No. 74 at 4.) The plaintiff previously raised this argument in its brief opposing ACC's Motion to Stay (*see* Docket No. 44 at 8) ("the [ACO] does not require ACC to comply with the federal Clean Water Act by obtaining permits for its . . . discharge of sediment onto [the

7

plaintiff's] property"). The court considered this argument and essentially rejected it in the Memorandum Opinion. (*See* Docket No. 64 at 16) (noting that "the issues underlying the plaintiff's CWA and RCRA claims were reviewed during the contested case hearing before the [Solid Waste Control Board], to which the plaintiff was a party, and are now before the Chancery Court on appeal").

The plaintiff also contends that its fill permit claim should proceed because the TDEC lacks the authority to issue the required permit. (Docket No. 74 at 4.) The court acknowledged this point in its memorandum opinion, but nevertheless found that it should abstain from exercising jurisdiction over the fill permit claim in light of Tennessee's overriding interest in regulating water quality and solid waste disposal and the claim's close connection to the corresponding CWA discharge permit and RCRA claims. (*Id.* at 17, n.12.)

However, even if the court were to reconsider its decision regarding this claim, ACC raises an additional point indicating that the claim may not even be actionable. Specifically, ACC argues that the sediment-laden stormwater discharge that forms the basis of the plaintiff's fill permit claim does not constitute fill material as that term is defined under the applicable regulation. (Docket No. 83 at 3-5.) In a joint regulation promulgated in 2002, both the EPA and the Corps agreed that "fill material" means, among other things, any "material [that] has the effect of . . . [c]hanging the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2 (e)(1). The joint regulation further provides that:

> Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

33 C.F.R. § 323.2(e)(2). At first blush, it would appear that the sediment discharged from ACC's landfill would meet the definition of fill material.

However, ACC also directs the court's attention to the joint regulation's definition of "discharge of fill material," which provides:

> The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

33 C.F.R. § 323.2(f). Specifically, ACC contends that, given the aforementioned definition, the agencies did not contemplate the term "discharge of fill material" to include the sediment discharge at issue here. (Docket No. 83 at 3.) This argument is persuasive, in so far as the sediment-laden stormwater discharge exiting ACC's landfill is not analogous to any of the enumerated examples above.

But ACC adds that both the EPA and the Corps removed any ambiguity concerning whether the discharge at issue constitutes fill material in the preamble of the current fill material

9

regulation. 67 Fed. Reg. 31129 (2002) (final rule). (Docket No. 83 at 3-4.) In a section entitled "Effluent Guideline Limitations and 402 Permits," the preamble states:

> [W]e emphasize that today's rule generally is intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA.[3] Effluent limitation guidelines and new source performance standards ("effluent guidelines") promulgated under section 304 and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. *Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view.*

*Id.* at 31135 (emphasis added). The plaintiff acknowledges this last sentence of the preamble, but nonetheless attempts to read in a requirement that simply does not exist - namely, that to be excluded from being "fill material," such discharges can only cause minor increases to the bottom elevation of a water over time. (*See* Docket No. 80 at 4, n.1.) While the plaintiff refers to portions of the Supreme Court's decision in *Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*, 557 U.S. 261 (2009) to support its position (Docket No. 80 at 4, n. 1), the cited pages merely reproduce the section of the preamble that is quoted above and fail to offer the suggested interpretation advanced here. *See Coeur Alaska*, 557 U.S. at 288-89. Indeed, in *Coeur Alaska*, there was no dispute regarding whether the material at issue met the regulatory definition of fill material. *Id.* at 275.

---

[3] Section 402 of the CWA, 33 U.S.C. § 1342, addresses NPDES permits for the discharge of pollutants, while Section 404, 33 U.S.C. § 1344, concerns permits for dredged or fill material issued by the Corps.

Again, in its Amended Complaint, the plaintiff has alleged that the ongoing discharge of sediment-laden stormwater has, over time, substantially raised the bottom elevation of the upper portion of Arrow Lake. (*See* Docket No. 61 ¶¶ 13, 31.) In essence, this discharge is materially indistinguishable from the types of discharges of suspended or settleable solids that the preamble excludes from constituting fill material.[4] The court sees no reason to disregard the agencies' interpretation of the current fill material regulation, since there is no error or inconsistency in the interpretation. *See Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 619 (6th Cir. 2012) ("We generally give substantial deference to an agency's interpretations of its own regulations unless the interpretation is plainly erroneous or inconsistent with the published regulations"). Thus, even if the court were to reconsider its decision staying the plaintiff's CWA fill permit claim, it would nonetheless appear that the claim is not actionable, since the underlying sediment discharge does not constitute fill material.

For all of these reasons, the court will not reconsider its ruling staying the plaintiff's CWA fill permit claim.

### B. RCRA Endangerment Claim

The plaintiff's attempt to seek reconsideration of its RCRA endangerment claim is similarly unavailing. That claim alleges that ACC's ongoing mismanagement of its closed landfill has led to the escape of contaminants and is thus presenting an imminent and substantial endangerment to the environment. (Docket No. 61 ¶¶ 45-47.) Again, the plaintiff has primarily advanced two arguments to support its request for reconsideration of this claim.

---

[4] The word "sediment" is commonly understood to mean "the matter that settles to the bottom of a liquid" and, in the context of geology, "mineral or organic matter deposited by water, air, or ice." *Random House Webster's Unabridged Dictionary* 1732 (2d ed. 1998).

11

The plaintiff first contends that its RCRA endangerment claim should be allowed to proceed because the ACO does not address it, in that it does not require ACC to remediate the environmental damage to the plaintiff's property caused by the contaminated discharge. (Docket No. 74 at 5.) Again, the plaintiff previously raised a similar argument in opposing ACC's motion to stay (Docket No. 44 at 8-9), which the court essentially rejected in the memorandum opinion. (*See* Docket No. 64 at 16.) Moreover, as ACC pointed out in its opposition brief, the proposed ACO did initially require ACC to undertake certain remedial activities on the plaintiff's property. (Docket No. 76-1 at 27.) However, that provision of the ACO was later removed during the contested case hearing before the Solid Waste Control Board at the plaintiff's behest since, in the plaintiff's view, it did not address all of the damage to its property. (Docket No. 76-2 at 5.)

The plaintiff next contends that its RCRA endangerment claim should proceed because the TDEC lacks the authority to remediate damage caused to the plaintiff's property as a result of the imminent and substantial endangerment created by ACC's landfill practices. (Docket No. 74 at 5.) To properly address the plaintiff's argument, it is important to clarify precisely what relief is sought in the Amended Complaint for ACC's alleged violation of the RCRA endangerment claim. The Amended Complaint states that ACC is liable for injunctive relief and civil penalties for its creation of an imminent and substantial endangerment to the environment. (Docket No. 61 ¶ 47.) The Amended Complaint adds that the court should award injunctive relief against ACC to eliminate the ongoing endangerment - again, the contaminated discharge resulting from ACC's alleged mismanagement of its closed landfill. (*Id.* Prayer for Relief ¶ B.)

In advancing its argument regarding the TDEC's limited authority, the plaintiff relies on Tennessee Code Annotated § 68-212-206(c), which states, in pertinent part:

12

> If, at any time, the commissioner, after investigation, finds that an inactive hazardous waste substance site constitutes an imminent, substantial danger to the public health, safety or environment, the commissioner may undertake such actions as are necessary to abate the imminent and substantial danger.

Tenn. Code Ann. § 68-212-206(c). But this provision shows that the TDEC has the authority to order the relief requested in the Amended Complaint, as it is empowered to take whatever actions are necessary to abate an imminent and substantial danger presented by an inactive hazardous waste site. The word "abate" is commonly understood to mean "to reduce in amount, degree, intensity, etc.; lessen; diminish" and, in the context of a nuisance, "to put an end to or suppress." *Random House Webster's Unabridged Dictionary* 2 (2d ed. 1998). Accordingly, because the TDEC possesses the authority to eliminate the imminent and substantial endangerment alleged to have been created by ACC's landfill activities, the plaintiff's contention is without merit.

In sum, having reviewed the plaintiff's motion, the court finds no basis for it to reconsider its decision to abstain from exercising jurisdiction over the plaintiff's CWA and RCRA claims pending the final adjudication of the Chancery Court proceeding. In reaching its ruling, the court considered the arguments of the parties and the factual circumstances of this case before rendering a decision based on its interpretation of controlling authority. While the plaintiff may disagree with the court's decision, that disagreement alone is insufficient to warrant reconsideration. Indeed, the court has found none of the traditional bases for justifying reconsideration to be present here. For these reasons, the court will deny the plaintiff's motion.

## **CONCLUSION**

For all of the reasons discussed herein, the Plaintiff's Motion for Partial Reconsideration (Docket No. 73) will be **DENIED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge