IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| STARLINK LOGISTICS INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. 1:12-cv-00011 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| ACC, LLC and SMELTER SERVICE | ) | |
| CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Many federal environmental laws—including the Clean Water Act, 33 U.S.C. §§ 1251–1389 ("CWA"), and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k ("RCRA")—contain "citizen-suit" provisions. These provisions authorize "interstitial" enforcement by private citizens, but only when the government has been properly offered the chance to bring its own enforcement action and has failed to do so. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60–61 (1987). In this case, the latest chapter in the long-running legal saga between Plaintiff StarLink Logistics, Inc. ("Plaintiff") and Defendant ACC, LLC ("Defendant"), Plaintiff asserts citizen-suit claims under the CWA and RCRA, alleging that Defendant has for decades unlawfully discharged pollution from a now-closed landfill into a stream and lake on Plaintiff's neighboring property.

Now pending before the Court are three dispositive motions: Defendant's Motion for Judgment on the Pleadings (Doc. No. 247), and two cross-motions for summary judgment, one filed by Plaintiff (Doc. No. 257) and one by Defendant (Doc. No. 254). All three motions are accompanied by supporting memoranda of law (Doc. Nos. 248, 255, 258), and all three are fully

briefed and ripe for decision with Responses (Doc. Nos. 252, 265, 270) and Replies (Doc. Nos. 253, 272, 274) having been filed.

Plaintiff's claims do not respect the limited role of the citizen suit. In particular, Plaintiff's citizen-suit claims run headlong into a decade-old consent order designed to address the concerns of the Tennessee Department of Environment and Conservation ("TDEC") with respect to the landfill. Under that consent order, it is undisputed that Defendant has already excavated the waste from the former landfill and relocated it to a separate, lined area. Plaintiff cannot simply plow forward with its claims as though the consent order did not exist. Doing so would threaten to "change the nature of the citizens' role from interstitial to potentially intrusive"—a result the Supreme Court has warned against. *See Gwaltney*, 484 U.S. at 61.

For these reasons, and those that follow, Defendant's Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**. Further, to the extent that Plaintiff's claims are not included within the Court's grant of summary judgment, Plaintiff's claims will be **DISMISSED** for lack of subject-matter jurisdiction. Plaintiff's cross-motion will accordingly be **DENIED**, and Defendant's Motion for Judgment on the Pleadings will be **DENIED** as moot.

<u>BACKGROUND</u>

I.    <u>Factual Background</u>[1]

The procedural history of this case is tortuous, and some of the legal issues implicated are complex. However, the underlying material facts are straightforward and undisputed.

---

[1] The facts in this section are (a) undisputed, and (b) taken from facts in Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 266), Plaintiff's Response to Defendant's Statements of Undisputed Material Facts (Doc. No. 271), Plaintiff's Response to Defendant's Statement of Additional Material Facts (Doc. No. 273), and from a filing in the pending companion case between the same parties before this Court, namely, Plaintiff's Response to Defendant's Statement of Material Facts (Case No. 1:18-cv-00029, Doc. No. 119).

Plaintiff and Defendant are neighboring landowners in Maury County, Tennessee. Defendant was created to establish a landfill on its property (the "Landfill") dedicated solely to receiving waste from defendant Smelter Service Corp.'s operations.[2] (Doc. No. 266 at ¶ 1). Defendant constructed and operated the Landfill pursuant to a "registration" or "permit" issued on July 1, 1981 by the Tennessee Department of Public Health (the predecessor to TDEC). (*Id.* at ¶ 2; Doc. No. 271 at ¶ 8). Defendant operated the Landfill between August 1981 and September 1, 1993. (Doc. No. 266 at ¶ 3; Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 17). During that time, the only waste disposed in the Landfill consisted of byproducts from Smelter Service Corp.'s aluminum recycling operations at its secondary aluminum smelting plant—specifically, byproducts known as aluminum "slag" (also called "salt cake") and "baghouse dust." (Doc. No. 266 at ¶¶ 1, 3, 5–7; Case No. 1:18-cv-00029, Doc. No. 119 at ¶¶ 14–15). TDEC accepted the closure of the Landfill in 1996. (Doc. No. 271 at ¶ 9; Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 19).

Plaintiff owns a 1,485-acre tract of land located at 786 Arrow Lake Road in Mount Pleasant, Tennessee, which is directly adjacent to, and downstream from, Defendant's property. (Doc. No. 266 at ¶ 9; Case No. 1:18-cv-00029, Doc. No. 119 at ¶¶ 1, 12). A stream, known as Sugar Creek, is impounded to form Arrow Lake on Plaintiff's property. (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 2).

---

[2] Smelter Service Corp. is, like Defendant, a defendant in this action. However, Smelter Service Corp. has not filed a dispositive motion in this case or responded to Plaintiff's dispositive motion in this case. (In the related Case No. 1:18-cv-00029, however, Smelter Service Corp. has filed a dispositive motion, which is not at issue in this Opinion). Smelter Service Corp. appears to have assumed a position in this case as a "backseat" litigant, content to draft off Defendant's filings, because Smelter Service Corp. believes that the claims at issue in this case apply "directly" only to Defendant—and apply to Smelter Service Corp. either not at all, or at most only "derivatively" if Plaintiff is "ultimately allowed to pierce the corporate veil of ACC." (Doc. No. 237). Accordingly, for ease of reference, this Opinion will refer to ACC as "Defendant" throughout even though Smelter Service Corp. is a defendant in this case as well.

Soon after Defendant began disposing of Smelter Service Corp.'s salt cake and baghouse dust, waste in the Landfill came into contact with groundwater. (Doc. No. 266 at ¶ 11.) As groundwater infiltrated the waste, it formed something known as "leachate"—essentially, a substance consisting of dissolved chloride salts and ammonia that have leached out of the waste and into the water. (*Id.* at ¶ 12.)[3] Plaintiff's claims against Defendant in this case are all based on leachate and sediment emanating from the Landfill and entering Sugar Creek and Arrow Lake.

II.    Procedural Background

To put this case in its proper context, it is necessary to describe in some detail the administrative, state-court, and federal-court proceedings that have taken place over the last decade involving remediation of the Landfill.

### A. *TDEC's Enforcement Efforts and the 2012 Consent Order*

TDEC and Defendant have long been aware of, and have long been attempting to remedy, problems with leachate emanating from waste in the Landfill. The Tennessee Supreme Court described the lengthy history of TDEC and Defendant's efforts at remediation, from the 1980s through early 2011, as follows:

> TDEC and ACC learned, within a few years of when the landfill became operational, that high levels of chlorides and ammonia were being discharged from the landfill into groundwater and surface water that drained into Sugar Creek and Arrow Lake. The leaching of chloride and ammonia continued after the landfill's closure and caused areas west of the landfill, including Sugar Creek and Arrow Lake, to become polluted. ACC worked with TDEC to identify and remedy the leaching. ACC performed extensive investigative efforts to determine the cause of the leaching and performed multiple remedial measures but was unsuccessful in

---

[3] Tennessee Solid Waste Regulations define leachate as "a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste." Tenn. Comp. R. & Regs. 0400-11-01-.02(2). *See also Hudson River Fishermen's Ass'n v. Westchester Cnty.*, 686 F. Supp 1044, 1046 n.2 (S.D.N.Y. 1988) ("As used in the context of a landfill, leachate refers to that substance which is created when, over a period of time, compression of the solid waste, and other refuse contained within the landfill, forces liquid from the refuse. Leachate can also be produced when storm water seeps into the landfill and mixes with the refuse. The resultant liquid, or leachate, takes on the properties of certain constituents of the refuse. Leachate typically is very concentrated, high in metal and organic constituents.").

abating the pollution. In December 2003, at TDEC's request, ACC submitted a Corrective Action Plan ("the Plan") that evaluated available data, described the limitations of available options due to the site conditions, and identified three remaining options to mitigate the release of contaminated leachate from the landfill: clean closure/waste removal, leachate collection/treatment, and natural or enhanced site attenuation. . . . After a January 2004 public meeting, TDEC approved ACC's plan to build a wetlands system downgradient of the site to retain and buffer leachate and improve water quality and habitat. The wetlands system was constructed but was not successful.

In June 2008, TDEC requested that ACC submit a modified plan because the rate of discharge of contaminants from groundwater was increasing. In August 2008, ACC submitted a modified plan ("the Modified Plan") that TDEC approved in April 2010. The Modified Plan acknowledged that the discharge problem stemmed from a failure to accurately characterize the landfill's hydrogeology features during the permitting and development process, identified options for reducing the release of chlorides from the landfill and for removal of the contaminated material, and provided a strategy and schedule to evaluate, select, and implement ways to address the contaminated discharge. . . .

In January 2011, representatives of ACC and TDEC's Divisions of Solid Waste Management and Water Pollution Control met to discuss the necessary level of contaminant reduction for Sugar Creek. ACC discussed the potential remedy of removing the waste from the landfill and planned to do test excavations of waste material to assess the feasibility of the remedy.

*StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 662–63 (Tenn. 2016) (footnote omitted).

In June 2011, TDEC and Defendant's longstanding negotiations culminated in an administrative consent order. (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 37; *see* Doc. No. 16-2). The consent order was filed in Davidson County Chancery Court pursuant to provisions of Tennessee law that authorize TDEC and private parties to submit consent orders for judicial approval in order to obtain the legal force of a court judgment. (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 37.)

Plaintiff intervened in the Chancery Court action to challenge the adequacy of the consent order. *StarLink Logistics, Inc. v. ACC, LLC*, No. 12-1435-II, 2014 WL 7001397, at *3 (Tenn. Ch. Jan. 29, 2014). After Plaintiff, Defendant, and TDEC tried (and failed) to privately resolve the

disagreement over the scope of the consent order, the Chancery Court dismissed Defendant's petition seeking approval of the consent order and remanded the matter to the Tennessee Solid Waste Disposal Board (the "Board") for a contested case hearing. *Id.* at *3–4.

On May 17, 2012, TDEC notified Plaintiff that TDEC and Defendant would submit an Amended and Restated Consent Order (the "2012 Consent Order," *see* Doc. No. 41-17 at 34–59) to the Board for approval. *Id.* at *4. The 2012 Consent Order went well beyond the original consent order in terms of the concrete action it required. Specifically, the 2012 Consent Order required that, within 120 days of its effective date, Defendant would construct a berm upgradient from the Landfill to divert uncontaminated storm water away from the site. (Doc. No. 41-17 at 48). In addition, within four years Defendant would have to "remove from the current landfill site all solid waste, to the extent practicable, that has the potential for future contact with ground or surface water." (*Id.* at 49). The waste removed would be "relocated to a new landfill cell constructed on the Site or to a permitted off-site landfill." (*Id.*). Thus, in the 2012 Consent Order, TDEC and Defendant developed a two-pronged plan of attack to solve the long intractable problem of pollution from the Landfill: (1) uncontaminated storm water would, within 120 days, be diverted away from the Landfill to prevent its contamination in the short term, which (2) would allow Defendant time to relocate waste from the Landfill to another site to address more permanently the root cause of the contamination. The 2012 Consent Order also assessed a civil penalty of $400,000 against Defendant, with the entire amount contingent on Defendant's missing various deadlines set out in the 2012 Consent Order. (*Id.* at 57).

The Board permitted Plaintiff to intervene, and on August 7, 2012, the Board held a contested case hearing regarding whether to approve the 2012 Consent Order. *StarLink*, 494 S.W.3d at 663. Counsel for both Defendant and Plaintiff participated. At the hearing, TDEC and

Defendant "urged the Board to approve the proposed [2012 Consent Order], contending that the only way to remedy the contamination coming from the closed landfill was to divert storm water away from the landfill site and to remove the waste from the landfill." *Id.* Plaintiff, by contrast, objected to the 2012 Consent Order on the ground that it "did not adequately address the continued discharge of leachate into Sugar Creek and onto [Plaintiff's] property." *Id.* at 663–64.

The Board heard testimony from various witnesses, including expert witnesses. One of Plaintiff's witnesses testified that "the crux of [Plaintiff's] complaint with the proposed Amended Order was that it allowed ACC to continue releasing untreated discharge into Sugar Creek and onto [Plaintiff's] property for at least four more years while the waste is being removed." *Id.* at 664. An expert witness testifying in support of the 2012 Consent Order opined that "the cost of treating the discharge would be high and roughly equal to the cost of removing some of the waste material." *Id.* He further testified that "it would be better to focus ACC's resources on removing the landfill's waste material as opposed to treating discharge that leaves the landfill area." *Id.* A witness for Defendant similarly testified that Defendant "was not financially able to remove the waste from the landfill and also treat water discharging from the landfill. Therefore, Defendant decided it was best to focus on the root cause of the contamination by removing the waste." *Id.* at 665; *see also id.* at 666 (testimony by another one of Defendant's witnesses that the 2012 Consent Order "focused on capturing the water entering the landfill because it would be more cost-effective than capturing the water leaving the landfill," with the resulting benefit that "the money saved by not treating the water entering the landfill would be used to remove the landfill waste material").

There was some testimony at the hearing that, at one time, Plaintiff had proposed to pay for construction of a system to pipe water from the waste disposal site to other property owned by Defendant (from which it would not enter Plaintiff's property). *Id.* at 665. However, it was unclear

whether that offer was still on the table at the time of the hearing. *Id.* at 667. Testimony at the hearing did not reveal other proposed solutions to the contamination problem.

In their deliberations, numerous Board members expressed views to the effect that "it would not make sense for ACC to focus its financial resources on treating the symptom of contaminated discharge when doing so would prohibit ACC from allocating its resources to the root cause of the problem—the waste material." *Id.*; *see also id.* ("Board member Glenn Youngblood commented that until the waste material in the landfill is addressed, all parties involved would just be 'spinning their wheels' and later commented that a consent order that bankrupts ACC would benefit no one." (brackets omitted)).

The Board ultimately approved the 2012 Consent Order, finding that "remediation of the ACC Landfill in the manner specified in the [2012 Consent Order] is necessary to protect the health, safety and welfare of the public." (Doc. No. 41-17 at 6–7).

### B. The State Court Action: Judicial Review of the 2012 Consent Order

Plaintiff sought judicial review in the Davidson County Chancery Court to challenge the Board's adoption of the 2012 Consent Order. *See* Tenn. Code Ann. § 4-5-322(h). Plaintiff's action in the Chancery Court challenging the 2012 Consent Order, together with the ensuing appeals to the Tennessee Court of Appeals, Tennessee Supreme Court, and U.S. Supreme Court (on petition for writ of certiorari), will be collectively referred to herein as the "State Court Action."

On January 29, 2014, the Chancery Court upheld the Board's approval of the 2012 Consent Order, finding that the Board's decision did not exceed its statutory authority and was not arbitrary, capricious or a clearly unwarranted exercise of discretion. *StarLink Logistics, Inc. v. ACC, LLC*, 2014 WL 7001397 (Tenn. Ch. Jan. 29, 2014).

On March 11, 2015, the Tennessee Court of Appeals reversed, "find[ing] that the Board's decision was arbitrary and capricious inasmuch [as] it ignored the viability of a plan that proposed diverting contaminants before discharge"—that is, the option discussed at the Board hearing of diverting water leaving the Landfill away from Plaintiff's property by piping it to other property owned by Defendant. *StarLink Logistics Inc. v. ACC, LLC*, No. M2014–00362–COA–R3–CV, 2015 WL 1186311, at \*9 (Tenn. Ct. App. Mar. 11, 2015).

On May 9, 2016, the Tennessee Supreme Court reversed the Court of Appeals' decision, concluding that the Court of Appeals "failed to properly apply the judicial review provisions of Tennessee Code Annotated section 4–5–322(h) and substituted its judgment for that of the Board." *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 672 (Tenn. 2016).[4] The Tennessee Supreme Court concluded that the Board's decision to approve the 2012 Consent Order was not arbitrary or capricious, *id.* at 670, and remanded for the Court of Appeals to consider additional issues it had not reached the first time around, *id.* at 672.

On remand, the Court of Appeals this time affirmed the Board's approval of the 2012 Consent Order. *StarLink Logistics, Inc. v. ACC, LLC*, No. M2014–00362–COA–R3–CV, 2018 WL 637941 (Tenn. Ct. App. Jan. 31, 2018). At this point, a brief primer on some Clean Water Act basics is needed to understand the issues that were before the Tennessee Court of Appeals on

---

[4] The Tennessee Supreme Court emphasized the thorough nature of TDEC and ACC's investigation and efforts at remediation:

> For more than eight years, TDEC and ACC wrestled with the problem of contaminated water leaving the landfill site and entering Sugar Creek and Arrow Lake. ACC thoroughly investigated the condition of the landfill and its hydrogeology features, compiled data on the landfill site and remedial options, prepared and submitted reports to TDEC, reviewed the feasibility and effectiveness of various remediation options, and unsuccessfully attempted multiple remediation efforts. The issue of leachate flowing out of the landfill was clearly a difficult problem to resolve. In 2011, TDEC and ACC arrived at a solution that they considered to be reasonable, feasible, cost-effective, and practical.

*Id.* at 670.

remand. (The CWA's regulatory scheme will be explained in greater detail in a later section.) The CWA broadly prohibits any "discharge" of pollutants into navigable waters from "point sources," but prescribes particular exceptions whereby such discharges are allowed. 33 U.S.C. § 1311. One such exception permits such discharges if the polluter obtains and complies with a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). *Id.* § 1342. Before the Court of Appeals, Plaintiff argued that, under the CWA, Defendant had only two options to address the issue of contamination emanating from the Landfill: it could either stop the pollution, or it could obtain an NPDES permit. *StarLink*, 2018 WL 637941, at *5. The Court of Appeals rejected this argument, finding that Plaintiff's "argument rests on the necessity to follow the federal [CWA] and the federal precedent surrounding the statute." *Id.* The Court of Appeals instead found that the 2012 Consent Order was issued under Tennessee's Water Quality Control Act ("WQCA"), and "although federal judicial decisions 'interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee rule,' they 'are non-binding even when the state and federal rules are identical.'" *Id.* at *6 (citation omitted). The Court of Appeals concluded that the specific language of the WQCA provision at issue, Tenn. Code Ann. § 69-3-108(g),[5] gave the TDEC Commissioner the *option* to grant an NPDES permit to authorize discharges of pollutants, but did not *require* the granting of a permit (as opposed to some other means of authorizing the discharge, such as the 2012 Consent Order). *StarLink*, 2018 WL 637941, at *6. The Court of Appeals also held that the Board's decision did not violate the Tennessee Hazardous Waste

---

[5] Tenn. Code Ann. § 69-3-108(g) provides: "The commissioner may grant permits authorizing the discharges or activities described in subsection (b), including, but not limited to, land application of wastewater, but in granting such permits shall impose such conditions, including effluent standards and conditions and terms of periodic review, as are necessary to accomplish the purposes of this part, and as are not inconsistent with the regulations promulgated by the board. Under no circumstances shall the commissioner issue a permit for an activity that would cause a condition of pollution either by itself or in combination with others."

Management Act ("HWMA"), because that statute also provided the TDEC Commissioner with authority to exempt Defendant from the NPDES permit requirement. *Id.* at *6. The Court of Appeals made clear that its decision did *not* depend on an interpretation of federal law, but rather turned on Tennessee state law (the WQCA and HWMA):

> While [Plaintiff's] argument relying on federal law may have been persuasive, their reliance on such law is misguided. Neither the Board nor this Court are obligated to follow such precedent when the similar state law can be interpreted using plain language and legislative intent.

*Id.* at *7.

Plaintiff sought another round of review by the Tennessee Supreme Court, but this time the Tennessee Supreme Court denied permission to appeal.

On November 2, 2018, Plaintiff filed a petition for writ of certiorari in the U.S. Supreme Court, seeking review of whether Tennessee state law is preempted by the CWA to the extent that it authorizes the TDEC Commissioner to allow discharges of pollutants from point sources without an NPDES permit. Petition for Writ of Certiorari, *StarLink Logistics, Inc. v. ACC, LLC*, No. 18-593 (Nov. 2, 2018). Defendant and the Board each filed response briefs, arguing that the preemption issue was not implicated inasmuch as because (according to them) Plaintiff had never proven (as opposed to merely assumed) that the discharges at issue were from a "point source," and that the CWA does not require NPDES permits for non-point source discharges.[6] ACC's Brief in Opposition at 16–23, *StarLink Logistics, Inc. v. ACC, LLC*, No. 18-593 (Feb. 6, 2019); Tennessee Solid Waste Disposal Control Board's Brief in Opposition at 15–16, *StarLink Logistics,*

---

[6] As the Supreme Court has emphasized, "the structure of the [CWA] indicates that, as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States. . . . The Act envisions EPA's role in managing nonpoint source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants." *Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020).

*Inc. v. ACC, LLC*, No. 18-593 (Feb. 6, 2019). The U.S. Supreme Court denied Plaintiff's petition

for writ of certiorari on May 4, 2020. *StarLink Logistics, Inc. v. ACC, LLC*, 140 S. Ct. 2738 (2020).

### C.  The 2016 Consent Order and Related State Court Litigation

On November 23, 2016 (a few months after the Tennessee Supreme Court's opinion),

Defendant and TDEC agreed to another consent order (the "2016 Consent Order," *see* Doc. No.

197-4 at 24–39). The 2016 Consent Order did not supersede the 2012 Consent Order. Rather, the

2016 Consent Order made clear that it was "supplemental" to the 2012 Consent Order, that the

2012 Consent Order "remain[ed] in force," and that the remedial work pursuant to the 2012

Consent Order was "proceeding." (*Id.* at 29).

Significantly, the 2016 Consent Order shed light on the state of the work being conducted

under the 2012 Consent Order. It explained that the removal of waste from the Landfill pursuant

to the 2012 Consent Order had occurred in four phases spread over "four consecutive annual

construction seasons":

1) Construction of the downgradient impoundment and upgradient storm water diversion berms to manage storm water at the site;[7]

2) Construction of an approximately 12-acre lined on-site waste relocation area;

3) Excavation of approximately 550,500 cubic yards of waste and cover soils from the original landfill, and relocation of these materials to the new, lined waste area; and

4) Construction and stabilization of a minimum 12-inch thick intermediate cover layer over exposed waste.

(*Id.* at 29–30). The 2016 Consent Order stated that "[t]he fourth phase ha[d] been completed" and

that "[t]he capping of the relocated waste commenced during the 2016 construction season." (*Id.*

---

[7] The terms "upgradient" and "downgradient" refer to the direction in which water flows on Defendant's property—that is, water flows from "upgradient" locations toward "downgradient" locations. *See, e.g.*, *New York v. Adamowicz*, 16 F. Supp. 3d 123, 129 (E.D.N.Y. 2014); *S. Farmingdale Water Dist. v. Coltec Indus. Inc.*, No. 05-cv-1566, 2007 WL 9718900, at *2 n.2 (E.D.N.Y. Oct. 17, 2007).

at 30). Thus, *by November 2016, the waste had already been removed from the Landfill and was in the process of being capped in a lined, on-site waste relocation area.*

In addition to recounting the state of the work under the 2012 Consent Order, the 2016 Consent Order further explained that, although Defendant's monitoring showed reductions in the concentrations of chlorides, ammonia, and total dissolved solids in surface and groundwater leaving the Landfill site, 2016 sampling data showed that surface water and groundwater continued to contain high levels of those contaminants. (*Id.* at 30–31). To remedy this problem, the 2016 Consent Order required Defendant to implement a TDEC-approved action to prevent surface water and leachate with concentrations of the identified pollutants exceeding the Tennessee Water Quality Criteria from leaving Defendant's property and polluting downstream waters. (*Id.* at 31–34).[8]

TDEC was ultimately dissatisfied with Defendant's actions to reduce pollution in the manner required by the 2016 Consent Order.[9] Accordingly, in December 2018 TDEC filed a complaint against Defendant in Davidson County Chancery Court, alleging that Defendant failed

---

[8] Plaintiff explains that it did not challenge the 2016 Consent Order because "as written, [Defendant's] agreement to stop polluting downstream waters within 120 days"—*i.e.*, the time limit specified for Defendant to implement an interim action under the 2016 Consent Order—"was consistent with the relief [Plaintiff] was seeking under its First Claim in this action." (Doc. No. 236 at 5).

[9] As required by the 2016 Consent Order, Defendant initiated an interim action in January 2017 by installing a leachate collection system for the new waste relocation area and by transporting the leachate for off-site treatment. (Doc. No. 197-4 at 10). In March 2017, Defendant invoked its option to submit a corrective action work plan ("CAWP") to TDEC. (*Id.* at 11). However, TDEC determined that the CAWP did not adequately address the corrective action objectives of the 2016 Consent Order. After significant back and forth between TDEC and Defendant, during which TDEC sent Defendant extensive written comments and Defendant responded, TDEC ultimately required that Defendant submit a CAWP designed to prevent the release of chlorides, ammonia, and/or total dissolved solids in concentrations exceeding promulgated Tennessee Water Quality Criteria by November 1, 2018. (*Id.* at 11–15). Defendant failed to do so.

to comply with the 2016 Consent Order. (*See id.* at 2–19).[10] For reasons that are not of great importance here, but which are set forth in the first paragraph of the footnote below, the Chancery Court ultimately did not resolve that dispute.[11] Suffice it to say that it appears, from the record in

---

[10] TDEC's complaint summarized the then-current state of play:

> By the beginning of 2016, [Defendant] had completed the last phase of waste removal required under the 2012 Consent Order, excavating and relocating over 500,000 cubic yards of waste and cover soils from its original landfill to a new lined waste area on the Site. [Defendant] then began capping the relocated waste. While groundwater investigation and monitoring of the Site in 2016 revealed lower concentrations of ammonia, chlorides, and total dissolved solids (TDS) since the 2012 remedial action (waste removal) began, the reported concentrations of those pollutants were still not meeting Tennessee Water Quality Criteria.

(Doc. No. 197-4 at 9–10).

[11] TDEC moved for a temporary injunction, asking the Chancery Court to order a date certain by which Defendant would have to bring the Landfill site into compliance with Tennessee Water Quality Criteria with respect to surface water leaving the site. On February 4, 2019, the Chancery Court denied TDEC's requested injunction, finding, among other things, that the Chancery Court was not the proper forum to determine whether Defendant was complying with Tennessee Water Quality Criteria because the 2016 Consent Order established a dispute resolution process under which disputes regarding Defendant's compliance with the Consent Order must be submitted to the TDEC Commissioner's designee in the first instance. (Doc. No. 197-6 at 3–5, 19). TDEC thereafter voluntarily dismissed the action on January 23, 2019. (Doc. No. 235-2).

An informal hearing before the TDEC Commissioner's designee took place on November 21, 2019. (Doc. No. 235-6 at 3). On July 20, 2020, the Commissioner's designee found that Defendant was not in compliance with the 2016 Consent Order because "the water discharges from the ACC site . . . exceed the water quality criteria (WQC) for chlorides, ammonia, and total dissolved solids." (*Id.* at 4). The hearing officer thus upheld "TDEC's determination of noncompliance and the assessment of contingent penalties." (*Id.* at 9).

On September 21, 2020, Defendant filed a petition for judicial review and declaratory relief against the TDEC Commissioner and the Tennessee Underground Storage Tanks and Solid Waste Disposal Control Board, once again in Davidson County Chancery Court. (Doc. No. 235-7). The Chancery Court issued an opinion in December 2020, which summarized the state of affairs as follows:

> After a contested case hearing before the Tennessee Solid Waste Board in 2012 [Defendant] entered into a Consent Order with [TDEC] and began remediating the Site. The final phase of the remediation was addressed in a 2016 Consent Order and concerned the surface water migrating from the Site. Four years later the parties are at an impasse on the scope of the remediation. TDEC claims [Defendant] is not complying with the provisions of the 2016 Consent Order concerning surface water leaving the Site. [Defendant] asserts it is in compliance and that the TDEC Commissioner is exceeding jurisdiction by applying a stricter Water Quality Criteria for chloride or total dissolved solids . . . to an unnamed tributary to Sugar Creek than the Petition asserts was promulgated

this Court, that in December 2020 the dispute between TDEC and Defendant related to the 2016 Consent Order was remanded to the Underground Tanks and Solid Waste Disposal Board for a contested case hearing, with possible judicial review to follow. (Doc. No. 235-1 at 4–5). The record does not reflect the outcome of that hearing, or the further steps (if any) taken in connection with TDEC's efforts to enforce the 2016 Consent Order against Defendant.

### D. This Case

With an understanding of that lengthy state administrative and state court procedural history, the Court now turns to the instant federal case.

On July 21, 2011—about a month after TDEC and Defendant entered into the original consent order, but more than a year before TDEC and Defendant entered into the 2012 Consent Order—Plaintiff sent a Notice of Intent to Sue to Defendant, TDEC, and the EPA—as statutorily required before a private citizen plaintiff may file a lawsuit under the CWA or RCRA. (*See* Doc. No. 255-1). On January 19, 2012, Plaintiff initiated this case.[12] (*See* Doc. No. 1). The original complaint asserted claims under the CWA (Counts 1 and 2), RCRA (Counts 3–5), and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (Count 6), as well as Tennessee common-law claims for private nuisance (Count 7), negligence (Count 8), trespass (Count 9), and punitive damages (Count 10). (*Id.* at 9–18).

---

by the Tennessee Board of Water Quality, Oil and Gas . . . . The Commissioner asserts that [Defendant] is liable for contingent penalties for noncompliance. [Defendant] disputes that.

(Doc. No. 235-1 at 2–3).

[12] This was the same day that Defendant notified the Chancery Court the parties could not resolve their dispute and requested a remand to the Board. *See StarLink*, 2014 WL 7001397, at *3.

Defendant moved to dismiss the original complaint, and on June 25, 2012, the Court denied that motion. (*See* Doc. No. 34).[13] Notably, this denial occurred more than a month *before* TDEC and Defendant entered into the 2012 Consent Order on August 7, 2012.

On January 9, 2013, Plaintiff filed an Amended Complaint (Doc. No. 61), which for the first time named Smelter Service Corp. as a defendant, but otherwise did not substantively alter Plaintiff's claims. (*See* Doc. Nos. 42, 43). The Amended Complaint remains the operative complaint here.

### E. *This Court Abstains Under* Burford

In 2013, this Court took an important action that explains why this case remains pending ten years after it was filed and is crucial to understanding the Court's ultimate disposition of the case at this time. Namely, on January 17, 2013, the Court abstained from hearing Plaintiff's CWA and RCRA claims under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). (*See* Doc. Nos. 64, 65).

---

[13] Defendant argued, among other things, that the Court lacked subject-matter jurisdiction because TDEC was "diligently prosecuting" an enforcement action against Defendant, *see* 33 U.S.C. § 1365(b)(1)(B) (barring CWA citizen suits "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order"), as evidenced by the fact that TDEC and Defendant had entered into the original consent order in June 2011. (Doc. No. 16 at 13–14). The Court rejected that argument because the diligent-prosecution bar applies only if the state is prosecuting a civil or criminal action "in a court of the United States, or a State," and Defendant's voluntary filing of the original consent order in the Chancery Court did not amount to the commencement of a civil or criminal enforcement action in a state court. (Doc. No. 34 at 11–12).

The Court also rejected Defendant's argument that the Court lacked subject-matter jurisdiction over the CWA claims due to 33 U.S.C. § 1319(g)(6)(A), which provides in pertinent part that:

> [A]ny violation . . . with respect to which a State has commenced and is diligently prosecuting an action *under a State law comparable to this subsection* . . .shall not be the subject of a civil penalty action under . . . section 1365 of this title.

(Emphasis added). The Court concluded that § 1319(g)(6)(A) was rendered inapplicable to this action by *Jones v. City of Lakeland, Tenn.*, 224 F.3d 518, 524 (6th Cir. 2000) (en banc), which held that the CWA and WQCA are *not* comparable statutes. (Doc. No. 34 at 12–15). No party challenges these decade-old conclusions via the currently pending motions.

The *Burford* doctrine is a rule of federalism that requires federal courts sometimes to abstain from hearing cases that would unduly interfere with a state's efforts to maintain a coherent policy over an "essentially local problem." *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* (*NOPSI*), 491 U.S. 350, 360–62 (1989) (quoting *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 347 (1951)); *see also* 17A Charles A. Wright et al., *Federal Practice and Procedure* § 4245, at 382 (3d ed. 2007) ("The general thrust of Burford-type abstention can be well captured by saying that abstention is ordered in order to avoid needless conflict with the administration by a state of its own affairs . . . . ."). As the Supreme Court has laid down the test, the *Burford* doctrine is that:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI*, 491 U.S. at 361 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)).[14]

Defendant asked this Court to abstain under *Burford* in light of the recently filed State Court Action. In its motion, Defendant asked the Court to stay all ten of Plaintiff's claims, emphasizing that the work of remediating the Landfill in conformance with the 2012 Consent Order was already well under way:

> [Plaintiff] failed to seek a stay of the [2012 Consent Order] before the Board or in Chancery Court. Thus, a removal action . . . was selected and commenced at the ACC landfill site on or about September 12, 2012, in compliance with the [2012 Consent Order].

---

[14] Notably, the Supreme Court's discussion here was indeed about *Burford* abstention even though (for whatever reason) the Supreme Court cited *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), which is the origin of what is widely recognized as a separate abstention doctrine known as "*Colorado River*" abstention.

Because [Plaintiff] failed to seek a stay of the [2012 Consent Order], the remedial measures are underway; as of October 31, 2012, the Phase I Cell work is complete. Any alleged unauthorized discharge of surface water emanating from the ACC Landfill has ceased.

(Doc. No. 41 at 4–5 (internal citations and emphasis omitted)).

The Court ultimately granted Defendant's motion to stay with respect to the CWA claims (Counts 1 and 2) and RCRA claims (Counts 3–5), based on the second prong (alternative) of *Burford*, finding that "the exercise of federal review at this juncture would be disruptive of Tennessee's efforts to establish a coherent policy with respect to its management of water quality and solid waste disposal, especially given that the issues underlying the plaintiff's CWA and RCRA claims were reviewed during the contested case hearing before the Board, to which the plaintiff was a party, and are now before the Chancery Court on appeal." (Doc. No. 64 at 16). In support of this conclusion, the Court observed that Tennessee has an "overriding interest in protecting its environment from the effects of contaminated discharges flowing from solid waste disposal sites into state waters," as evidenced by its enactment of a "broad regulatory scheme concerning water quality and solid waste disposal," including judicial review of decisions of the Board. (*Id.*). The Court recognized that Plaintiff's CWA claim,

in seeking civil penalties stiffer than those provided in the [2012 Consent Order], . . . essentially invites this court to second-guess the policy decisions reached by the TDEC in negotiating the [2012 Consent Order] with ACC. The same can also be said for the plaintiff's RCRA claims, which seek injunctive relief against ACC to eliminate its statutory violations, as well as more severe civil penalties. In this respect, these claims are similar to those that boil down to allegations that the state agency "failed to apply or misapplied its lawful authority under" applicable state and federal law. . . . As the Sixth Circuit [has recognized], such claims "offer a classic explanation for applying *Burford* abstention."

(*Id.* at 17 (quoting *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481 (6th Cir. 2004))). The Court also particularly noted that Defendant had submitted evidence demonstrating that it had already begun remedial activities at the Landfill pursuant to the 2012 Consent Order:

> In support of its motion, ACC has submitted affidavits attesting to the fact that remedial activities pursuant to the [2012 Consent Order] are currently underway at the landfill site. Specifically, Nancy Sullivan, a professional engineer and principal at an environmental consulting firm retained by ACC to assist in its remedial activities, testified that ACC has completed construction of a new phase-1 landfill cell to hold the landfill waste. She added that ACC has incurred over $1 million in costs for conducting remedial activities in 2012. Thomas Grosko, ACC's Manager, also testified to the completion of the phase-1 landfill cell and added that, pursuant to the [2012 Consent Order], ACC constructed an upgradient berm to divert uncontaminated storm water away from the landfill. The plaintiff does not appear to dispute that ACC has commenced remedial activities at its landfill pursuant to the [2012 Consent Order], although it does appear to challenge the effectiveness of the actions taken thus far.

(*Id.* at 11–12 (internal citations omitted)).

The Court declined, however, to stay Plaintiff's CERCLA claim or its state common-law claims, finding that *Burford* abstention was not warranted with respect to those claims, "since neither of those claims was addressed in the administrative proceeding that is now under review in the Chancery Court." (*Id.* at 18). Accordingly, after January 2013, the parties proceeded with discovery on the CERCLA claim and the state common-law claims, while the CWA and RCRA claims ultimately remained stayed for more than eight years.

### F. The Related 2018 Action

On October 25, 2017, Plaintiff issued a second Notice of Intent to Sue. (*See* Case No. 1:18-cv-00029, Doc. 1-1). On April 9, 2018, Plaintiff initiated a second federal action in this Court, Case No. 1:18-cv-00029 (the "2018 Action"). (*See* Case No. 1:18-cv-00029, Doc. No. 1). This Opinion does not address any of the claims or pending motions in the 2018 Action, although,

where indicated, it does rely on undisputed facts that these same parties have asserted in the 2018 Action.

### G. This Court Lifts the Stay

On July 2, 2018—about five months after the Tennessee Court of Appeals' second decision upholding the 2012 Consent Order—Plaintiff moved to lift the stay of the CWA and RCRA claims in this case that had been in place since January 2013. (Doc. Nos. 177, 178). Plaintiff argued that *Burford* abstention had ceased to be warranted because Plaintiff had now "exhausted [its] state court appeals of the Board Order," and because Defendant had "completed the removal action that was required by the Board Order." (Doc. No. 178 at 15). However, several months after moving to lift the stay, Plaintiff filed a petition for a writ of certiorari in the U.S. Supreme Court, seeking review of the Tennessee Court of Appeals' final decision in the State Court Action. Accordingly, on July 9, 2019, this Court declined to lift the stay because the pending petition for certiorari meant that the State Court Action had *not* yet been finally adjudicated.[15] (Doc. No. 218 at 3). Thereafter, following a case management conference, on August 30, 2019, the Court severed the non-stayed CERCLA and state-law claims from this case and consolidated them with the claims pending in the 2018 Action. (Doc. No. 225).

On May 4, 2020, the U.S. Supreme Court denied Plaintiff's petition for writ of certiorari. *StarLink Logistics, Inc. v. ACC, LLC*, 140 S. Ct. 2738 (2020). On March 10, 2021, this Court granted Plaintiff's motion to lift the stay of the CWA and RCRA claims (the only claims left in this case), concluding that the stay should be lifted "simply to enable, as is now appropriate,

---

[15] The undersigned did not become the presiding judge in this case until October 22, 2018, when the case was reassigned to him from another district judge. (Doc. No. 189). The actions described above (*i.e.*, the actions taken by this Court prior to October 22, 2018) were taken by other judges of this Court.

*something* to happen to move this case forward" after eight years in hibernation. (Doc. No. 241 at 1–2). In lifting the stay, the Court took "no position as to any substantive issues." (*Id.* at 2).

III.    The Current State of the Landfill[16]

As should be evident from the lengthy procedural history discussed above, the state of the Landfill today is vastly different from when Plaintiff commenced this action in 2012. The parties' Statements of Undisputed Material Facts filed in both this case and the 2018 Action acknowledge that reality.

For example, it is undisputed that in 2012, Defendant began implementing the corrective actions set forth in the 2012 Consent Order. (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 43). As recounted in the 2016 Consent Order, those actions included constructing downgradient impoundment and upgradient storm water diversion berms to manage storm water at the site; constructing a 12-acre lined on-site waste relocation area; excavating approximately 550,500 cubic yards of waste and cover soils from the original Landfill and relocating these materials to the new, lined waste area; and constructing a minimum 12-inch-thick intermediate cover layer over exposed waste. (Doc. No. 197-4 at 29–30). According to the 2016 Consent Order, these activities had been completed as of November 2016, and "[t]he capping of the relocated waste commenced during the 2016 construction season." (*Id.* at 30).

Defendant contends that, consistent with the facts related in the 2016 Consent Order, the construction activities were "substantially completed" in late 2016 (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 45), and that "the former ACC landfill was dug up between the years 2012-2016 and

---

[16] Unless otherwise noted, the facts in this section are (a) taken from facts in Plaintiff's Response to Defendant's Statement of Additional Material Facts (Doc. No. 273) and from a filing in the 2018 Action, namely, Plaintiff's Response to Defendant's Statement of Material Facts (Case No. 1:18-cv-00029, Doc. No. 119), and (b) disputed. The facts set forth herein are either undisputed or specifically identified as disputed.

the waste that was in the former ACC Landfill was relocated . . . into what is referred to as the 'Waste Relocation Area,'" (Doc. No. 273 at ¶ 4). Plaintiff quibbles with the characterization of the construction activities as "completed," but Plaintiff's point appears to be only that Defendant has not submitted a Notice of Termination to TDEC because further remedial activities at the Landfill may be necessary. (Case No. 1:18-cv-00029, Doc. No. 119 at ¶ 45). Crucially, Plaintiff does not appear to dispute that the key portions of the corrective actions contemplated by the 2012 Consent Order—that is, construction of the berms, removal of the waste from the original landfill, and relocation to a new waste area with a synthetic liner and capped with an engineered cover (known as the "Waste Relocation Area")—were complete as of 2016. (*Id.* at ¶¶ 45–46; Doc. No. 273 at ¶ 5). Indeed, in its original motion to lift the stay, Plaintiff argued that lifting the stay would be appropriate in part because Defendant had "completed the removal action that was required by the Board Order." (Doc. No. 178 at 15).

While Plaintiff concedes that "most of the waste from the ACC Landfill was relocated to the Waste Relocation Area," Plaintiff does dispute that "*all* such waste and waste-impacted soils located beneath that waste was removed from the former Landfill and placed in the Waste Relocation Area." (Doc. No. 273 at ¶ 4) (emphasis added). In support of this assertion, Plaintiff cites August 31, 2021, deposition testimony from its expert, Charles M. McCullough, in which Mr. McCullough opined as follows:

> [W]hen ACC removed the waste, they didn't just take the waste out and put it in the WRA [Waste Relocation Area], they also took the soil on top and put it in the WRA because that soil was impacted by the waste. What they didn't do was take the soil that was in the bottom and move that over to the WRA that was impacted. And that's what's generating the problem out there today. . . . [T]hey took out the waste and the soil above it that was impacted. They didn't take out the soil below it that was impacted.

(*Id.*; Doc. No. 273-2 at 4).

Plaintiff's position thus appears to be that, although the waste and the soil on top of the waste were removed from the Landfill and relocated to the Waste Relocation Area as of 2016, Defendant failed also to remove contaminated soil from the Landfill that was *below* the waste, and that this below-waste soil is the cause of the ongoing contamination problems today. In other words, to the extent Plaintiff seeks prospective relief in this case, that relief is based not on pollution from waste in the Landfill as it existed in 2012, but rather on pollution from contaminated soil below the former Landfill waste left after Defendant completed the work required by the 2012 Consent Order.

IV.    Plaintiff's Claims

After the Court severed Plaintiff's CERCLA and state common-law claims from this case and transferred them to the 2018 Action, five claims remain in this case, two under the CWA and three under RCRA:

A. *CWA Claims*

In Claim One, Plaintiff asserts a violation of the CWA's NPDES permit requirement. (Doc. No. 61 at ¶¶ 25–29). Plaintiff alleges that Defendant has violated the CWA by discharging "pollutants"—specifically, both surface and subsurface leachate, as well as sediment-laden stormwater—from one or more "point sources" into navigable waters of the United States without an NPDES Permit, in violation of 33 U.S.C. § 1311.

In Claim Two, Plaintiff asserts a violation of the CWA's dredge-and-fill permit requirement. (Doc. No. 61 at ¶¶ 30–33). Plaintiff alleges that Defendant's failure both to properly operate its Landfill while open, and to comply with TDEC's rules for post-closure care and monitoring for closed solid waste landfills, have resulted in "the discharge or placement of significant quantities of fill material in Arrow Lake, raising the bottom elevation of the upper

portion of the Lake substantially." (*Id.* at ¶ 31). Plaintiff further alleges that this discharge or placement of "fill material" occurred without a dredge-and-fill permit from the U.S. Army Corps of Engineers, in violation of 33 U.S.C. §§ 1311 and 1344.

As discussed further below, both of Plaintiff's CWA claims are asserted via the CWA's citizen-suit provision, 33 U.S.C. § 1365.

### B. RCRA Claims

In Claim Three, Plaintiff alleges that Defendant has violated RCRA because the Landfill constitutes an "open dump" as defined by 42 U.S.C. § 6903(14). (Doc. No. 61 at ¶¶ 34–38). Under § 6903(14), an "open dump" is defined as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under [42 U.S.C. § 6944]."[17] In other words, an "open dump" is essentially the opposite of a "sanitary landfill." RCRA requires the EPA to "promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps." 42 U.S.C. § 6944(a). At a minimum, EPA's criteria must provide that "a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." *Id.* EPA has promulgated criteria for distinguishing between sanitary landfills and open dumps at 40 C.F.R. Part 257. RCRA expressly makes the prohibition on open dumping enforceable through RCRA's citizen-suit provision. 42 U.S.C. § 6945 (stating that RCRA's prohibition against open dumping "shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping"). Plaintiff alleges that Defendant has engaged in open dumping through Defendant's failures to (i) properly operate

---

[17] The definition of "open dump" also includes any facility "which is not a facility for disposal of hazardous waste." 42 U.S.C. § 6903(14). The parties do not appear to dispute that the Landfill has never been a facility for disposal of hazardous waste.

the Landfill while open; (ii) comply with TDEC's rules for post-closure care and monitoring for closed solid waste landfills; (iii) apply for and comply with an NPDES permit; and (iv) apply for and comply with a dredge-and-fill permit. (Doc. No. 61 at ¶ 37). Plaintiff alleges that these failures have resulted in the following actions that constitute open dumping under EPA regulations: (i) the discharge of pollutants to waters of the United States in violation of the CWA's NPDES permitting requirements; (ii) the discharge of fill material to waters of the United States in violation of the CWA's dredge-and-fill permitting requirements; (iii) the discharge of non-point source pollution to waters of the United States in violation of Tennessee's U.S. EPA-approved state solid waste management plan; and/or (iv) contaminated underground drinking water sources. (*Id.* at ¶¶ 36–37).

In Claim Four, Plaintiff alleges that Defendant failed to close the Landfill in compliance with Tennessee's post-closure performance standard established in Tenn. Admin. Code Chapter 0400-11-01.[18] (*Id.* at ¶¶ 39–43). Plaintiff alleges that Chapter 0400-11-01 "includes rules requiring that operators of solid waste landfills close the landfill in a manner that controls, minimizes, or eliminates, to the extent necessary to prevent threats to public health and the environment, post-closure escape of solid waste, solid waste constituents, leachate, contaminated rainfall, or waste decomposition products to the ground or surface water." (*Id.* at ¶ 41). Plaintiff further alleges that Defendant failed to close the Landfill in compliance with these standards because "solid wastes, solid waste constituents, leachate, contaminated rainfall, and waste decomposition projects have escaped, and continue [to] escape today, to the ground and surface waters on and off of the site in quantities, and in such concentrations, that are immediately toxic to all aquatic life, and even toxic

---

[18] The Amended Complaint alleges that the post-closure performance standard is set forth in Tenn. Admin Code Chapter 1200-01-07 (Doc. No. 61 at ¶¶ 41–42), but that Chapter has since been renumbered as Chapter 0400-11-01.

to surrounding surface vegetation." (*Id.* at ¶ 42). Because Chapter 0400-11-01 was approved by the EPA as part of Tennessee's RCRA solid waste management plan, Plaintiff alleges that Defendant's violation of the standards set forth in Chapter 0400-11-01 may form the basis for a citizen suit under RCRA. *See* 42 U.S.C. § 6972(a)(1)(A) (authorizing RCRA citizen suits against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter").

In Claim Five, Plaintiff alleges (under another subsection of RCRA's citizen suit provision) that Defendant has "contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of . . . solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). (Doc. No. 61 at ¶¶ 44–47). Specifically, Plaintiff alleges that Defendant's mismanagement of the closed Landfill "has caused, and continues to cause today, the escape of solid wastes, solid waste constituents, leachate, contaminated rainfall, and waste decomposition projects . . . in such quantities and in such concentrations as to be immediately lethal to aquatic life in the unnamed tributary to Sugar Creek, in Sugar Creek and in the upper portion of Arrow Lake . . . and even toxic to surface vegetation." (*Id.* at ¶ 46). Plaintiff alleges that these circumstances present an "imminent and substantial endangerment to the environment" for purposes of 42 U.S.C. § 6972(a)(1)(B).

Crucially for the analysis to follow, all of the claims in this case are brought under the CWA's and RCRA's respective citizen-suit provisions. *See* 33 U.S.C. § 1365 (CWA); 42 U.S.C. § 6972 (RCRA). Indeed, Plaintiff's claims *must* be brought under those provisions, because the citizen-suit provisions provide the *exclusive* cause of action for a private plaintiff seeking to enforce the substantive requirements of the CWA and RCRA. *Middlesex Cnty. Sewerage Auth. v.*

*Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15 (1981) (CWA); *Bd. of Trs. of Painesville Twp. v. City of Painesville, Ohio*, 200 F.3d 396, 399 (6th Cir. 1999) ("As the Supreme Court made clear in *Sea Clammers*, the CWA's legislative history and elaborate enforcement provisions preclude lower federal courts from recognizing an implied private right of action under provisions other than § 1365."); *Walls v. Waste Res. Corp.*, 761 F.2d 311, 314–16 (6th Cir. 1985) (CWA and RCRA).

V.     The Pending Motions

As noted at the outset, there are three dispositive motions pending in this case: (a) Defendant's Motion for Judgment on the Pleadings (Doc. No. 247); (b) Defendant's Motion for Summary Judgment (Doc. No. 254); and (c) Plaintiff's Motion for Summary Judgment (Doc. No. 257). The arguments in Defendant's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment overlap to a large extent. Because it is questionable whether many of those arguments can be resolved solely on the basis of the pleadings, the Court will direct its attention first to Defendant's Motion for Summary Judgment (hereafter, "Motion"). The Court finds this to be the most efficient way to address the various pending motions because, should the Court grant the Motion in full—or conclude that Plaintiff's claims must be dismissed for some other reason, such as lack of subject-matter jurisdiction—then Defendant's Motion for Judgment on the Pleadings could be denied as moot without the need for additional analysis.

The Court will briefly describe each motion in turn.

*Defendant's Motion for Judgment on the Pleadings*. Defendant argues first that Plaintiff's claims are barred by the doctrine of res judicata (*i.e.*, claim preclusion) because they were fully litigated in the State Court Action. (Doc. No. 248 at 8–13). Next, Defendant argues that Plaintiff's claims are barred by collateral estoppel (*i.e.*, issue preclusion) based on issues raised and decided

in the State Court Action. (*Id.* at 13–15). Defendant's third argument is that Plaintiff's claims are an improper collateral attack on the results of the State Court Action. (*Id.* at 15–19). This argument characterizes Plaintiff's claims as impermissible attacks on the permits issued by TDEC and also contends that Plaintiff's claims are barred by the *Rooke*r-*Feldman* doctrine. Finally, Defendant argues that Plaintiff lacks a private right of action under the CWA or RCRA. (*Id.* at 19–22). This last argument, although sometimes framed broadly, at other times appears simply to be that the CWA and RCRA do not authorize damages as a form of relief—a point Plaintiff does not contest (*see* Doc. No. 252 at 24–25 (conceding that Plaintiff seeks only injunctive relief and civil penalties)).

*Defendant's Motion for Summary Judgment*. Defendant raises five arguments in support of its Motion for Summary Judgment. First, Defendant argues that Plaintiff's Notice Letter failed to satisfy the applicable specificity requirements for such a notice under the CWA and RCRA, which (if true) would mean that the Court lacks subject-matter jurisdiction. (Doc. No. 255 at 6–11). Defendant next asserts that Plaintiff's claims are barred by the five-year statute of limitations in 28 U.S.C. § 2462. (*Id.* at 11–13). Defendant also argues that Plaintiff's claims are not justiciable under Article III of the Constitution because, among other reasons, Plaintiff lacks standing and its claims are moot now that the Landfill is no longer in operation. (*Id.* at 13–18). As in Defendant's Motion for Judgment on the Pleadings, Defendant also argues that Plaintiff's claims are "collaterally estopped"; however here Defendant appears not to be invoking issue preclusion but rather arguing that Plaintiff is (impermissibly) collaterally attacking TDEC's issuance of permits to Defendant. (*Id.* at 18–21). Finally, Defendant again argues that Plaintiff's claims are barred by claim preclusion, including that Plaintiff's claims for civil penalties are barred because the 2012 Consent Order already ordered civil penalties against Defendant. (*Id.* at 21–25).

*Plaintiff's Motion for Summary Judgment.* Plaintiff argues that it is entitled to summary judgment on the merits of each of its five claims: (1) that Defendant has violated the CWA by discharging pollutants from a point source without an NPDES permit (Doc. No. 258 at 4–10); (2) that Defendant has also violated the CWA by discharging fill material into navigable waters without a dredge-and-fill permit (*id.* at 10–15); (3) that Defendant has violated RCRA by operating an "open dump" and engaging in "open dumping" (*id.* at 15–20); (4) that Defendant has violated RCRA by failing to comply with the State of Tennessee's landfill closure and post-closure care requirements (*id.* at 20–22); and (5) that Defendant has violated RCRA in that pollution emanating from the Landfill presents an imminent and substantial endangerment to health and the environment (*id.* at 22–25).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006), *abrogated on other grounds by Young v. Utd. Parcel Serv., Inc.*,

575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

It is typically stated that the party bringing the summary judgment motion (the movant) has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See, e.g.*, *Johnson v. Ford Motor Co.*, 13 F.4th 493, 502 (6th Cir. 2021) ("At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008))); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). But this is somewhat inexact in the aftermath of 2010 amendments to Rule 56. The movant's initial burden actually is to demonstrate the absence of a genuine issue of material fact, and not necessarily to so demonstrate specifically by referencing portions of the record. True, prior to the 2010 amendments, referencing portions of the record seemed to be the only way to make such a demonstration, and even today that is the primary way to make such a demonstration.[19] But the 2010 amendments added, *inter alia*, Rule 56(c)(1)(B), which "recognizes that a party need not always point to specific record materials." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment.

Under Rule 56(c)(1)(B), the movant actually has another available means—an alternative to *citing materials in the record*—for demonstrating the absence of a genuine issue of material fact. Specifically, the moving party may meet its initial burden (to indicate the absence of a genuine issue of material fact) by "show[ing]"—even without citing materials of record—that the

---

[19] Under current Rule 56, a party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—still can (and typically does) attempt to support the assertion by pointing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A).

nonmovant "cannot produce admissible evidence to support [a material] fact" (for example, the existence of an element of a nonmovant plaintiff's claim). *See* Fed. R. Civ. P. 56(c)(1)(B).[20]

If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009)). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849–50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to

---

[20] More specifically, Rule 56(c)(1)(B), as added in 2010, provides in pertinent part that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). This means, specifically in the case of a party asserting that a fact *cannot be* genuinely disputed (which typically would be the summary judgment *movant*), that its assertion can be supported by "show[ing]"—even without citing materials of record—that the adverse party (typically the *non-movant*) cannot produce admissible evidence to support the fact.

any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

One important implication from the prior paragraph is that the court should not, in determining whether one side or the other is entitled to summary judgment on a particular claim, take the approach of looking at all relevant evidence from a single perspective and then ask whether the evidence reflects a genuine issue of material fact such that neither party is entitled to summary judgment. Instead, the court must consider the cross-motions separately, viewing the evidence not from a single perspective, but rather from one perspective on one cross-motion and then from a different perspective on the other cross-motion; more specifically, the court must view the evidence in favor of the non-movant on each of the respective cross-motions, and ask whether the movant has shown the absence of a genuine issue of material fact even with the evidence viewed in the non-movant's favor.

STATUTORY FRAMEWORK

The Court will next provide an overview of the CWA, RCRA, and the citizen-suit provisions of those statutes. This overview is necessary and informs the analysis that follows.

I.    Clean Water Act

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Before the CWA, "Federal and State Governments regulated water pollution in large part by setting water quality standards." *Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020) (citing *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202–03 (1976)). The CWA replaced this system with a flat prohibition on "'the discharge of any pollutant by any person'

unless done in compliance with some provision of the Act." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) (quoting 33 U.S.C. § 1311(a)); *see Tenn. Clean Water Network v. TVA*, 206 F. Supp. 3d 1280, 1285 (M.D. Tenn. 2016) ("The bedrock of the CWA is 'a default regime of strict liability,' whereby the discharge of any covered pollutant into the Nation's waters amounts to a violation of the statute unless subject to a specific exception." (quoting *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015))).

The CWA's broad regime of strict liability is, however, subject to at least one important limitation. Although the CWA defines the term "pollutant" broadly, *see* 33 U.S.C. § 1362(6), the CWA defines the phrase "discharge of a pollutant" more restrictively to mean "any addition of any pollutant to navigable waters *from any point source*," *id.* § 1362(12) (emphasis added). And a "point source" means a "discernible, confined and discrete conveyance," such as a "pipe, ditch, channel, [or] tunnel . . . from which pollutants are or may be discharged." *Id.* § 1362(14). *See Cnty. of Maui*, 140 S. Ct. at 1469; *Miccosukee Tribe*, 541 U.S. at 102. Thus, although the CWA affords the EPA substantial authority to regulate pollutants emanating from "point sources," the statute also "leave[s] substantial responsibility and autonomy to the States" to regulate "groundwater pollution and nonpoint source pollution." *Cnty. of Maui*, 140 S. Ct. at 1471.

The principal exception under which the CWA authorizes the "discharge" of pollutants is prescribed by § 402 of the statute, which establishes the National Pollutant Discharge Elimination System, or "NPDES." *See* 33 U.S.C. § 1342. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Miccosukee Tribe*, 541 U.S. at 102. "Discharge of pollutants into the waters of the United States without an NPDES permit, or in violation of the terms of an

NPDES permit, is typically a violation of the CWA." *Tenn. Clean Water Network*, 206 F. Supp. 3d at 1285–86.

The CWA allows the Administrator of the EPA to issue NPDES permits authorizing the discharge of pollutants from point sources in accordance with specified conditions. 33 U.S.C. § 1342(a). However, "each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the Administrator." *Gwaltney*, 484 U.S. at 52 (citing 33 U.S.C. § 1342(b)). Once the EPA Administrator approves a state program, the Administrator must suspend the issuance of federal permits as to waters subject to that state program. 33 U.S.C. § 1342(c)(1). "In December of 1977, the EPA authorized the State of Tennessee to issue some types of NPDES permits, which the State grants and enforces through TDEC." *Tenn. Clean Water Network*, 206 F. Supp. 3d at 1286 (citing 56 Fed. Reg. 21, 376 (1991)). So as relevant to this case, TDEC—not EPA—is the applicable NPDES permitting authority.

The CWA also establishes a separate permitting system under § 404 of the statute, which authorizes the U.S. Army Corps of Engineers (not EPA) to grant permits for the discharge of "dredged or fill material." *See* 33 U.S.C. § 1344(a); *Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*, 557 U.S. 261, 268 (2009).

II.     Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act is a "comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). RCRA "is not principally designed to effectuate the cleanup of toxic waste sites." *Id.* Rather, its primary purpose is "to reduce the generation of hazardous waste" in the first place, and "to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health

and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)). RCRA's intricate scheme is often described as authorizing EPA to regulate solid and hazardous wastes "from cradle to grave." *See, e.g.*, *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 331 (1994); *United States v. ILCO, Inc.*, 996 F.2d 1126, 1130 (11th Cir. 1993).

III.    <u>Citizen Suits</u>

Primary enforcement authority under both the CWA and RCRA lies with the government (the EPA and the states)—not with private citizens. *See S. Side Quarry, LLC v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 28 F.4th 684, 690 (6th Cir. 2022) ("When violations [of the CWA] occur, the EPA and the states form the first line of defense. They retain the 'primary' power to 'enforce' the CWA." (brackets omitted) (quoting *Askins v. Ohio Dep't of Agric.*, 809 F.3d 868, 875 (6th Cir. 2016))); *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (RCRA's citizen-suit provision "belongs to a genre common to environmental laws under which citizen suits serve as goads to both the EPA and polluters without displacing the federal agency as the principal enforcer").

Both the CWA and RCRA permit private citizens to act as adjuncts to the government— as a secondary line of enforcement—by filing "citizen suits" when the government has been offered the chance to act but chosen not to. *See* 33 U.S.C. § 1365 (CWA); 42 U.S.C. § 6972 (RCRA). Citizen suits "serve only as a backup, permitting citizens to abate pollution when the government cannot or will not command compliance." *S. Side Quarry*, 28 F.4th at 690 (brackets and internal quotation marks omitted) (quoting *Askins*, 809 F.3d at 875); *see also Sierra Club v. Hamilton Cnty. Bd. of Cnty. Com'rs*, 504 F.3d 634, 637 (6th Cir. 2007) ("Although the primary responsibility for enforcement rests with the state and federal governments, private citizens

provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations.").

The purpose of citizen suits is to prevent ongoing harm to "society as a whole," not to redress particular harms suffered by private persons. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004). Citizen suits may thus be used only in a prospective manner: "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Gwaltney*, 484 U.S. at 59. Damages are not available under the citizen-suit provisions of the CWA or RCRA; the only authorized forms of relief are injunctive relief, civil penalties, and attorney's fees. [21] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 173 (2000) ("a district court may prescribe injunctive relief in [a CWA citizen] suit; additionally or alternatively, the court may impose civil penalties payable to the United States Treasury"); *Meghrig*, 516 U.S. at 484 (RCRA); *Gwaltney*, 484 U.S. at 53 ("If the citizen prevails in [a CWA citizen suit], the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury."); *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 601 (6th Cir. 2004) ("the relief available under § 6972 of the RCRA is virtually identical to that available under the CWA, i.e., injunctive relief, civil penalties, and attorney fees"); *Walls*, 761 F.2d at 316 ("the District Court was clearly correct in . . . dismissing the plaintiffs' counts for damages under 42 U.S.C. § 6972(a) and 33 U.S.C. § 1365(a), since neither of these provisions expressly permits a private action for damages").

In *Gwaltney*, the Supreme Court emphasized that citizen suits play only a limited and "interstitial" role and should not "intru[de]" on governmental enforcement prerogatives. 484 U.S.

---

[21] Defendant argues that Plaintiff is (wrongly) attempting to seek damages under the CWA and RCRA. (Doc. No. 248 at 20–22). Not so. Plaintiff (correctly) disclaims any intent to seek damages in this action. (Doc. No. 252 at 24–25).

at 61.[22] Citizen suits, the Court explained, are "meant to supplement rather than supplant governmental action." *Id.* at 60; *see also id.* at 53 ("*In the absence of federal or state enforcement*, private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." (emphasis added)).

To ensure that citizen suits retain their properly limited character, both the CWA and RCRA contain notice provisions that require a citizen plaintiff to provide at least 60 days' notice to the EPA, the relevant state, and the defendant(s) before the plaintiff may commence a citizen suit. *See* 33 U.S.C. § 1365(b) (CWA); 42 U.S.C. § 6972(b) (RCRA). These notice provisions establish a procedure whereby a putative citizen plaintiff must notify the relevant government enforcers (EPA and the state), wait (at least) 60 days, and then—*only if* the government is not "diligently prosecuting" a court action by the end of the 60-day period—may the citizen plaintiff proceed.

By affording the government notice and opportunity to take charge, the notice provisions play a crucial role in maintaining the appropriate division between government and private enforcement of the CWA and RCRA. Requiring notice "allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989). Because of the important functions served

---

[22] Although *Gwaltney* specifically concerned the CWA's citizen-suit provisions, its generalized statements about citizen suits apply equally to RCRA. As the Supreme Court has recognized, numerous federal environmental laws—including the CWA and RCRA—contain similarly structured citizen-suit provisions modeled on those in the Clean Air Act. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 23 & n.1 (1989) (collecting environmental statutes with citizen-suit provisions modeled on the Clean Air Act, including the CWA and RCRA); *Gwaltney*, 484 U.S. at 62 (noting that the CWA's citizen suit provision is modeled on the Clean Air Act's similar provision). Indeed, the structure of the citizen-suit provisions in the CWA and RCRA is "essentially the same." *Vernon Village, Inc. v. Gottier*, 755 F. Supp. 1142, 1152 (D. Conn. 1990). For this reason, courts commonly construe the citizen-suit provisions of the CWA and RCRA (and other federal environmental laws) in gross. *See, e.g.*, *Walls*, 761 F.2d at 315–16 (collectively interpreting the citizen-suit provisions of the CWA and RCRA and applying Supreme Court caselaw regarding the CWA's citizen-suit provisions to interpret both statutes).

by the notice provisions, a citizen plaintiff's failure to comply with them will deprive the court of subject-matter jurisdiction over the plaintiff's suit. *Id.* at 31 (holding that compliance with RCRA's notice requirement is a "mandatory condition[] precedent to commencing" a citizen suit); *Bd. of Trs. of Painesville Twp.*, 200 F.3d at 400 ("[The Sixth Circuit] has always required plaintiffs to adhere to [the CWA's] notice provision because compliance with the notice requirement is a jurisdictional prerequisite to recovery under the statute."); *Walls*, 761 F.2d at 316 (holding that "compliance with the sixty day notice requirement is a jurisdictional prerequisite to bringing suit against private defendants under the citizen suit provisions of RCRA and [CWA]").[23]

---

[23] More recently, the Sixth Circuit has referred to the pre-suit notice requirement as a "mandatory condition precedent" to bringing a citizen suit. *See S. Side Quarry*, 28 F.4th at 694 (quoting *Cooper v. Toledo Area Sanitary Dist.*, 797 F. App'x 920, 923 (6th Cir. 2019)). This "condition precedent" language is notable for its omission of any reference to "jurisdiction." In *Cooper* (an unpublished decision), the Sixth Circuit expressed uncertainty over whether the pre-suit notice requirement is truly jurisdictional, but ultimately "[did] not dwell on the question" because the court found that the plaintiff there "complied with the notice requirement in any event." 797 F. App'x at 924 n.1. The *Cooper* court acknowledged that multiple previous published Sixth Circuit decisions refer to the pre-suit notice requirement as jurisdictional. *Id.* (citing *Bd. of Trs. of Painesville Twp.*, 200 F.3d at 400, and *Walls*, 761 F.2d at 316). The *Cooper* court's dictum aside, the undersigned feels bound to conclude, based on the clear language cited above from the published decisions in *Painesville Township* and *Walls*, that the pre-suit notice requirement is, in fact, jurisdictional, at least until a published decision of the Sixth Circuit—or the U.S. Supreme Court—says otherwise, perhaps as part of the long running project of more rigorously policing the bounds of the term "jurisdictional." *See, e.g.*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010).

Even in cases that use the "mandatory condition precedent" language, the Sixth Circuit has continued to recognize that, "[i]f a plaintiff fails to provide sufficient notice, a district court 'must dismiss the action as barred' under the CWA." *S. Side Quarry*, 28 F.4th at 694 (quoting *Atl. States Legal Found., Inc., v. Utd. Musical Instruments*, 61 F.3d 473, 478 (6th Cir. 1995)). The main functional difference between dismissal for failure to comply with a "mandatory condition precedent" and dismissal for lack of subject-matter jurisdiction is that "a dismissal for lack of subject matter jurisdiction is not a dismissal on the merits for claim preclusion purposes," whereas a dismissal for failure to satisfy a condition precedent *would be* a dismissal on the merits and thus preclude further suits on the same claim. *See Mitchell v. Chapman*, 343 F.3d 811, 820 (6th Cir. 2003). In the specific context of this case, the Court does not perceive a significant functional difference between the two forms of dismissal. Even if the Court were to dismiss Plaintiff's citizen-suit claims for failure to satisfy a mandatory condition precedent, and thus "on the merits," it is unclear how a future suit—seeking only prospective relief based on the current facts on the ground, as citizen suits must—would be barred by claim preclusion (other than with respect to some portion of civil penalties). *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1596 (2020) ("Claim preclusion generally 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'") (citation omitted).

ANALYSIS

With that statutory framework in mind, the Court turns to the pending motions. The Amended Complaint does not set forth any particular occurrences of the CWA and RCRA violations it alleges. Rather, it refers only to alleged violations that occurred continuously over a period of time long pre-dating 2012. That is to say, Plaintiff neither identifies any particular dates on which alleged violations occurred nor ties any claims to particular violation(s) or the date(s) thereof. However, the violations (and Plaintiff's claims based on those violations) can best be addressed by dividing them into two groups for purposes of analysis and considering the violations in each group collectively. Thus, Plaintiff's claims will herein be referred to as (i) the "Pre-Consent-Order Claims" to the extent that they are based on discrete alleged violations that would have supported a claim that accrued before the entry of the 2012 Consent Order and (ii) the "Post-Consent-Order Claims" to the extent that they are based on discrete alleged violations that would have supported a claim that accrued *after* the entry of the 2012 Consent Order.[24]

I.    Post-Consent-Order Claims

Taking the Post-Consent-Order Claims first, those claims must all be dismissed for lack of subject-matter jurisdiction. Under *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004), once the State of Tennessee resolved its claims against Defendant relating to pollution at the Landfill

---

[24] The Court uses this terminology aware that the Amended Complaint alleges (in its asserted causes of action dubbed "First Claim for Relief" through "Tenth Claim for Relief") only a single "claim" with respect to each category of alleged violation at issue. Nonetheless, the Court believes that dividing the claims into "Pre-Consent-Order" and "Post-Consent-Order" groups is compelled by *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004), as discussed immediately below. The Court also believes its terminology is useful and appropriate because the Amended Complaint alleges repeated commission by Defendant of each kind of alleged violation, and each such violation could support what is conceivably viewed as a separate "claim." This is reflected by the fact that defendants can be liable for civil penalties in citizen suits under the CWA and RCRA like the one brought here by Plaintiff—albeit with such penalties being payable to the Government and not the plaintiff—and that a civil penalty is assessable for "each" violation. *See* 42 U.S.C. § 6928(g) (authorizing civil penalty "not to exceed $25,000 for each . . . violation"); 33 U.S.C. § 1319(d) (authorizing civil penalty "not to exceed $25,000 per day for each violation").

via the 2012 Consent Order, Plaintiff had to submit a new notice of intent to sue in order to proceed with its claims post-dating the 2012 Consent Order. Without a new notice of intent to sue, Plaintiff has failed to satisfy the CWA's and RCRA's notice requirements with respect to its claims accruing after the 2012 Consent Order. Accordingly, the Court will **DISMISS** the Post-Consent-Order claims without prejudice for lack of subject-matter jurisdiction.[25]

### A. Sixth Circuit precedent regarding the effect of a government consent order on pending citizen suits

Under binding Sixth Circuit precedent, the 2012 Consent Order has a significant effect on the proper analysis of this case.[26] In *Ellis*, the United States and private citizen plaintiffs each filed "overlapp[ing]" Clean Air Act ("CAA") claims[27] against the same corporate defendants. 390 F.3d at 468. After the citizen plaintiffs intervened in the United States' suit, the district court entered consent decrees that resolved the United States' claims against the defendants. *Id.* The citizens continued to press their separate suit, however, and the district court ultimately concluded that, although the citizen plaintiffs' claims up to the date of entry of the consent decrees were barred by claim preclusion, the plaintiffs were entitled to a permanent injunction for their CAA claims *postdating* entry of the consent decrees. *Id.* at 469.

---

[25] Although Defendant does argue that the 2012 Consent Order requires dismissal under *Ellis*, Defendant frames the issue largely as one of claim preclusion rather than subject-matter jurisdiction. (Doc. No. 255 at 22). Regardless of how Defendant chose to frame the issue, the Court concludes that it goes to the Court's subject-matter jurisdiction, and therefore the Court has an independent obligation to raise and decide the issue. *See Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").

[26] As discussed later, the 2016 Consent Order has a similar effect. The Court focuses its analysis on the 2012 Consent Order because any portion of Plaintiff's claims affected by the 2016 Consent Order is necessarily also impacted by the 2012 Consent Order.

[27] As explained in footnote 22, *supra*, the CWA's citizen-suit provisions are modeled on those in the CAA. Indeed, "[t]he citizen suit provisions in the Clean Air Act and the Clean Water Act are virtually identical." *St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Refining, LLC*, 500 F. Supp. 2d 592, 602 n.2 (E.D. La. 2007).

On appeal, the Sixth Circuit first emphasized the important function served by citizen-suit notice provisions. Such notice provisions "allow Government agencies to take responsibility for enforcing environmental regulations." *Id.* at 475 (quoting *Hallstrom*, 493 U.S. at 28). Because citizen suits play a merely "interstitial" role in enforcing environmental statutes "when environmental officials '*fail* to exercise their enforcement responsibility,'" citizen suits may not "seek types of relief 'that the government chose to forgo.'" *Id.* (quoting *Gwaltney*, 484 U.S. at 60–61). "[O]therwise, administrative 'discretion to enforce the statute in the public interest would be curtailed considerably' and the 'nature of the citizens' role' would become 'potentially intrusive.'" *Id.* (brackets omitted) (quoting *Gwaltney*, 484 U.S. at 60–61).

Based on these important policies underlying (and limiting) citizen suits, the *Ellis* court concluded that the citizen plaintiffs' claims for "alleged post-consent-decree violations constitute[d] 'new' claims that must separately comply with the notice provisions of the Clean Air Act." *Id.* at 474. The court reasoned that, after "a consent decree dismissing the same types of claims that [plaintiffs] had previously filed," the citizen plaintiffs were required to satisfy "the traditional requirements for commencing an action regarding new claims," including the 60-day notice requirement. *Id.* at 476. "If it is true that citizens must notify the EPA before commencing an action in the first instance, surely it is true that they must notify the EPA before commencing an action that turns on the alleged inadequacy (or alleged under-enforcement) of a consent decree proposed by and negotiated by that very agency." *Id.* Indeed, the Sixth Circuit found the requirement of notice for the plaintiffs' post-consent-decree claims to be "doubly important" because the plaintiffs "not only sought to obtain an injunction on the same terms as the consent decrees but they also sought to obtain relief on 'more stringent terms than those worked out by the EPA.'" *Id.* at 477 (quoting *U.S. E.P.A. v. City of Green Forest, Ark.*, 921 F.2d 1394, 1404 (8th Cir.

1990)). Such "second-guessing" of the government's assessment of an appropriate remedy failed to respect the statute's "careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view." *Id.*

In response to the district court's concern that the citizen plaintiffs did not have the right to enforce the EPA's consent decree, the Sixth Circuit observed that "it is well to remember that the Clean Air Act primarily serves public, not private, interests. Citizens acting as 'private attorneys general' to enforce the Clean Air Act, as the phrase implies, seek relief not on their own behalf but on behalf of society as a whole, and accordingly 'personalized' remedies are not a first priority of the Act." *Id.* (citing *Orange Env't, Inc. v. Cnty. of Orange*, 923 F. Supp. 529, 539 (S.D.N.Y. 1996)).

The Sixth Circuit then explained that, in any event, three avenues of relief remained open to the citizen plaintiffs: (1) they could have petitioned the EPA to enforce the consent decrees; (2) they could have petitioned the EPA or the court to obtain a modification of the consent decree; and/or (3) they could have filed a new lawsuit after supplying the requisite notice to the EPA, to the state, and to the defendants. *Id.* "What the [citizen plaintiffs] cannot do once the EPA becomes involved is wait until the EPA has resolved its own claims against the polluter, then obtain stricter enforcement than the Government negotiated." *Id.* To obtain such stricter post-consent-decree relief, the citizen plaintiffs would have to "notif[y] the EPA that violations of the Clean Air Act had persisted after the entry of the consent decrees," and then, "if the Government did not enforce the decrees or otherwise prosecute these claims, the [citizen plaintiffs] could file a new complaint (and comply with the statute's 60–day notice requirements, in part by showing that the Government is not 'diligently prosecuting' its suit, *i.e.*, not enforcing the consent decrees)." *Id.*

A district court in this Circuit has applied *Ellis* to dismiss a citizen plaintiff's CWA claims in circumstances similar to this case. *See DP Marina, LLC v. City of Chattanooga, Tenn.*, 41 F. Supp. 3d 682 (E.D. Tenn. 2014). In *DP Marina*, the plaintiff filed a CWA citizen suit against the City of Chattanooga based on allegedly unlawful discharges of sewage and wastewater from the municipal sewer system. *Id.* at 684. Thereafter, the EPA and the State of Tennessee brought a separate CWA suit against the City for similar discharges from the sewer system. *Id.* In the government's case, the district court entered a consent decree that resolved the government's claims against the City. *Id.*

After the entry of the consent decree, the citizen plaintiff provided a new notice under the CWA notice provisions and attempted to proceed with its CWA claims in its existing suit. *Id.* at 693–94. The court first concluded that (as in *Ellis*) the citizen plaintiff's claims were barred by claim preclusion up through the date of the consent decree. *Id.* at 686–91. Next, the court considered the effect of the consent decree on the citizen plaintiff's *post-consent-decree* CWA claims. Relying on *Ellis*, the court held that, following the consent decree, the plaintiff's only option was to provide a new 60-day notice *and file a new lawsuit*:

> While the [*Ellis*] court noted that appropriate notice would be required to institute a new lawsuit for the post-decree violations, the court did not state or even suggest that the citizen-plaintiffs would have been entitled to maintain their claims for post-decree violations in their existing citizens' suit had they properly given the government notice of [their] intent to sue for those violations. Instead, the court suggested that *any such new claims should be brought in a new lawsuit and should be based on a 60–day notice which would adequately warn the government that the suit was based on "the alleged inadequacy (or alleged under-enforcement) of [the] consent decree proposed by and negotiated by"* the government.
>
> The court expressly noted in *Ellis* that the plaintiffs had three specific avenues of relief that they could pursue for the alleged post-decree violations: (1) seek enforcement of the consent decrees; (2) seek modification of the consent decree; or (3) file a new lawsuit. The Court finds that *Ellis stands for the proposition that these are the only methods of relief [that] are available to citizen-plaintiffs in the*

> *wake of a valid consent decree for violations of the CAA or CWA that fall within the scope of relief provided for in the decree.*

*Id.* at 693 (emphasis added).

The court concluded that "although Plaintiff complied with the CWA's notice provisions, it nonetheless failed to put the government on notice that it would seek to challenge the adequacy or enforcement of a valid consent decree and failed to seek an appropriate avenue for relief for its post-decree CWA claims." *Id.* at 694. Accordingly, the court dismissed without prejudice the citizen plaintiffs' claims for post-decree violations. *Id.*

This Court agrees with the *DP Marina* court's interpretation of *Ellis* and now holds as follows: After the government—whether federal or state—reaches a valid consent decree (or consent order) with a party, a citizen plaintiff that is currently pursuing CWA or RCRA claims against that same party that fall within the scope of the relief provided for in the consent decree (or order) has only three options: (1) petition the government to enforce the consent decree (or order); (2) seek modification of the consent decree (or order) from the government or a court; or (3) file a new lawsuit after providing the requisite notice to the EPA, to the state, and to the defendant. *Ellis*, 390 F.3d at 477; *DP Marina*, 41 F. Supp. 3d at 693.

If the citizen plaintiff chooses none of these options, but instead attempts to plow ahead with its existing CWA or RCRA claims notwithstanding the consent decree (or order), the result is that the court lacks subject-matter jurisdiction over the claim to extent it asserts CWA or RCRA violations that accrued after the date upon which the consent decree was entered. This is because, as stated earlier, compliance with the notice requirement for citizen suits is a matter of subject-matter jurisdiction. *Bd. of Trs. of Painesville Twp.*, 200 F.3d at 400 ("[The Sixth Circuit] has always required plaintiffs to adhere to [the CWA's] notice provision because compliance with the notice requirement is a jurisdictional prerequisite to recovery under the statute."); *Walls*, 761 F.2d

at 316 (holding that "compliance with the sixty day notice requirement is a jurisdictional requirement" to bringing a citizen suit under the CWA or RCRA); *DP Marina*, 41 F. Supp. 3d at 694 (dismissing post-consent-decree CWA claims for lack of subject-matter jurisdiction).

### B.  Application of precedent to the Post-Consent-Order Claims

Here, the Post-Consent-Order Claims assert violations of the CWA and RCRA that "fall within the scope of relief" provided for in the 2012 Consent Order. *See DP Marina*, 41 F. Supp. 3d at 693. The 2012 Consent Order resolved the state's claims against Defendant relating to the "unacceptably high levels of chloride and ammonia [that] were leaching out of the wastes [in the Landfill] and into the underlying ground water and down-gradient surface water that drained into Sugar Creek and Arrow Lake." (Doc. No. 41-17 at 39). The state chose to resolve those claims by requiring Defendant to take certain measures to solve the problem of pollution emanating from the Landfill (*i.e.*, constructing an upgradient berm and then removing the waste from the Landfill and placing it in the Waste Relocation Area); the goal of Plaintiff's CWA and RCRA claims is now to require Defendant to take *different* measures to resolve those same problems (*e.g.*, applying for and obtaining NPDES and dredge-and-fill permits).

After TDEC and Defendant entered into the 2012 Consent Order, Plaintiff could have petitioned TDEC to enforce the 2012 Consent Order if it believed that Defendant was not complying (although there is no indication that Defendant actually failed to comply with the 2012 Consent Order). Plaintiff also could have asked TDEC or a court to modify the 2012 Consent Order if Plaintiff believed it was ineffective. Indeed, that was essentially the purpose of the State Court Action, which Plaintiff litigated for eight years to no avail. And Plaintiff could have filed a new lawsuit *after providing the requisite notice to the EPA, to the state, and to Defendant*. But what Plaintiff could *not* do is what it has chosen to attempt: "wait until the [government] has

resolved its own claims against the polluter, then"—without notice to the government—"[attempt to] obtain stricter enforcement than the Government negotiated." *See Ellis*, 390 F.3d at 477.

Plaintiff's Post-Consent-Order claims necessarily "turn[] on the alleged inadequacy" of the 2012 Consent Order. *See id.* Defendant completed its work under the 2012 Consent Order six years ago and the waste from the Landfill has now been moved to the Waste Relocation Area. If the 2012 Consent Order had adequately addressed the problem of pollutants and fill material being discharged from the Landfill, then the Post-Consent-Order Claims would fail (both on the merits and for mootness). The Post-Consent-Order Claims thus necessarily depend on the inadequacy of the 2012 Consent Order.[28] Plaintiff's Post-Consent-Order Claims fall squarely within the scope of relief provided for in the 2012 Consent Order and so Plaintiff had to submit a new 60-day notice in order to proceed with those claims.[29]

_____

[28] In *Ellis*, the citizen plaintiffs argued that they had the right to continue to seek injunctive relief after a government settlement, "if the violations continue." 390 F.3d at 478. In support of that argument, the *Ellis* plaintiffs cited *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 127–28 (2d Cir. 1991), and *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 355 (8th Cir. 1998), which *Ellis* described as standing for the proposition that "citizen plaintiffs may maintain their lawsuits after the Government has resolved claims regarding earlier violations when there is a 'realistic prospect' of the alleged violations continuing." 390 F.3d at 478. *Ellis* found both of these cases to be inapplicable on this point because "neither . . . establishes that a court may issue a citizen-suit injunction when consent decrees concluded by the Government grant prospective injunctive relief covering the same ground." *Id.* For essentially the same reason, the Court finds those two decisions inapplicable here; that is, by ordering Defendant to remove and relocate the Landfill waste, the 2012 Consent Order as good as ordered "prospective injunctive relief covering the same ground" as Plaintiff's claims here, even if the 2012 Consent Order was not formally an "injunction." Moreover, the cited portion of *Comfort Lake* clearly was concerned with mootness, not the 60-day notice provision. *See* 138 F.3d at 355. The Court does not read *Comfort Lake* to suggest that a plaintiff could continue with a citizen suit after a consent order without giving the required notice simply because there is a "realistic prospect" that the defendant's violations could continue. To the extent that *Eastman Kodak* could be so read, the Court finds *Eastman Kodak* simply inconsistent with *Ellis* and *DP Marina*, which clearly indicate that the court lacks subject-matter jurisdiction under such circumstances.

[29] It is true that the 2012 Consent Order does not explicitly address sediment (as opposed to leachate). However, it is reasonable to conclude that TDEC would have expected that the main remedy contemplated by the 2012 Consent Order—relocating the waste from the Landfill—would have addressed any problems

What's more, the problems with Plaintiff's Post-Consent-Order Claims stem not just from the 2012 Consent Order, but from the 2016 Consent Order as well. In the 2016 Consent Order, TDEC sought to address the continued problem of pollutants flowing from the Landfill—even after the waste had been removed and relocated—by requiring Defendant to implement a TDEC-approved action to prevent surface water and leachate with concentrations of chlorides, ammonia, and/or total dissolved solids exceeding the Tennessee Water Quality Criteria from leaving Defendant's property and polluting downstream waters. (Doc. No. 197-4 at 32–33). As far as the record reveals, TDEC may still be attempting to enforce the 2016 Consent Order against Defendant in state administrative and judicial proceedings. The Post-Consent-Order Claims thus turn on the alleged inadequacy or underenforcement of not one *but two* consent orders.

It is undisputed that the only notice Plaintiff provided of its intent to pursue the CWA and RCRA claims asserted in this case was provided on July 21, 2011—before entry of the 2012 Consent Order. (Doc. No. 271 at ¶ 1). Under *Ellis*, Plaintiff had to provide a new notice if it intended to pursue those claims to the extent they accrued after the 2012 Consent Order and after the 2016 Consent Order. Plaintiff's failure to do so deprives the Court of subject-matter jurisdiction over those claims. *See Bd. of Trs. of Painesville Twp.*, 200 F.3d at 400; *Walls*, 761 F.2d at 316.

This may at first blush seem to be a harsh result. But in addition to being required by binding precedent (*Ellis*), dismissal of the Post-Consent-Order Claims serves salutary purposes. One of those is judicial economy. As the Sixth Circuit has explained, "[o]ne of the important purposes of the notice requirement under environmental statutes is to facilitate 'dispute resolution

the Landfill may have been experiencing with discharges of sediment as well as leachate. Moreover, as the Court has previously noted, there is a "close nexus" between the dredge-and-fill permit claim and the NPDES permit and RCRA claims. (Doc. No. 64 at 17 n.17). Accordingly, the Court finds that Plaintiff's Post-Consent-Order CWA dredge-and-fill permit claim necessarily turns on the alleged inadequacy of (at least) the 2012 Consent Order, and thus required a new 60-day notice.

by EPA negotiation and thereby reduce the volume of costly litigation.'" *Atl. States Legal Found., Inc. v. Utd. Musical Instruments, USA, Inc.*, 61 F.3d 473, 478 (6th Cir. 1995) (brackets omitted) (quoting *Walls*, 761 F.2d at 317). Had Plaintiff notified the EPA, TDEC, and Defendant that it intended to pursue CWA and RCRA claims based on the inadequacy of the 2012 and 2016 Consent Orders, EPA and/or TDEC might have stepped in to negotiate a resolution—thereby conserving the valuable resources of both the parties and the Court. Dismissing the Post-Consent-Order claims under these circumstances also respects Congress's choice to enact a limited citizen-suit regime that "authorize[s] citizen suits only when environmental officials '*fail* to exercise their enforcement responsibility' and . . . provide[s] an 'interstitial' role for private parties in enforcing the statute." *Ellis*, 390 F.3d at 475 (quoting *Gwaltney*, 484 U.S. at 60–61). By disregarding multiple government consent orders, Plaintiff attempts to subvert the limited citizen-suit enforcement scheme that Congress created.

To the extent that Plaintiff simply disagrees with the remedies TDEC has chosen to negotiate, that is a feature (rather than a bug) of a system whereby the government has primary enforcement authority and private citizen suits must take a back seat unless the government fails to act. *See, e.g.*, *City of Green Forest*, 921 F.2d at 1404 ("The EPA is charged with enforcing the CWA on behalf of all citizens. . . . While the [citizen plaintiffs] might have preferred more stringent terms than those worked out by the EPA, such citizens are no more aggrieved than citizens who are precluded from commencing an action in the first instance because of pending agency action."); *Hudson River Fishermen's Ass'n v. Westchester Cnty.*, 686 F. Supp. 1044, 1052 (S.D.N.Y. 1988) ("The Government, of course, as representative of society as a whole, usually is in the best position to vindicate societal rights and interests. In those instances where, for whatever reasons, the Government fails or declines to take action, the CWA allows citizens acting as private

attorneys general to fill the void. That does not mean, however, that [the citizen plaintiff] is *ipso facto* entitled to its own, 'personalized' remedy in this or any other CWA case.").

Accordingly, Plaintiff's Post-Consent-Order Claims will be **DISMISSED** for lack of subject-matter jurisdiction.

IV.     Pre-Consent-Order Claims

Having disposed of any claims that may have accrued following the entry of the 2012 Consent Order, the question remains what to do with Plaintiff's CWA and RCRA claims that may have accrued before the 2012 Consent Order, *i.e.*, the Pre-Consent-Order Claims. For the reasons that follow, the Court finds that although Plaintiff gave adequate pre-suit notice of these claims, the Pre-Consent-Order Claims nonetheless must be dismissed because they are (1) moot to the extent they seek injunctive and declaratory relief, (2) barred to the extent they seek civil penalties because the 2012 Consent Order already imposed civil penalties on Defendant for the same conduct, and (3) also barred entirely (regardless of the form of relief sought) by the doctrine of claim preclusion based on the final judgment entered in the State Court Action.

A.  *Adequacy of Pre-Suit Notice*

Defendant argues that the Court lacks subject-matter jurisdiction over Plaintiff's CWA and RCRA claims because the pre-suit Notice Letter failed to provide notice of the claims with the required degree of specificity. (Doc. No. 255 at 6–11). When a plaintiff provides notice before filing a citizen suit, "the notice must 'contain sufficient information to allow [a defendant] to identify all pertinent aspects of its alleged violations without extensive investigation.'" *Cooper v. Toledo Area Sanitary Dist.*, 797 F. App'x 920, 924 (6th Cir. 2019) (quoting *Sierra Club*, 504 F.3d at 644). The content required of such notices is spelled out by regulation—one for the CWA, *see*

40 C.F.R. § 135.3,[30] and one for RCRA, *see* 40 C.F.R. § 254.3.[31] "Dismissal is . . . required if the plaintiff fails to provide notice prior to bringing suit, *or if it provides notice that is somehow deficient*." *Cooper*, 797 F. App'x at 924 (emphasis added); *see also Stephens v. Koch Foods, LLC*, 667 F. Supp. 2d 768, 785 (E.D. Tenn. 2009) (stating that "[s]trict compliance" with the CWA notice regulation "is a mandatory jurisdictional prerequisite for a citizen suit"). Having already found no subject-matter jurisdiction over the Post-Consent-Order Claims, the Court will consider the adequacy of the Notice Letter only with respect to the Pre-Consent-Order Claims.

Defendant contends that the Notice Letter failed to comply with the regulation governing notice of CWA claims because it failed to identify the "effluent standard or limitation" or "order with respect thereto" that Defendant is alleged to have violated. *See* 40 C.F.R. § 135.3(a). (Doc. No. 255 at 9–11). It is true that the Notice Letter does not identify a specific effluent standard or limitation in a permit, or order with respect thereto. (*See* Doc. No. 255-1.) But Defendant's argument nonetheless fails because it ignores a key distinction between (a) CWA citizen-suit claims that allege discrete violations of an existing permit, and (b) claims (like this one) that the defendant *wholly lacks a required permit*. *See S. Side Quarry*, 28 F.4th at 694 (distinguishing between such claims). Plaintiff here claims that Defendant is required to obtain both an NPDES permit and a dredge-and-fill permit, but in fact has neither. Under these circumstances, it would

---

[30] "Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

[31] "Notice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order which has become effective under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 254.3(a).

make little sense to require Plaintiff to specify the particular effluent standard or limitation in the permit at issue when Plaintiff's claim is that *there is no permit at all* (even though, according to Plaintiff, there should be).

With respect to the RCRA claims, Defendant argues that the Notice Letter was deficient because it failed to identify the "specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated." *See* 40 C.F.R. § 254.3(a). (Doc. No. 255 at 8). The Court disagrees with Defendant's characterization of the Notice Letter. It clearly alleges that Defendant violated TDEC requirements for closed solid waste landfills to (i) properly monitor, protect and preserve the integrity of the final cover, (ii) stop leachate from discharging to surface and groundwaters, (iii) prevent erosion, (iv) prevent ponding of surface water, and (v) take corrective action to remediate downstream leachate contamination. (Doc. No. 255-1 at 3–4). The Notice Letter also specifically alleges that the Landfill contains "pollutants and contaminants including metals, chlorides, and ammonia," and that the discharge of resulting leachate was causing "an 'imminent and substantial endangerment to health or the environment' as defined under . . . 42 U.S.C. § 6972(a)(1)(B)." (*Id.* at 4). For present purposes, the issue is not whether these claims have merit; it is merely whether they are adequately alleged in the Notice Letter so as to inform Defendant of what requirements Plaintiff claims were violated. The Notice Letter achieves that modest goal.

Defendant also argues that the Notice Letter is inadequate because it fails to identify the specific "date or dates" on which the alleged CWA and RCRA violations occurred. *See* 40 C.F.R. §§ 135.3(a), 254.3(a). This argument overlooks the difference between "the normal citizen suit where plaintiffs are suing over specific, discrete discharges which occur over a finite period," *Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), *aff'd* 236

F.3d 985, 996 (9th Cir. 2000), and this suit in which Plaintiff alleges that Defendant has *failed* to take a variety of actions (*i.e.*, has failed to obtain the required CWA permits and to comply with TDEC requirements for closed landfills). When bringing such a claim, a plaintiff need not notify the defendant of all the many days on which it failed to take the allegedly required action. *See Cooper*, 797 F. App'x at 925 (noting that when the alleged CWA violation was the failure to take a specific mandated act, "the violation was necessarily ongoing until the action was taken"); *Sw. Marine, Inc.*, 945 F. Supp. at 1333 ("[T]he deficiencies in [the allegedly required] plans are ongoing, so there is no specific date that can be alleged as the date of the violation. As long as [defendant] operates without a legally adequate [Best Management Practices Program], [Storm Water Pollution Prevention Plan], or monitoring and reporting plan, the violations will continue each and every day."). There is little more that a plaintiff can do under these circumstances than notify the defendant that the plaintiff believes the identified action is required, and that the plaintiff will consider it an ongoing violation unless and until the defendant takes the action.

At the end of the day, the question on this issue is merely whether the Notice Letter contained "sufficient information to allow Defendant[] to identify all pertinent aspects of its alleged violations without extensive investigation." *Cooper*, 797 F. App'x at 924 (backets omitted) (quoting *Sierra Club*, 504 F.3d at 644). Plaintiff's four-page Notice Letter meets that standard. Moreover, one of the key reasons for requiring specificity in a citizen plaintiff's pre-suit notice letter is that "such specific notice will allow the government agencies to evaluate fully and adequately the violations alleged, and thereby to determine accurately their appropriate level of involvement in the matter." *Stephens*, 667 F. Supp. 2d at 785 (quoting *Frilling v. Village of Anna*, 924 F. Supp. 821, 834 (S.D. Ohio 1996)). That purpose has not been frustrated here: TDEC was already investigating these very same alleged violations long before Plaintiff's Notice Letter, and

in fact entered into the 2012 Consent Order to address these issues not long after Plaintiff sent the Notice Letter.

Accordingly, the Court concludes that the Notice Letter provided adequate pre-suit notice of Plaintiff's Pre-Consent-Order Claims against Defendant.

However, the Notice Letter is *not* adequate with respect to Defendant Smelter Service Corp. The Notice Letter expressly provides notice of intent to assert Plaintiff's CWA and RCRA claims "against ACC, LLC" only. (Doc. No. 255-1 at 2). The Notice Letter is not addressed to Smelter Service Corp. and, indeed, never even mentions Smelter Service Corp. Accordingly, Plaintiff failed to provide pre-suit notice to Smelter Service Corp., and the Court therefore lacks subject-matter jurisdiction over Plaintiff's claims against Smelter Service Corp. (both pre- and post-Consent Order). *See Bd. of Trs. of Painesville Twp.*, 200 F.3d at 400; *Walls*, 761 F.2d at 316.

### B. Mootness

Defendant next argues that Plaintiff's claims must be dismissed because they are moot. (Doc. No. 255 at 15). The Court agrees, at least in part. Plaintiff's Pre-Consent-Order Claims are moot *to the extent they seek injunctive and declaratory relief* because they have been overtaken by the facts on the ground; the Pre-Consent-Order Claims depend on the existence of (and discharges from) a landfill that no longer exists.

"[T]he exercise of judicial power under Article III of the Constitution depends on the existence of a live case or controversy." *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (citing *Lemis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). The required "case or controversy" must be "extant at all stages of review, not merely at the time the complaint is filed." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). Mootness is thus often described as "the doctrine of standing set in a time

frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth*, 528 U.S. at 189 (quoting *Arizonans for Official English*, 520 U.S. at 68 n.22). "If 'events occur during the pendency of a litigation which render the court unable to grant the requested relief,' the case becomes moot and thus falls outside [the court's] jurisdiction." *Demis*, 558 F.3d at 512 (quoting *Abela v. Martin*, 309 F.3d 338, 343 (6th Cir. 2002)).

Plaintiff filed its complaint in 2012, when the Landfill still contained approximately 550,500 cubic yards of waste. Plaintiff's CWA and RCRA claims all essentially allege the discharge of leachate and/or sediment from the Landfill. (*See* Doc. No. 255-1 at 3 (stating that Plaintiff's CWA and RCRA claims "arise from the discharge of sediment and leachate from Associated Commodities' closed landfill"). Between 2012 and 2016, however, that waste was excavated from the Landfill and relocated to the new lined and covered Waste Relocation Area. (Doc. No. 197-4 at 29–30; Doc. No. 273 at ¶ 5; Case No. 1:18-cv-00029, Doc. No. 119 at ¶¶ 45–46). Accordingly, Plaintiff's Pre-Consent-Order Claims for injunctive and declaratory relief—predicated as they are on the Landfill's existence—are moot (and have been for approximately six years). *See, e.g.*, *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (claim for injunctive relief requiring Salt Lake City to process plaintiff's applications for permits to demonstrate during the 2002 Winter Olympics was moot because "the Olympics ha[d] come and gone"); *JOC Inc. v. ExxonMobil Oil Corp.*, 507 F. App'x 208, 209–10 (3d Cir. 2012) (claim seeking injunction to prevent the termination of a franchise was moot "[b]ecause the franchise no longer exists"); *Medina-Rodriguez v. Canóvanas Plaza Rial, Econo Rial, LLC*, Civ. No. 17-1943, 2021 WL 4485652, at *13 (plaintiff's claim for injunctive relief under the Americans

with Disabilities Act based on a certain restroom was moot "[s]ince the restroom implicated in [plaintiff's] claims no longer exists").

As noted earlier, Plaintiff does not dispute that both the waste and the soil on top of the waste were removed from the Landfill and relocated to the Waste Relocation Area as of 2016. However, Plaintiff now contends that Defendant failed *also* to remove contaminated soil from the Landfill that was *below* the waste, and that this below-waste soil is the cause of the ongoing contamination problems today. (Doc. No. 273 at ¶ 4; Doc. No. 273-2 at 4). To the extent that Plaintiff intends to proceed with claims for injunctive and declaratory relief based on alleged discharges from the soil that was below the waste in the former Landfill (but not from the waste itself, which has been relocated), that would not be a *Pre*-Consent-Order Claim. That is, such a claim necessarily could not have accrued before the 2012 Consent Order because the waste was still in the Landfill at that time. Such a claim would have to be a *Post*-Consent-Order Claim. Therefore, any claim for injunctive or declaraotry relief based on releases from soil below the waste in the former Landfill is a Post-Consent-Order Claim, over which the court lacks subject-matter jurisdiction for reasons already explained.

Accordingly, Plaintiff's Pre-Consent-Order Claims are moot to the extent they seek injunctive and declaratory relief, and so will be **DISMISSED** for lack of subject-matter jurisdiction.[32] *See Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 175 (6th Cir. 2022) ("a mootness finding deprives a court of subject-matter jurisdiction").

---

[32] The exception to the Court's mootness holding is Plaintiff's request for injunctive relief requiring Defendant to remove fill from Arrow Lake and "restore Arrow Lake to its previous condition before [Defendant's] violations commenced." (*See* Doc. No. 61 at 21). To the extent that Plaintiff seeks relief requiring remediation of Arrow Lake, such relief is not mooted by the non-existence of the Landfill. However, such relief *is* barred because the Pre-Consent-Order Claims are barred *in toto* by claim preclusion, as explained below.

*C. Civil Penalties*

Defendant contends that Plaintiff is barred from seeking civil penalties because the 2012 Consent Order already assessed civil penalties against Defendant for the same conduct for which Plaintiff seeks assessment of civil penalties. (Doc. No. 255 at 23). The Court agrees, based on the reasoning in *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 357 (8th Cir. 1998).[33]

In *Comfort Lake*, after a citizen plaintiff brought suit for NPDES permit violations, the state environmental agency entered into a Stipulation Agreement with the defendant, whereby the defendant agreed to pay approximately $12,000 in civil penalties for all past violations of the permit. *Id.* at 354. The citizen plaintiff asked the federal court to impose civil penalties of $25,000 per day for each of the defendant's CWA violations—even though in the agency's view a total of $12,000 in civil penalties was sufficient to redress the violations. *Id.* at 355.

The Eighth Circuit held that the citizen plaintiff could not "collaterally attack" the state agency's decision that civil penalties of $12,000 were appropriate for the same violations alleged

Defendant also argues that Plaintiff lacks Article III standing for two of its RCRA claims because Plaintiff was not the owner of the property adjacent to the Landfill when the Landfill was in operation. (Doc. No. 255 at 16). Defendant cites no case law in support of this argument. The Court does not see why it would be relevant to Plaintiff's interest in this case if it did not own its property at a past time, given that, by the time this action was filed, all agree that Plaintiff *did* own the property that was allegedly then being polluted by the Landfill. Accordingly, the Court rejects this standing argument and does not find that Plaintiff's past non-ownership of its current property has any impact on its Article III standing in this case.

[33] To the extent that Plaintiff's Pre-Consent-Order claims seek civil penalties, the non-existence of the Landfill does not moot them in the Article III sense. *See Comfort Lake*, 138 F.3d at 356 ("Because [plaintiff] satisfied *Gwaltney*'s on-going violation test when its complaint was filed, there remains an actual controversy over its claim for civil penalties for these violations. Rather, the issue is what effect [defendants'] settlement with [the state enforcement agency] has on that claim for civil penalties."). The Fifth Circuit, however, *has* analyzed this issue as one of mootness. *See Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) (finding citizen plaintiff's claim for civil penalties moot where government consent decree had already imposed $800,000 in civil penalties). The Court finds *Comfort Lake*'s reasoning more persuasive on this point and thus addresses this issue as one statutory interpretation, not mootness.

in the citizen suit. *Id.* at 356–57. Although the Stipulation Agreement was not a judicially approved consent decree—and thus did not pose a res judicata bar—the court held that the Stipulation Agreement was still entitled to "considerable deference" in order to achieve the CWA's "stated goal of preserving 'the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution.'" *Id.* at 357 (quoting 33 U.S.C. § 1251(b)). The court also emphasized that defendants may be "disinclined to resolve disputes by such relatively informal agreements if additional civil penalties may then be imposed in pending citizen suits, thereby depriving [state enforcement agencies] of this resource-conserving enforcement tool." *Id.* The *Comfort Lake* court thus held that, by awarding civil penalties, the administrative enforcement agreement "preclude[d] a pending citizen suit for civil penalties if the agreement is the result of a diligently prosecuted enforcement process, however informal." *Id.*

The *Comfort Lake* court was not explicit as to the legal basis for its decision. The court did, however, correctly rule out mootness. *Id.* at 356. It also ruled out claim preclusion and issue preclusion on the ground that the Stipulation Agreement was not judicially approved (unlike the 2012 Consent Order here). 138 F.3d at 357. By process of elimination, then, the decision in *Comfort Lake* appears to be best understood as simply an exercise in statutory interpretation—a judicial gloss on the citizen-suit provision, similar to what the Supreme Court did in *Gwaltney*. *See Gwaltney*, 484 U.S. at 56–62 (interpreting the CWA's citizen-suit provision not to provide a cause of action for wholly past violations). *Comfort Lake* takes *Gwaltney*'s premise that "the citizen suit is meant to supplement rather than to supplant governmental action," *id.* at 60, and from it reasons that the CWA's citizen-suit provision must implicitly bar civil penalties after the government (whether EPA or a state agency) has already obtained civil penalties with respect to the same underlying conduct through a negotiated agreement with the defendant—at least so long

as that agreement is "the result of a diligently prosecuted enforcement process, however informal." *Comfort Lake*, 138 F.3d at 357.

The Court agrees with this interpretation. Indeed, the Sixth Circuit arguably has already endorsed this aspect of *Comfort Lake*. *See Ellis*, 390 F.3d at 477 (citing *Comfort Lake* for the proposition that "private plaintiffs cannot 'collaterally attack' a state environmental agency's decision that a certain level of civil penalties suffice for the same violations alleged in the citizen suit"). Any other interpretation would seriously hamstring government agencies in their laudable efforts to settle allegations that the environmental laws have been violated—a result Congress likely would not have intended.

Here, the 2012 Consent Order imposed a $400,000 civil penalty, made contingent on Defendant's failure to meet certain deadlines set forth in the order. Plaintiff has not shown that this civil penalty—which was plainly used as a significant "stick" to incentivize compliance with the 2012 Consent Order—was not the result of a "diligently prosecuted enforcement process." All indications are that TDEC's enforcement has been diligent: Defendant completed work under the 2012 Consent Order on schedule, and TDEC continued to enforce the environmental laws against Defendant even after that, entering into the 2016 Consent Order and bringing enforcement proceedings thereunder. In *Gwaltney*, the Supreme Court warned against permitting a citizen plaintiff to seek a civil penalty in a situation like this:

> Suppose that the [EPA] Administrator identified a violator of the Act and issued a compliance order . . . . Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities.

484 US. at 60–61. Here, TDEC made Defendant's $400,000 civil penalty contingent on its timely completion of what might fairly be called an "extreme corrective action"—excavating the entire Landfill and relocating the waste to the lined Waste Relocation Area. Allowing Plaintiff to seek a more substantial civil penalty years later for claims that accrued before the 2012 Consent Order would largely undermine TDEC's discretion to strike a bargain that, in its expert judgment, best serves the public interest.

Therefore, under the rationale of *Comfort Lake* (which the Court herein adopts), Plaintiff is precluded from seeking an additional civil penalty for its Pre-Consent-Order Claims above and beyond that negotiated by TDEC in the 2012 Consent Order. Accordingly, Defendant's Motion will be granted as to Plaintiff's Pre-Consent-Order Claims to the extent that they seek civil penalties for alleged violations of CWA and RCRA, and Plaintiff's Motion will be denied.[34]

### D. Claim Preclusion

Finally, even if Plaintiff's Pre-Consent-Order Claims were not already moot to the extent they seek injunctive and declaratory relief and barred by the reasoning of *Comfort Lake* to the extent they seek civil penalties, they would still be barred *in toto* by the doctrine of claim preclusion. (*See* Doc. No. 255 at 21–25).

Under 28 U.S.C. § 1738, a federal court must "give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments

---

[34] As for the final possible form of relief—attorney's fees—Plaintiff does not contend in any of its filings that it is entitled to attorney's fees in this case if it loses the pending dispositive motions. Given the Court's disposition herein, Plaintiff is not a "prevailing or substantially prevailing party" in this action as would be required to sustain an award of attorney's fees. *See* 33 U.S.C. § 1365(d). Nor is Plaintiff entitled to attorney's fees under the so-called "catalyst" theory, even if that theory remains viable in the Sixth Circuit, *see Sierra Club*, 504 F.3d at 643, both because TDEC was in enforcement negotiations with Defendant long before Plaintiff initiated this action and because Plaintiff "actually impeded" TDEC's enforcement by litigating the State Court Action for eight years to attack the 2012 Consent Order's validity. *See Comfort Lake*, 138 F.3d at 357.

emerged." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982); *accord Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *Lumbard v. City of Ann Arbor*, 913 F.3d 585, 590 (6th Cir. 2019); *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015). This principle applies when state courts have engaged in judicial review of a state administrative determination. *Kremer*, 456 U.S. at 466–67; *id.* at 480 n.21 (1982) ("It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect."); *Hollimon v. Shelby Cnty. Gov't*, 325 F. App'x 406, 410 (6th Cir. 2009) ("Federal courts must give state-court judgments— including those affirming state administrative-agency decisions—the same preclusive effect that the state courts would give them."); *Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*, 646 F.3d 1258, 1264 (10th Cir. 2011) (finding that a Wyoming state court's affirmance of a Wyoming Environmental Quality Council order was subject to full faith and credit under § 1738); 18B Charles A. Wright et al., *Federal Practice and Procedure* § 4471.3, at 319 (3d ed. 2019) ("State law ordinarily governs preclusion if there has been state-court review [of state administrative findings and orders], just as if the state court had rendered judgment after an original judicial proceeding.").[35] Accordingly, this Court looks to determine the preclusive effect, under Tennessee law, of the Tennessee courts' affirmance of the Board's adoption of the 2012 Consent Order.

---

[35] It is an open question in the Sixth Circuit whether *unreviewed* state administrative decisions have claim-preclusive effect. *See Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 552 n.9 (6th Cir. 2012) (noting circuit split on this issue and declining to take a position); *Stolmayer v. McCarthy*, 673 F. App'x 467, 469 (6th Cir. 2016) (same); *see also P.I. & I. Motor Express, Inc. v. RLI Ins. Co.*, 40 F.4th 398, 412 (6th Cir. 2022) (assuming that preclusion rules applied to unreviewed state agency judgment where parties did not dispute the issue). That issue is not implicated in this case, however, because the Tennessee state courts reviewed the 2012 Consent Order.

Under Tennessee law, claim preclusion[36] bars "a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or *could have been* litigated in the former suit." *Hooker v. Haslam*, 393 S.W.3d 156, 165 n.6 (Tenn. 2012) (emphasis in original) (quoting *Young v. Barrow*, 130 S.W.3d 59, 64 (Tenn. Ct. App. 2003)). The party asserting claim preclusion must demonstrate the following elements: "(1) a court of competent jurisdiction rendered a prior judgment; (2) the prior judgment was final and on the merits; (3) both proceedings involved the same parties or their privies; and (4) both proceedings involved the same cause of action." *Id.*

The "primary purposes" of claim preclusion are "to promote finality in litigation, prevent inconsistent or contradictory judgments, conserve legal resources, and protect litigants from the cost and vexation of multiple lawsuits." *Id.* Claim preclusion "is not based upon any presumption that the final judgment was right or just. Rather, it is justifiable on the broad grounds of public policy which requires an eventual end to litigation." *Moulton v. Ford Motor Co.*, 533 S.W.2d 295, 296 (Tenn. 1976). The Court will consider each of the elements of claim preclusion in turn.

### 1. A court of competent jurisdiction rendered a prior judgment.

On the first element, Plaintiff argues that "the 'underlying judgment' that started the State Court Action was rendered by the Board," and that the Board is not a "court of competent

---

[36] Claim preclusion is sometimes also known less precisely as "res judicata." *See Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012) (referring to "[t]he doctrine of res judicata or claim preclusion"); *see also Brownback v. King*, 141 S. Ct. 740, 747 n.3 (2021) ("The terms res judicata and claim preclusion often are used interchangeably."). This terminology is somewhat confusing, however, because historically the term "res judicata" could also be used to refer collectively to *both* claim preclusion and issue preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"). Because claim preclusion and issue preclusion are today recognized as "two distinct doctrines," *see Lucky Brand Dungarees*, 140 S. Ct. at 1594, the Court will use the more precise terminology of claim preclusion and issue preclusion herein. *See White v. Bradley Cnty. Gov't*, 639 S.W.3d 568, 581 (Tenn. Ct. App. 2021) (noting that, although claim preclusion and issue preclusion "necessarily overlap in many instances, they are not the same").

jurisdiction." (Doc. No. 252 at 11). This argument fails because, as explained, this Court looks to the Tennessee state courts' judgment affirming the Board's order, not simply the Board's order itself. *See Hollimon*, 325 F. App'x at 410.

Plaintiff does not contest that the Tennessee state courts were "courts of competent jurisdiction." And, indeed, any such argument would fail. "A court of competent jurisdiction is a court with the power to adjudicate the case before it." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017) (citing *Black's Law Dictionary* 431 (10th ed. 2014)). That means "a court with a grant of subject-matter jurisdiction covering the case before it." *Id.* at 560–61. That is how Tennessee courts have understood and applied the first element of the claim preclusion test. *See, e.g.*, *Recipient of Final Expunction Order in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 172 (Tenn. 2022) (looking to provisions establishing the prior court's subject-matter jurisdiction on the first element); *Bank of New York Mellon v. Berry*, No. W2017-01213-COA-R3-CV, 2018 WL 930967, at *4 (Tenn. Ct. App. Feb. 15, 2018) (same).

Here, the Tennessee state courts clearly had subject-matter jurisdiction to review the Board's final order in a contested case pursuant to Tenn. Code Ann. § 4-5-322. Accordingly, the first element of claim preclusion—*i.e.*, that the judgment in the State Court Action was rendered by a "court of competent jurisdiction"—is established.

2. The prior judgment was final and on the merits.

The State Court Action clearly resulted in a judgment that was both "final" and "on the merits." The judgment was final because it "resolve[d] all the issues in the case, 'leaving nothing else for the trial court to do.'" *See Hooker*, 393 S.W.3d at 165 n.6 (quoting *In re Estate of Ridley*, 270 S.W.3d 37, 40 (Tenn. 2008)). Plaintiff appealed the Chancery Court's judgment to the Tennessee Court of Appeals (twice) and the Tennessee Supreme Court (which issued one opinion

and then denied permission to appeal a second time). In addition, the U.S. Supreme Court denied certiorari. Plaintiff acknowledged the finality of the judgment when, in its motion to lift the stay, it stated that "the Chancery Court proceeding has been finally adjudicated and [Plaintiff] has exhausted its appeal of the state court's decisions with respect to the Solid Waste Board Order." (Doc. No. 236 at 12).

Under Tennessee law, a judgment is "on the merits" unless it was rendered on procedural or technical grounds (such as lack of jurisdiction, lack of venue, or lack of an indispensable party). *Creech v. Addington*, 281 S.W.3d 363, 378 (Tenn. 2009). Here, the State Court Action resulted in a final judgment affirming the Board's decision to adopt the 2012 Consent Order. The judgment was not rendered on any technical basis such as jurisdiction, venue, or lack of an indispensable party. Accordingly, it was "on the merits."

For purposes of claim preclusion, it does not matter whether the government enforcement action or the citizen plaintiff's suit was *commenced* first. What matters is simply whether there was a *prior final judgment* in the government's enforcement action by the time the court rules on the citizen suit. "Even when an agency enforcement action is not commenced until after the citizen suit, final judgment in the agency's court action will be a res judicata or collateral estoppel bar to the earlier citizen suit." *Comfort Lake*, 138 F.3d at 356 (citing *City of Green Forest*, 921 F.2d at 1402–05); *DP Marina*, 41 F. Supp. 3d at 693 (same). Because there is a prior final judgment on the merits in the State Court Action, it is immaterial for purposes of claim preclusion which action was commenced first.

### 3. Both proceedings involved the same parties.

The third element is met because this case involves the same parties as the State Court Action. Plaintiff intervened in the State Court Action in 2011. (*See* Doc. No. 248-1). At the August

2012 hearing before the Board, Plaintiff (represented by counsel) participated in the hearing, presented and questioned witnesses, and made closing arguments to the Board. *StarLink*, 494 S.W.3d at 663–67. Plaintiff thereafter filed a petition for judicial review in the Davidson County Chancery Court (Doc. No. 248-3), and Plaintiff litigated the resulting case, captioned *StarLink Logistics Inc. v. ACC, LLC*, through the Davidson County Chancery Court, the Tennessee Court of Appeals (twice), the Tennessee Supreme Court, and the U.S. Supreme Court. *See StarLink Logistics, Inc. v. ACC, LLC*, No. 12-1435-II, 2014 WL 7001397 (Tenn. Ch. Jan. 29, 2014); *StarLink Logistics, Inc. v. ACC, LLC*, No. M2014–00362–COA–R3–CV, 2015 WL 1186311 (Tenn. Ct. App. Mar. 11, 2015); *StarLink Logistics, Inc. v. ACC, LLC*, 494 S.W.3d 659 (Tenn. 2016); *StarLink Logistics, Inc. v. ACC, LLC*, No. M2014–00362–COA–R3–CV, 2018 WL 637941 (Tenn. Ct. App. Jan. 31, 2018); Petition for Writ of Certiorari, *StarLink Logistics, Inc. v. ACC, LLC*, No. 18-593 (Nov. 2, 2018).

Plaintiff's only response on this factor is to argue that the State of Tennessee was a party to the State Court Action but is not a party here. (Doc. No. 252 at 11). Plaintiff does not explain why this should make a difference, and cites no case law in support of the notion that this element requires that *all* parties in the prior case be parties in the subsequent case potentially subject to claim preclusion. And indeed, this notion is flatly incorrect: the second element of claim preclusion does not require that the prior suit and the current suit involve *all* of the same parties; rather it merely requires that both suits involve the party to be precluded and the party asserting preclusion. *See Creech*, 281 S.W.3d at 376–77 (looking solely to whether the parties to be precluded and the parties asserting preclusion "were both a part of the original proceeding," and finding this element

satisfied without noting that the original proceeding also included numerous other defendants).[37]

It would make little sense—and would severely undermine claim preclusion's role as a "rule of rest" meant to bring an "eventual end to litigation," *Moulton*, 533 S.W.2d at 296—if a party could relitigate the same cause of action merely by dropping one of the defendants from the prior case (as Plaintiff's proposed rule would allow).

Because both Plaintiff and Defendant were actually parties to the State Court Action, it is unnecessary to consider whether the second element can be established via "privity" as well. *See Ellis*, 390 F.3d at 474 (holding that the fact that the citizen plaintiffs intervened in (and were thus actually parties to) the government enforcement action "mak[es] privity irrelevant"). However, the Court concludes that the third element is alternatively established because Plaintiff, as a citizen plaintiff, is in privity with the State of Tennessee.

In the context of claim preclusion, "the concept of privity relates to the subject matter of the litigation, not to the relationship between the parties themselves. Privity connotes an identity of interest, that is, a mutual or successive interest to the same rights." *State ex rel. Chilar v. Crawford*, 39 S.W.3d 172, 180 (Tenn. Ct. App. 2000) (internal citations omitted); *accord Recipient of Final Expunction Order*, 645 S.W.3d at 172–73 ("The test for privity is whether the parties to the second suit stand in the same relationship to the subject matter of the initial claim."); *Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102, 115 n.11 (Tenn. 2016); *Phillips v. Gen. Motors Corp.*, 669 S.W.2d 665, 669 (Tenn. Ct. App. 1984) ("The Tennessee rule holds that privity as used in the

---

[37] *See also Alemarah v. Gen. Motors, LLC*, 980 F.3d 1083, 1086 (6th Cir. 2020) ("the relevant inquiry 'is whether the plaintiff and defendant in the precluded action were opposing parties in the first action; the presence of additional parties does not affect the analysis'" (applying Michigan law) (brackets omitted) (quoting *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 416 (6th Cir. 2016))); 18A Charles A. Wright et al., *Federal Practice and Procedure* § 4449, at 323–24 (3d ed. 2017) ("The bare fact that other parties were involved in the prior action and are not involved in the later action does not oust preclusion as to parties participating in both actions.").

context of *res judicata* does not embrace relationships between persons or entities, but rather to the subject matter of the litigation.").

Here, TDEC and Plaintiff (as a citizen plaintiff) have an "identity of interest"—they are each seeking to enforce laws regulating water quality and waste disposal on behalf of the public. The only difference is that Plaintiff seeks to act as a "private attorney general," whereas TDEC speaks on behalf of the actual Attorney General and Reporter of the state of Tennessee. For this reason, courts have found the privity prong of claim preclusion to be established under a *parens patriae* theory in citizen-suit cases.

In *U.S. EPA v. City of Green Forest, Ark.*, 921 F.3d 1394 (8th Cir. 1990), the court considered "whether citizens' claims brought prior to a government action are properly dismissed when a consent decree is entered in a later-filed EPA action." *Id.* at 1403. Recognizing the "preeminent role that government actions must play in the CWA enforcement scheme," the court held that such citizen suits are indeed barred by claim preclusion after a government consent decree. *Id.* The court found the privity element satisfied because of the *parens patriae* character of a CWA governmental enforcement action. "In a proper *parens patriae* suit, the state or federal government is deemed to represent all of its citizens." *Id.* at 1404 (quoting *United States v. Olin Corp.*, 606 F. Supp. 1301, 1305 (N.D. Ala. 1985)). "[O]nce a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding upon their rights." *Id.* (quoting *Olin Corp.*, 606 F. Supp. at 1304); *accord DP Marina*, 41 F. Supp. 3d at 689 (because a citizen plaintiff acts "in order to vindicate the rights of society as a whole, rather than to vindicate his own private rights," for the purposes of claim preclusion "the government is necessarily in privity with those plaintiffs bringing [a] citizens' suit"). Therefore, the Court concludes that the second element of claim preclusion is

alternatively established because Plaintiff, as a citizen plaintiff, is in privity with the State of Tennessee acting in its *parens patriae* capacity.

4. <u>Both proceedings involved the same cause of action</u>**.**

The final element is whether both proceedings involve the same "cause of action." The Tennessee Supreme Court "has adopted the 'transactional' test espoused by the Restatement (Second) of Judgments for determining whether two proceedings [involve] the 'same cause of action' for purposes of [this final element of] res judicata." *Hooker*, 393 S.W.3d at 165 n.6 (Tenn. 2012) (citing *Creech*, 281 S.W.3d at 380). Under this "transactional" test, "[t]wo suits . . . shall be deemed the same 'cause of action' for purposes of res judicata where they arise out of the same transaction or a series of connected transactions." *Creech*, 281 S.W.3d at 381. This test uses the term "transaction" not in the narrow sense of a business deal, but rather in "the broad sense" to "connote[] a natural grouping or common nucleus of operative facts." *Id.* at 380 (quoting *Restatement (Second) of Judgments* § 24 cmt. b).[38]

---

[38] Tennessee cases commonly state that claim preclusion bars a second suit between the same parties or their privies on claims that "were, *or could have been*, litigated in the former suit." *E.g.*, *Elvis Presley Enters., Inc. v. City of Memphis*, 620 S.W.3d 318, 323–24 (Tenn. 2021) (emphasis added) (quoting *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012)); *see also Hooker*, 393 S.W.3d at n.6 (citing *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987), for the proposition that claim preclusion "bars not only claims that have been litigated but also claims that 'could have been litigated in the former suit'"). This phrasing makes clear that claim preclusion applies not only with respect to claims that were *actually* raised in the prior litigation, but to all those that *could have been* raised as well.

Sometimes, however, Tennessee cases phrase the final element of the claim preclusion test as whether "the same claim or cause of action *was asserted* in both suits." *Id.* (emphasis added) (quoting *Jackson*, 387 S.W.3d at 491). This phrasing is somewhat confusing, as it could be understood to require that the particular legal claim at issue have *actually* been raised. However, in light of the fact that Tennessee has adopted the "transactional" test under which the "same cause of action" element is satisfied whenever the two cases involve the same "natural grouping or common nucleus of operative facts," it is clear that this element cannot really require that the particular legal claim have been actually asserted in the prior proceeding. Rather, it is sufficient if it "could have been" litigated in the former suit. *See Elvis Presely Enters.*, 620 S.W.3d at 324; *see also Gerber v. Holcomb*, 219 S.W.3d 914, 918 (Tenn. Ct. App. 2006) ("The doctrine of res judicata only requires that there be 'a full and fair *opportunity* to litigate all issues arising out of' the claim, however, every applicable issue need not be actually litigated in order for res judicata to apply." (internal citation omitted)).

Here, this case and the State Court Action involve the same "cause of action" because Plaintiff's CWA and RCRA claims arise from the same "natural grouping or common nucleus of operative facts" as the State Court Action—namely, the fact that the Landfill was discharging leachate and sediment into navigable Waters of the United States. Plaintiff's CWA claims allege that Defendant discharged both pollutants and fill material from the Landfill without the proper permits. Plaintiff's RCRA claims allege that Defendant's failure to obtain those same permits, plus Defendant's failure to properly operate and close the landfill, have likewise resulted in the discharge of pollutants and fill material. Similarly, the State Court Action reviewed and affirmed the 2012 Consent Order, which was intended to remediate the discharge of pollution from the Landfill. Under the "broad sense" of the term "transaction" contemplated by the Restatement definition that Tennessee has adopted, Plaintiff's CWA and RCRA claims are part of the same transaction out of which the State Court Action arose, and thus involve the same "cause of action" for purposes of the final element.

In analyzing this element of claim preclusion, the Court "focus[es] on facts, not legal theories, to determine whether an action is precluded." *See Froebel v. Meyer*, 217 F.3d 928, 934 (7th Cir. 2000) (applying Wisconsin law, which has also adopted the Restatement (Second) test). The Court does not look to whether the *legal theories* asserted in the State Court Action are identical to those that Plaintiff asserts now. In *Froebel*, for example, the State of Wisconsin removed a dam on a river, resulting in damaging downstream silt deposits. *Id.* at 931. A citizen plaintiff intervened in a contested case hearing under state administrative law and sought to require the Wisconsin Department of Natural Resources to remediate the damage to the river. *Id.* at 931–32. The citizen plaintiff lost before the state agency and the state courts, resulting in a final state-court judgment against the citizen plaintiff. *Id.* The citizen plaintiff next turned to the federal courts

through a CWA citizen suit, alleging that the state agency had violated the CWA by discharging silt into the river without a permit. *Id.* at 932. The Seventh Circuit held that the citizen plaintiff's CWA action was barred by claim preclusion based on the judgment in his prior state-court action. *Id.* at 933. With respect to the "same cause of action" element, the Seventh Circuit found the transactional test satisfied because the citizen plaintiff was "complaining about the procedures employed in the 1992 removal of [the dam], just as he did before the Wisconsin ALJ and courts." *Id.* at 934. It was irrelevant that the citizen plaintiff had asserted legal theories under state administrative law before the state courts and (by contrast) under the CWA in federal court.

So too here. For purposes of this element, it does not matter that the specific legal theories asserted in the State Court Action were under Tennessee laws, whereas the specific legal theories in this action are under federal laws (the CWA and RCRA). The salient question is simply whether the "cause of action" extinguished in the State Court Action encompassed the same "transaction"—that is, the same "natural grouping or common nucleus of operative facts"—as that from which Plaintiff's present claims arise. The basic facts at issue in the State Court Action were the same as those that form the basis for Plaintiff's CWA and RCRA claims, and so this element is satisfied. *See DP Marina*, 41 F. Supp. 3d at 690 (finding that claim preclusion applied where the facts underlying the citizen plaintiff's CWA claim "share[d] an identity" and "overlapped" with the facts underlying a government consent decree).[39]

---

[39] Tennessee follows the "full relief" requirement, under which claim preclusion does not apply if "the initial forum *did not have the power* to award the full measure of relief sought in the later litigation." *Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998) (emphasis added); *see West v. Parker*, 783 F. App'x 506, 512 (6th Cir. 2019); *Church v. Brown*, 470 S.W.3d 42, 46 (Tenn. Ct. App. 2015); *Restatement (Second) of Judgments* § 26(1)(c) cmt. c (1982). Here, although Plaintiff does not raise this issue, the Court finds that claim preclusion can be applied consistent with the full-relief requirement because there is no indication that the Tennessee state courts lacked the power to award Plaintiff the full relief he seeks here. In this action, Plaintiff seeks a declaration that Defendant has violated the CWA and RCRA; civil penalties against Defendant for those violations; and injunctive relief requiring Defendant to remedy those violations. (Doc.

5. Claim preclusion and _Burford_ abstention.

As a coda, the Court notes that it should hardly come as a surprise that claim preclusion applies here, given that the Court previously abstained under the _Burford_ doctrine. "Abstention" generally refers to a federal court's "_withholding_ of authorized equitable relief because of undue interference with state proceedings." _NOPSI_, 491 U.S. at 359 (emphasis added). When _Burford_ abstention applies, the federal court "_decline[s] to interfere_ with the proceedings or orders of state administrative agencies." _Id._ at 361 (emphasis added). As implied by the phrases "withholding . . . relief" and "declin[ing] to interfere," _Burford_ abstention (when it occurs) does not entail the federal court giving the state court the first crack at it, and then following behind to check the state court's work. Instead, the idea is that when the federal court abstains, the state courts will decide the case—period. _See, e.g._, _William Powell Co. v. Nat'l Indem. Co.,_ 18 F.4th 856, 864 (6th Cir. 2021)

No. 61 at 20–21). As noted earlier, damages of any form are not available for Plaintiff's claims under the CWA or RCRA. The State Court Action was brought under Tennessee's Uniform Administrative Procedures Act, under which, "[t]he court may reverse or modify the decision [of the agency] if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are . . . [i]n violation of constitutional or statutory provisions." Tenn. Code Ann. § 4-5-322(h)(1). Thus, if the Tennessee state courts had determined that the CWA and/or RCRA warranted declaratory or coercive relief or civil penalties different from those in the 2012 Consent Order, they had the power to "reverse or modify" the Board's decision to adopt the 2012 Consent Order as appropriate to comply with the CWA and RCRA. _See Froebel_, 217 F.3d at 934–37 (applying claim preclusion where the state courts had the authority under state administrative law to "modify the ALJ's decision" and "fashion appropriate relief" to the extent that the agency's action violated the federal CWA). Even if the Tennessee state courts lacked the power to issue an injunction in the course of judicially reviewing the Board's approval of the 2012 Consent Order, the full relief requirement is still met because they certainly could have issued declaratory relief that could subsequently be enforced via injunction. _See West_, 783 F. App'x at 513.

It is true that the Tennessee Court of Appeals apparently concluded that the Tennessee WQCA authorized the 2012 Consent Order, irrespective of the federal CWA. _See StarLink_, 2018 WL 637941, at *6. But for purposes of the full relief requirement, the question is not whether the Tennessee state courts _correctly_ applied federal law in reaching that decision. That would run counter to Tennessee's express policy that claim preclusion "is not based upon any presumption that the final judgment was right or just." _Moulton_, 533 S.W.2d at 296. The question is only whether the state courts _had the power_ to award the full measure of relief sought here—that is, whether they had the power to reverse or modify the 2012 Consent Order based on its possibly not complying with the CWA and RCRA. The Tennessee state courts had that power (whether or not they correctly exercised it or correctly declined to exercise it) and so the full relief requirement is satisfied.

(when *Burford* abstention applies, the federal court "should decline to decide the case"); 17A Charles A. Wright et al., *Federal Practice and Procedure* § 4245, at 411–12 (3d ed. 2007) ("Burford-type abstention . . . is premised on a belief that in particular areas of the law any intervention by the federal court would have an impermissibly disruptive effect on state policies."). "Ultimately, what is at stake [in *Burford* abstention] is a federal court's decision . . . that the State's interests are paramount and that *a dispute would best be adjudicated in a state forum*." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (emphasis added; internal citation omitted).[40]

A natural consequence of deferring to state court proceedings is that *res judicata*—whether claim preclusion or issue preclusion, or both—may well apply in federal court once the state proceedings are concluded. *See Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 425 (6th Cir. 2007) (recognizing that, after a stay based on *Burford* abstention, "[i]f the state court rules on all aspects of plaintiffs' state court appeal, their federal claims will likely be precluded by the doctrine of res judicata because their pending state claims . . . are essentially identical to the claims in the federal lawsuit"); *Feige v. Sechrest*, 90 F.3d 846, 851 (3d Cir. 1996) ("The entry of

---

[40] Because the federal court defers to adjudication of the claims in a state forum, a federal court abstaining under *Burford* may sometimes dismiss the plaintiff's action altogether. *See* 17A Charles A. Wright et al., *Federal Practice and Procedure* § 4245, at 412 (3d ed. 2007). However, outright dismissal is permissible only in cases where the district court already had preexisting discretion to deny relief entirely—that is, discretion derived from something other than the *Burford* doctrine—as in cases seeking only equitable relief. *See Quackenbush*, 517 U.S. at 731 ("federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary"); *Gray v. Bush*, 628 F.3d 779, 784 (6th Cir. 2010) ("In some areas, district courts already have discretion to dismiss a case, as in equity cases, or declaratory judgment actions, permitting them to dismiss a case under *Burford* because the courts already may deny relief altogether[.]" (internal citations omitted)). Here, Plaintiff's CWA and RCRA claims could have been dismissed outright under *Burford*, rather than stayed, to the extent that they seek equitable and declaratory relief (although not to the extent that they seek civil penalties). *But see Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 425 (6th Cir. 2007) (the district court was required to stay the action after abstaining under *Burford*, rather than dismissing it, because "[i]f the state court should dispose of [plaintiffs'] federal claims on grounds that do not reach the merits, plaintiffs' federal action would still be pending" and so would not be subject to statute of limitations defenses).

a stay [under *Burford*] rather than a dismissal prevents those claims from becoming time-barred should jurisdiction be somehow lacking in the [state court], and the preclusion doctrines of res judicata and collateral estoppel will prevent their re-litigation in the more likely event that court proceeds to judgment."); Richard H. Fallon, Jr., et al., *Hart and Wechsler's The Federal Courts and the Federal System* 1123 (7th ed. 2015) ("[I]n Burford abstention, the federal court defers to the state court on federal as well as state issues, and unless the Supreme Court reviews the case, res judicata would preclude federal litigation of the federal issues."); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10 (1983) (observing in the similar context of *Colorado River* abstention that "a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata"). That claim preclusion should apply after the federal court defers to state proceedings is not an anomaly, but rather is part and parcel of the deference to state courts that lies at the heart of the *Burford* doctrine. *See Baltimore Bank for Coops. v. Farmers Cheese Co-op.*, 583 F.2d 104, 108 (3d Cir. 1978) ("In a *Burford*-type administrative abstention, the federal courts defer completely to the state courts so that: 'administrative abstention does not merely postpone original federal jurisdiction, but actually displaces it, removing entirely from the original federal jurisdiction cases that fall within federal jurisdictional grants; a state court will dispose of all the issues in the case, subject to possible Supreme Court review, and whether or not such review is granted, res judicata will bar a party from having the federal district court decide the issue anew.'" (quoting M. Field, *Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine*, 122 U. Pa. L. Rev. 1071, 1153–54 (1974))).

In truth, then, this Court's decision nearly ten years ago to abstain under *Burford* was tantamount to a decision to dismiss this action and leave matters to the Tennessee state courts. Out

of an abundance of caution, the Court may have formally stayed the action rather than dismissing it at the time. But the Sixth Circuit has recognized that this procedure—while often desirable to safeguard the plaintiff from a statute-of-limitations defense should the state court fail to reach the merits—more likely will leave the federal court with "nothing . . . to do but clear the case number off of its docket once the state proceedings conclude." *Adrian Energy*, 481 F.3d at 425 (quoting *Carroll v. City of Mount Clemens*, 139 F.3d 1072, 1075–76 (6th Cir. 1998)). Such is the case here.

If Plaintiff wished to preserve a federal forum for the adjudication of its claim, it could have immediately appealed the Court's abstention order ten years ago. *See Moses H. Cone*, 460 U.S. at 10–13. In *Moses H. Cone*, the Supreme Court held that abstention stay orders are immediately appealable precisely because such orders "would be entirely unreviewable if not appealed" immediately: "Once the state court decide[s] the issue [in question], the federal court would be bound to honor that determination as res judicata." *Id.* at 12. But Plaintiff did not appeal this Court's *Burford* stay order ten years ago. It chose to litigate the State Court Action for years to final judgment. The consequence of that decision is that claim preclusion now applies in this case.

Moreover, to the extent that Plaintiff's fundamental concern is that the Tennessee state courts failed properly to address its claims of federal right, the law accounts for that concern (albeit perhaps not in the manner and to the extent that Plaintiff might now wish) by affording Plaintiff the option to seek review in the U.S. Supreme Court. *See* Wright, *supra*, § 4245, at 415–16 ("If the state court to which deference is . . . shown [under *Burford* abstention] prejudices any federal rights of the parties, this can be redressed by review of the state decision in the United States Supreme Court."). Plaintiff filed a petition for writ of certiorari in the U.S. Supreme Court asserting that the Tennessee courts ignored the federal CWA, and that petition was denied. Plaintiff thus

availed itself of at least one option for seeking further federal review that exists after a federal court abstains under *Burford*—the one contemplated by the Madisonian Compromise[41]—though it did not avail itself of its other option to immediately appeal the *Burford* stay order.

Accordingly, Plaintiff's Pre-Consent-Order Claims are barred by the doctrine of claim preclusion.[42] Because the Court is precluded from reaching the merits of Plaintiff's Pre-Consent-Order Claims and lacks subject matter jurisdiction over Plaintiff's Post-Consent-Order Claims, the Court is unable to provide Plaintiff with any measure of relief.[43]

---

[41] Under the Madisonian Compromise, the Framers "established only a Supreme Court, and made the creation of lower federal courts optional with the Congress—even though it was obvious that the Supreme Court alone could not hear all federal cases throughout the United States." *Printz v. United States*, 521 U.S. 898, 907 (1997). One implication is that the Constitution contemplates that sometimes, as here, claims of federal right will be heard in state court with the only available review by a federal court being in the U.S. Supreme Court, which may well decline to grant *certiorari* in the case.

[42] Defendant also argues that the Pre-Consent-Order Claims are barred by issue preclusion. (Doc. No. 248 at 13–15). The precise issue Plaintiff seeks to have decided here—whether *federal* law, as opposed to the Tennessee state environmental laws, required Defendant to obtain certain permits for its pre-consent-order discharges—was expressly *not* decided in the State Court Action. To the contrary, the Tennessee Court of Appeals went to great lengths to make clear it was not deciding that issue. *See StarLink Logistics, Inc. v. ACC, LLC*, 2018 WL 637941, at *6 (Tenn. Ct. App. Jan. 31, 2018). Issue preclusion, therefore, does not apply. *See Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009) (issue preclusion requires "that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding").

 Defendant's briefing also includes an argument which, although labeled "collateral estoppel," does not actually appear to assert issue preclusion but instead appears to contend that Plaintiff's citizen-suit claims are (impermissibly) "collaterally attacking" TDEC's permitting decisions. (Doc. No. 255 at 18–21). The Court has attempted to parse this argument but finds it largely unintelligible. As best the Court can tell, this argument is based on *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, 175 F. Supp. 2d 1071, 1078 (E.D. Tenn. 2001), in which the court reasoned that a Clean Air Act suit challenging actions that were indisputably authorized by the relevant Clean Air Act permit failed because it amounted to a "collateral attack on a facially valid permit issued by the state enforcement agency." So interpreted, Defendant's argument fails because Defendant does not adequately explain how any action that Plaintiff is challenging is authorized by a TDEC permit such that Plaintiff's claims would amount to a "collateral attack" on such permit.

[43] Defendant also contends that the Court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine. (Doc. No. 248 at 18). Defendant is wrong on this point. The *Rooker-Feldman* doctrine "generally provides that lower federal courts may not engage in appellate review of state-court decisions." *Isaacs v. DBI-ASG Coinvestor Fund, III, LLC (In re Issacs)*, 895 F.3d 904, 912 (6th Cir. 2018). *Rooker-Feldman* applies only when the source of the plaintiff's injury (as alleged in the plaintiff's federal complaint) is the state-court judgment. "'If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury

CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant ACC, LLC's Motion for Summary Judgment (Doc. No. 254). Specifically, the Court will **GRANT** the Motion with respect to Plaintiff's Pre-Consent-Order Claims to the extent that they seek civil penalties. The Court will **DENY** the Motion in all other respects.

The Court will **DISMISS** the remainder of Plaintiffs' claims against Defendant ACC, LLC—including the Pre-Consent-Order Claims to the extent they seek injunctive and declaratory relief, and the Post-Consent-Order claims with respect to all forms of relief sought—for lack of subject-matter jurisdiction.[44]

The Court will also **DISMISS** Plaintiff's claims in their entirety for lack of subject-matter jurisdiction to the extent that they are asserted against Smelter Service Corp.

The Court will accordingly **DENY** Plaintiff's Motion for Summary Judgment (Doc. No. 257) and also **DENY AS MOOT** Defendant's Motion for Judgment on the Pleadings (Doc. No. 247).

---

then the plaintiff asserts an independent claim' that is not subject to the *Rooker-Feldman* bar." *Id.* (ellipses omitted) (quoting *Berry v. Schmitt*, 688 F.3d 290, 299 (6th Cir. 2012)). Here, the source of Plaintiff's alleged injury is pollution from the Landfill, not the judgment in the State Court Action, meaning this case falls outside the scope of *Rooker-Feldman*'s "narrow doctrine." *See id.* at 915 (quoting *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (per curiam)).

    Given the Court's disposition of all the other issues described above, it is unnecessary to reach Defendant's additional argument that Plaintiff's CWA and RCRA claims are barred by the general five-year statute of limitations in 28 U.S.C. § 2462. (*See* Doc. No. 255 at 11–13).

[44] To be clear, the Court will dismiss the bulk of Plaintiff's claims for lack of subject-matter jurisdiction *sua sponte*, as it has the power and the duty to do. *See Henderson*, 562 U.S. at 434 ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."). The Court notes that Defendant, in its summary-judgment briefing, alluded in places to arguments that dismissal for lack of subject-matter jurisdiction would be appropriate. But the Court declines to characterize a dismissal for lack of subject-matter jurisdiction as a grant of summary judgment. More to the point, the analysis herein is largely the Court's own rather than the analysis set forth by Defendant in its brief in support of summary judgment. Accordingly, the dismissal (for lack of subject-matter jurisdiction) is properly deemed *sua sponte* and not properly part of a grant of summary judgment.

An appropriate order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE